1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

10  EDWIN GREGORY,                        )   1:98-cv-06521 LJO MJS HC
                                          )
11            Petitioner,                 )   FINDINGS AND RECOMMENDATION
                                          )   REGARDING PETITION FOR WRIT OF
12       v.                               )   HABEAS CORPUS
                                          )
13  FRANK X. CHAVEZ, Warden,              )
                                          )
14            Respondent.                 )
                                          )
15  _____ )

16
17
18
19
20
21
22
23
24
25
26
27
28

U.S. District Court
E. D. California

I.    FACTUAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . -5-
      A.    Procedural Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
      B.    Statement of Facts Regarding the Offense, Guilty Plea, and Insanity Trial   -6-
      C.    Petitioner's Post-Conviction Filings . . . . . . . . . . . . . . . . . . . . . . . . . . -19-
            1.    Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-
            2.    First Round of State Habeas Review . . . . . . . . . . . . . . . . . . -19-
            3.    Federal Habeas Review Initiated . . . . . . . . . . . . . . . . . . . . . . -20-
            4.    Further State Habeas Petitions . . . . . . . . . . . . . . . . . . . . . . . -21-
            5.    Second Round of State Habeas Review . . . . . . . . . . . . . . . . -22-
            6.    Third Round of State Habeas Review . . . . . . . . . . . . . . . . . . -24-
            7.    Fourth Round of State Habeas Review . . . . . . . . . . . . . . . . . -24-
            8.    Petitioner's Federal Habeas Petition Pursued . . . . . . . . . . . . . -25-

II.   JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-

III.  LEGAL STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-
      A.    Contrary to or an Unreasonable Application of Federal Law . . . . . . . . . . -27-
      B.    Review of State Decisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-
      C.    Prejudicial Impact of Constitutional Error . . . . . . . . . . . . . . . . . . . . . . -29-

IV.   REVIEW OF PETITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-
      A.    Ground One - Absence From Pretrial Conference . . . . . . . . . . . . . . . . -29-
            1.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -30-
            2.    State Review of the Claim . . . . . . . . . . . . . . . . . . . . . . . . . . -31-
            3.    Right To Be Present . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -31-
            4.    Analysis of Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -33-
      B.    Ground Two - Voluntariness of Petitioner's No Contest Plea . . . . . . . . . -35-
            1.    Asserted Invalidity of Petitioner's Plea Based on Petitioner's Lack of
                  Understanding of the Terms and Consequences of the Plea due to the
                  Combined Effects of his Medical Illness and Medications . . . . . . . -35-
                  a.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . -36-
                        (1)    Summary of Events Leading to No Contest Plea   . . . -36-
                        (2)    Petitioner and Petitioner's Family's Observations . . . . -36-
                        (3)    Defense Counsel's Observations . . . . . . . . . . . . . . . -38-
                        (4)    Medical Expert's Observations . . . . . . . . . . . . . . . . -38-
                  b.    State Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-
                  c.    Voluntariness of Plea . . . . . . . . . . . . . . . . . . . . . . . . . -41-
                  d.    Competence to Stand Trial, Plead Guilty, and Represent Oneself
                        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -43-
                  e.    Analysis of Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . -44-
            2.    Asserted Invalidity of Petitioner's Plea Based on Trial Counsel's Failure
                  to Advise Petitioner of the Lesser Included Offense of Involuntary
                  Manslaughter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -53-
                  a.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . -53-
                  b.    State Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -55-
                  c.    Lack of Advice During Plea Proceeding . . . . . . . . . . . . . . -57-
                  d.    Analysis of Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . -60-
            3.    Asserted Invalidity of Petitioner's Plea Based on Trial Counsel's Failure
                  to Advise Petitioner that an Insanity Defense was not Likely to Succeed
                  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -63-
                  a.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . -63-
                  b.    State Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -64-
                  c.    Right to Be Advised of the Consequences of a Plea . . . . . . -66-
                  d.    Analysis of Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . -66-
      C.    Ground Three - Ineffective Assistance of Counsel; Failure to Provide

        Exculpatory Evidence to Expert Witnesses and Jury . . . . . . . . . . . . . . . . -68-
        1.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -69-
              a.    Statements of Delusions Made to Family Members . . . . . . -69-
              b.    Petitioners Handwritten Notes . . . . . . . . . . . . . . . . . . . . . . -70-
              c.    Evidence that the Business Meeting was Positive . . . . . . . . -70-
              d.    Evidence from Law Enforcement Officers . . . . . . . . . . . . . -70-
              e.    Evidence that Jail Nurse Ybarra Overstated His Observations of
                    Petitioner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -71-
              f.    Evidence Allegedly Not Provided to Professor Morse . . . . . -72-
        2.    State Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -76-
        3.    Ineffective Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . -78-
        4.    Analysis of Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -80-
              a.    Statements of Delusions Made to Family Members . . . . . . -80-
              b.    Petitioners Handwritten Notes . . . . . . . . . . . . . . . . . . . . . . -87-
              c.    Evidence that the Business Meeting was Positive . . . . . . . . -88-
              d.    Evidence from Law Enforcement Officers . . . . . . . . . . . . . -89-
              e.    Evidence that Jail Nurse Ybarra Overstated His Observations of
                    Petitioner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -89-
    D.    Ground Four - Ineffective Assistance of Counsel; Failure to Rebut Testimony of
          Professor Morse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -89-
          1.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -89-
          2.    State Review of the Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -90-
          3.    Ineffective Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . -91-
          4.    Analysis of Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -92-
    E.    Ground Five - Ineffective Assistance of Counsel In Failing to Move for Change
          of Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -93-
          1.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -93-
          2.    State Review of the Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -93-
          3.    Change of Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -94-
          4.    Analysis of Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -95-
    F.    Ground Six - The Trial Court's Failure to Sua Sponte Order a Change of Venue
          Violates Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -96-
          1.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -96-
          2.    State Review of the Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -97-
          3.    Petitioner's Claim is Barred Under Teague v. Lane . . . . . . . . . . . -97-
    G.    Ground Seven - Petitioner's Due Process Rights Were Violated By Taking
          Petitioner's Plea and Conducting Trial While Incompetent . . . . . . . . . . . . -99-
          1.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -99-
          2.    State Review of the Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -100-
                a.    First Round of State Habeas Review . . . . . . . . . . . . . . . . . -100-
                b.    Second Round of State Habeas Review . . . . . . . . . . . . . . -100-
                c.    Third Round of State Habeas Review . . . . . . . . . . . . . . . -103-
                d.    Fourth Round of State Habeas Review . . . . . . . . . . . . . . . -104-
          3.    Judicial Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -105-
                a.    Clear Inconsistences in Petitioner's Positions . . . . . . . . . . -106-
                b.    Success in Persuading a Court to Accept the Earlier Position
                      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -106-
                c.    Unfair Advantage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -107-
          4.    State Review of Petitioner's Claim . . . . . . . . . . . . . . . . . . . . . . . . -107-
          5.    Analysis of Petitioner's Competency Claim . . . . . . . . . . . . . . . . . -109-
          6.    Petitioner's Delay in Bringing Competency Claim . . . . . . . . . . . . -110-
    H.    Ground Eight - Cumulative Prejudice of Multiple Errors . . . . . . . . . . . . -112-
          1.    State Review of the Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -112-
          2.    Analysis of Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -112-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

V.      APPROPRIATE RELIEF  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -113-

VI.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -115-

VII.    RECOMMENDATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -115-

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is represented in this action by Eric S. Multhaup, Esq. Respondent, Frank X. Chavez, as warden of Sierra Conservation Center, is hereby substituted as the proper named respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. Respondent is represented by Janis S. McLean, Esq. of the California State Attorney General's Office.

Based upon the findings and analysis below, THIS COURT RECOMMENDS THAT: Petitioner's writ of habeas corpus be GRANTED on the ground that the totality of circumstances show that his no contest plea was not knowingly and voluntarily entered and hence was invalid; that judgment be reserved on the issues of (1) whether defense counsel's failure to inform Petitioner of his chances of success in presenting an insanity defense constitutes a basis for relief and (2) whether Petitioner was competent at the time of trial; and, that relief be denied on all other grounds asserted in Petitioner's petition.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**[1]

A.   **Procedural Summary**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Tulare, entered on July 8, 1994. On May 16, 1994, Petitioner entered a plea of nolo contendre to second degree murder with a firearm enhancement. A jury trial was then commenced to determine if Petitioner was sane at the time of the crime. The jury found Petitioner sane, and he was sentenced to eighteen (18) years to life in state prison.

Petitioner filed a round of direct appeals and a first round of collateral appeals in the form of petitions for habeas corpus in the state courts during the period between 1995 through 1998. The appeals were all denied. On December 22, 1998, Petitioner filed the instant petition with the United States District Court; however, this matter was stayed on August 17, 2000,

---

[1]The parties have agreed to rely upon documents lodged in a joint record. The Court shall refer to lodged documents in the same manner as the parties. Unless otherwise stated, the facts presented are not in dispute.

1   pending the outcome of Petitioner's subsequent rounds of petitions for writ of habeas corpus

2   in the state courts. (Pet., Doc. No. 1[2]; Order Staying Case, Doc. No. 41, ECF No. 42.)

3        Petitioner filed a second round of habeas corpus petitions and on December 4, 2000

4   the Tulare County Superior Court granted the writ and vacated Petitioner's guilty plea. After

5   seven years of incarceration, Petitioner was released on bail. However, in 2002, the California

6   Court of Appeal reversed the decision of the Tulare County Superior Court.

7        Starting in 2005, Petitioner began his third round of habeas corpus petitions. The Tulare

8   County Superior Court again vacated the guilty plea.  The California Court of Appeal again

9   reversed the trial court.

10       In 2007, Petitioner filed his fourth round of habeas corpus petitions. All levels of the

11   state court denied his petitions. On March 16, 2009, Petitioner's second degree murder

12   sentence was reinstated and Petitioner was reincarcerated. On April 3, 2009, this Court lifted

13   its stay, and the parties proceeded with appropriate briefing.

14       **B.     Statement of Facts Regarding the Offense, Guilty Plea, and Insanity Trial**

15       The following statement of facts are taken from the unpublished opinion of the Court

16   of Appeal of the State of California, Fifth Appellate District, in People v. Gregory, F021997

17   (Cal. Ct. App., 5th Dist. Nov. 1. 1995) ("Gregory I"; Lodged Doc. 3.), taken upon direct appeal

18   of Petitioner's conviction. The factual findings of the state court are presumed correct. 28

19   U.S.C. § 2254(e)(1); Taylor v. Maddox, 336 F.3d 992, 1000 (9th Cir. 2004).

20       Defendant, born April 2, 1966, was one of three children of Jack and
     Jasmine Gregory. By all accounts his family was a close and loving one and his
21   childhood was unremarkable; he was not a discipline problem, he received good
     grades in school, and he pursued a normal range of hobbies and social
22   activities.

23       In 1983 defendant moved with his family to the Porterville area of Tulare
     County. He completed his last year of high school there and then attended
24   Fresno State University where he earned a degree in banking and finance. After
     graduation he moved to the Los Angeles area and took the first of several jobs
25

26   _____

27   [2] Many of the documents relating to this petition are not available electronically as they were filed prior to
     the implementation of the Court's electronic case management system. Such documents shall be referred to by
28   the document number ("Doc."), rather than the electronic case file number ("ECF") assigned to electronically filed
     documents.

with various financial institutions. It was during this period that his parents began to notice his occasional episodes of unusual behavior.

The first occurred in April of 1991 when defendant arrived unannounced at his parents' home. Visibly pale and shaken, he complained his bosses were "doing a number on his head," tapping his phone, following him, and harassing him at work. His parents feared he might be having a nervous breakdown and encouraged him to quit his job. He did and soon found another position.

A few months later defendant's pickup was stolen from his house. Frustrated by the inability of the police to identify the thief, he hired a private detective who cast suspicion on a neighbor. Defendant followed the neighbor to work and demanded his vehicle back. The neighbor, who police said had a lengthy criminal record, made what defendant interpreted as a threat to kill him. Defendant became frightened and distraught; he reported the incident to his parents who immediately moved him to another apartment. He later bought a gun for protection.

Around this time, defendant joined the rest of his family at his sister's college graduation. The next morning as the group was preparing to go to breakfast, defendant stared at his mother and in a generally unintelligible outburst exclaimed: "It's your fault. It's your fault." After a few minutes he stopped and said "I love you."

About a year later in mid 1992, his parents were dining at a local restaurant when they got a call from defendant who said he was in town with a woman friend. The two arrived shortly at the restaurant but defendant appeared nervous and pale and refused to eat. After returning to Los Angeles the following day, he phoned his parents and accused them in a rambling conversation of being bad parents because they refused to give him advice or tell him what to do.

In July 1992, at his parents' urging, defendant left his job in Los Angeles and moved to a house they owned in Porterville. Some years before, defendant's father, a physician in general practice, had formed a company to explore different business opportunities. Through a contact in Russia named Frank Lisney, he had arranged to import synthetic rubber products which he hoped to sell in this country through an Ohio company, Brad International, headed by Jack Burrow. Defendant joined the venture which was later incorporated as Champion Chemical. He soon became engrossed in the business, setting up a bookkeeping system, meeting with his counterparts in Russia, and negotiating a sales agreement with Brad International.

Defendant stayed with Frank Lisney during one such trip to Russia in August of 1992. He later complained Lisney had become irate and threatening as the result of a misunderstanding about the house key, and on another occasion had put something (later identified as niacin) in his drink. He described the trip as a "nightmare" and Lisney as an "evil" and "dangerous" man.

Defendant was also involved with his father in working out the details of the relationship between Champion Chemical and Brad International. He was described by other participants as very detail oriented and "nit[-]picky." At one meeting in March of 1993 he made a comment which evoked a brief but angry response from Jack Burrow. Nonetheless, according to his father, defendant liked and respected Burrow although he came to suspect Burrow might be

U.S. District Court
E. D. California

dealing directly with the Russians. It was in defendant's nature, however, to be suspicious.

The elder Gregorys did their best to ignore these incidents because they occurred only infrequently and because their son's behavior was otherwise "perfectly normal." They never suspected he suffered from a psychiatric disorder, even in the weeks immediately prior to the shooting when the episodes became more common.

By then defendant was usually eating dinner and sleeping at his parents' house. He had become preoccupied with the business and had few if any friends or outside interests. Usually very neat, he had begun to neglect his personal appearance. He acted withdrawn and distracted, sometimes pacing about or talking very fast. At one point his mother urged him to quit the company and get a less stressful job but he refused, saying he had put in too much effort to miss out on what was his "big chance."

One night at dinner in June of 1993, defendant for no apparent reason told his father in an emotionless voice: "You're selfish. You're selfish. This is all for you. All for you." He continued on mumbling incoherently, evidently oblivious to the distress his remarks were causing.

During a trip to Russia in July to negotiate some contracts, defendant's obstructive "nit[-]picking" was described by his father as "very noticeable, very disturbing."

In August and again on the weekend immediately prior to the shooting, defendant's uncle drove up from Los Angeles to take him fishing. Although defendant had always been an avid fisherman, he showed no interest. He drove erratically in the mountains, and when they stopped to go swimming he insisted on jumping off a very high rock with his glasses on. These and other events convinced his uncle that defendant was no longer the same person he had been the year before.

On the day of the shooting, September 5, defendant and his father had arranged to meet with Jack Burrow at defendant's house in Porterville. Defendant spent the previous night with his parents. In the morning his mother gave him a haircut, something of a family tradition which allowed her to talk alone with her children. Defendant was uncharacteristically quiet and did not respond to her efforts at conversation. Instead he stared downward mumbling to himself and then left without a word.

The meeting with Burrow, characterized by Dr. Gregory as an "excellent" one, lasted about three hours. Burrow did most of the talking; defendant took some notes and asked a few questions. At one point while they were alone, defendant asked his father to inquire of Burrow whether he had been communicating directly with the Russians or knew Frank Lisney. Burrow denied knowing Lisney; he said his only contact with the Russians had been limited to the one the Gregorys already knew about.

As the meeting concluded, defendant said his work with Champion Chemical was not keeping him busy and asked Burrow whether he might take a job in Los Angeles. Burrow responded that someone else could manage things until business increased enough for defendant to return. Defendant left the room. Dr. Gregory and Burrow gathered up their things and moved toward the

door with Gregory in the lead. Defendant walked back into the room past his father who then heard several loud noises. He turned to see defendant with a gun in his hand. Dr. Gregory grabbed the gun. Defendant, in a "high-pitched infantile voice," said "'Look out Daddy, look out, the gun is loaded.'" Gregory pulled the trigger twice, discharging the last live round into the floor. He threw the gun aside and went to call the police.

Defendant gave a lengthy taped statement to the police later that evening. In an often rambling discourse, he complained in essence that Burrow and Brad International had failed to honor their promise to find markets for Champion's products but instead had been stringing him and his father along for the past six months while talking directly with the Russians. But Burrow refused to allow the Gregorys to walk away from the deal. His double-dealing had created "tremendous amounts of pressure" which was "killing" defendant and destroying the relationship between his parents. He claimed to have shot Burrow to protect himself and his family because he could no longer handle the pressure:

> "EG [Edwin Gregory]: Okay. Um, I grabbed the gun and I ran out, (inaudible) I, I just looked at him [Burrow] and I, and I thought to myself, gosh, this is, has to be another way out of this. And I thought and there isn't, so I just had to do it.

> "DB [Officer David Bouffard]: Do what?

> "EG: Had to kill him. I, (inaudible) say kill, I had to shoot him. I had

> "DB: How many times did you shoot him?

> "EG: I'm not sure if I was gonna kill him or not. That's where, where I was leading to, to get out of my pain. And my father's pain.

> "DB: To kill him.

> "EG: Yes, that's correct. I can't lie.

> "DB: Okay. How many times did you shoot him?

> "EG: . . . I'll tell you what. My father I've never said anything about my father, to my father and mother about doing something like this. I wouldn't do it unless there's, unless there's good reason behind it. Okay I won't say (inaudible) are justified because again, that's the, I know it's justified but then, but the situation was so bad that if you ask my mother and father, it's like yes, the situation's . . . bad enough that that, something like this could happen. That's how bad the situation is."

Later in the interview defendant explained the shooting followed Burrow's refusal to answer his question about taking a job in Los Angeles:

> "EG: And he wouldn't give me another straight forward [sic] answer. He was,(inaudible)

> " . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

1

2
"DB: So then you decided to go get your gun and shoot him. Is that right?

3
"EG: No, I got up and just started (inaudible) like this, back and forth. Walking at the window. (inaudible) Then I realized this is

4
what he has done to me. He know it. It's a, he knows (inaudible) I have to sit here and just wait for him. Wait and wait and he

5
knows this and like, what does he want me to do?

6
"DB: So at what point in time did you decide to go get the gun?

7
"EG: Right then.

8
"DB: Right then.

9
.
"EG: Uh-huh (affirmative). It happened just seconds after that

10
"DB: And then you went, went in and got the gun and came back out and shot him.

11
"EG: That's correct.

12
"DB: Did your father shoot him?

13
"EG: No! No, my father didn't. My father would never ever, ever,

14
ever, ever, imagine to do (inaudible) would he ever tell, nor would he ever want it to happen.

15
"DB: Okay.

16
"EG: No way. No.

17
"DB: So you shot

18
"EG: I didn't do this only for myself. Did it for my father as well,

19
cause my father, I couldn't convince my father of just backing away from it.

20
"DB: So you shot him?

21
"EG: Yes I did.

22
". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

23
"DB: Was your state of mind to shoot him or scare him? To shoot him to hurt him or to shoot him to kill him, so he'll, so he'll be gone.

24
I mean, what was [sic] your intentions?

25
"EG: I really don't know what my intentions were, He, he had, he

26
had me in a state of mind that was so, I don't know (inaudible)

27
"DB: So, it was a spur of the moment.

28
"EG: It's like (inaudible) get out of my life."

Later that same evening defendant's mother talked with him at the police station. Reading from her notes of the meeting, she recounted their conversation this way:

"After he sat down, I asked him, 'Edwin, what were you thinking when you went for the gun?' Edwin held his head. Edwin held his head like this and said, 'My head, my head. There was something in my head. I was confused.' And he would pause after all that. Then he said, 'My chest. I have chest pains.' He was very shaken and he was saying, 'I have chest pain. This man is killing me and destroying you.'"

Defendant was held after his arrest at the Tulare County jail where he was interviewed on September 7 by a crisis worker assigned to screen new inmates. The worker found him to be well-oriented and appropriate under the circumstances but recommended he be monitored for signs of possible suicide. After meeting with him again on September 9 and 13, the worker recommended the monitoring by discontinued.

Defendant wrote two letters to his family in September in which he assured them he was getting along fairly well in jail. However his parents, who visited him regularly, testified his condition deteriorated considerably in the weeks following his arrest. His mother speculated his assurances were intended only to keep them from worrying.

Indeed a second crisis worker was assigned to evaluate defendant in early October because of his unstable behavior and suicidal ideations. At her first contact on October 8, the worker found him to be very confused and afraid, willing to speak only in whispers because he was convinced everyone was trying to kill him and his family. She concluded he was delusional and suicidal and recommended he be put in a padded safety cell. He was returned to a regular single cell the following day and placed on medication. But when his parents visited him that same day, "He was bouncing off the walls. . . . [¶] He could not make sense. He was saying, 'Test my blood. Something is wrong with my blood.' His leg was jerking. The pupils were dilated. He was biting this nail, this nail until it was bleeding." The crisis worker was summoned again the day after that, October 10, because defendant had begun banging his head on the cell wall. His speech was erratic and disconnected. He was "very, very fearful" and asked to be put back in a safety cell where he might be safer. He was transferred soon afterward to the psychiatric unit at Fresno Community Hospital where he remained for several days before being returned to the jail.

## Expert Testimony

Three psychiatrists testified as expert witnesses for the defense: Drs. Howard Terrell, Luis Velosa, and Mark Mills. All expressed the opinion defendant suffered from schizophrenia manifested most significantly by a paranoid delusion that persons acting through Burrow (notably Frank Lisney) were intent on killing him and his family. All three experts also concluded defendant was suffering from the disorder when he shot Burrow such that he was incapable of appreciating the wrongfulness of his actions and thus was

legally insane.[3] Their opinions varied, however, as to the onset of this disorder.

The doctors explained that the standard reference for the classification of psychiatric illnesses is the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders, known as the DSM-IV, published by the American Psychiatric Association. According to the DSM-IV, schizophrenia in its active phase is characterized in part by the presence of two or more symptoms from a list which includes delusions, hallucinations, disorganized speech, and catatonic behavior. A diagnosis of schizophrenia requires there must have been evidence of the disorder for a continuous period of at least six months, including at least one month of these active phase symptoms. The remainder of the period may have involved only "prodromal" symptoms, i.e., less obvious and severe types of abnormal behavior.

The three defense experts diverged somewhat in their assessment of defendant's behavior prior to the shooting – whether and when he displayed these prodromal and active phase symptoms. Dr. Terrell concluded the symptoms first appeared more than two years prior to the shooting while defendant was still living in Los Angeles. Dr. Velosa agreed some prodromal symptoms existed prior to the shooting but was unable to give an opinion about when they first appeared. Dr. Mills opined only that schizophrenia usually develops gradually so it is difficult to pinpoint the onset of the disorder.

This disparity was significant in light of the subsequent testimony of Steven Morse, a psychologist and law professor who appeared for the prosecution. Dr. Morse questioned whether defendant's behavior prior to the shooting could be considered evidence of incipient schizophrenia; he suggested its interpretation as such was the product of what he termed "retrospective bias," i.e., a tendency to characterize the behavior as prodromal in order to explain the eventual diagnosis. It was his opinion defendant's behavior up to and including the shooting was no more than prodromal in any event; that defendant was not manifestly psychotic until the incident at the jail when he began banging his head on the cell wall.

As discussed more fully below, Dr. Morse declined to express an opinion about whether defendant was legally sane at the time of the shooting in the sense that he understood the differences between right and wrong. The question, he explained, involved legal and moral determinations, as opposed to medical ones, which he was no more qualified than the jurors to make. Nevertheless, after rephrasing the sanity test in terms of a person's ability to accurately perceive reality, he testified at some length in support of his opinion defendant was not so detached from reality when he shot Jack Burrow as to be considered legally insane.

Additional facts as stated in People v. Gregory, 2007 WL 1018550 (Cal. Ct. App., 5th Dist. May 4, 2007) ("Gregory IV"; Lodged Doc. 59.):

---

[3]Dr. Velosa was of the opinion defendant also met the first prong of the insanity test in that he did not understand the nature and quality of his act. That is, although defendant knew shooting Burrows five times was likely to kill him, he believed the shooting was necessary to eliminate the threat against him and his family.

Edwin[4] was confined at Atascadero, due to his incompetence to stand trial, from October 25, 1993, to January 24, 1994. During that period, Edwin related to his mother that, at the time of the shooting, he believed Frank Lisney was directing the killing of Edwin and his father, and the destruction of their family, through Burrow and the Russians. Edwin believed he had to kill Burrow or Burrow was going to kill him.

In November 1993, Edwin's parents, Dr. and Mrs. Gregory, met with Deputy District Attorney Bartlett. They understood him to say that, if two psychiatrists opined Edwin was insane at the time of the crime, Edwin would "go to Atascadero NGI [not guilty by reason of insanity]."[5] The Gregorys communicated this belief to John Smurr, Edwin's attorney, and they also told Edwin himself many times between their meeting with Bartlett and the April 29, 1994, pretrial conference. Smurr subsequently told Mrs. Gregory that he would negotiate to close the case before the pretrial conference if he had the doctors' reports, which Mrs. Gregory understood to mean that if two psychiatrists said Edwin was insane, "Smurr will negotiate to go through the procedures of Edwin getting his NGI." Mrs. Gregory told Edwin this.

By April 29, 1994, reports had been received from Drs. Pitts and Velosa, stating that Edwin was insane at the time of the shooting. On that day, Dr. and Mrs. Gregory waited in the court hallway while the pretrial conference was held in chambers. Afterward, Smurr said the prosecutor was insisting on a jury trial on the sanity issue, but he told the Gregorys not to worry because the prosecutor had no experts, and he assured them the case would settle at the "eleventh hour." He also said, however, that Edwin would have to plead guilty to second degree murder.

While Mrs. Gregory was aware the People had the right to insist on a jury trial, she did not tell Edwin about the trial because she still believed, based on Smurr's assurances, that the case would settle at the last minute. In addition, Edwin was "very fragile" and she did not want to scare him.[6] On May 2, 1994, Mrs. Gregory told Edwin he would have to plead guilty to second degree murder. She explained to him that this was a matter of formality, "that we have to get through this stage for [Edwin] to get his NGI." Dr. Gregory also continued to tell Edwin that if doctors reported he was insane, he would be found not guilty by reason of insanity.

On May 14, 1994, Mrs. Gregory explained to Edwin the procedure for the entry of his plea. She felt Edwin understood, as he asked appropriate questions. When she spoke to him the next day, however, he sounded confused, nervous, and scared.

On May 16, prior to entering his plea, Edwin met with Smurr and Edwin's

---

[4]The state appellate court opinion uses the name "Edwin" in order to avoid confusion with other witnesses named Gregory.

[5]Bartlett denied making any such promise.

[6]Edwin was no longer voicing delusions when he returned to Tulare County from Atascadero. During February and March, however, he suffered a relapse due to changes in his medication. Although the medication problems appeared to have been resolved by early March, Edwin continued to vacillate between realism and confusion.

cousin, attorney Gregory Altounian, a civil law practitioner. Altounian did not recall Smurr telling Edwin the maximum time he could spend in a locked institution if a jury found him sane, although he did tell Edwin that if he were found sane at the time of the offense, he would go to prison instead of a mental hospital. Altounian did not hear Smurr advise Edwin of any defenses; instead, Smurr simply told Edwin that he was going to plead guilty to second degree murder that morning, and then they were going to go to the sanity phase and put on the witnesses. Similarly, although Smurr told Edwin that the judge was going to take a waiver of his constitutional rights, he did nothing to explain the various rights Edwin would be giving up, or to make sure Edwin understood them. Based on his lifelong familiarity with Edwin and Edwin's demeanor and lack of response, Altounian did not believe that Edwin understood the information Smurr conveyed to him. After the meeting, Altounian told Smurr that in his opinion, Edwin had "no clue" as to what Smurr was telling him. Smurr did not respond, but continued into the courtroom.

Dr. and Mrs. Gregory, Edwin's brother Eric, and Altounian all felt, based on how Edwin acted in court during the change of plea proceedings, that Edwin did not understand what was occurring. For instance, when the judge asked him questions, Edwin did not respond promptly, but frequently asked the judge for clarification or to repeat what he had said. On a number of occasions, Edwin looked to Smurr, then answered affirmatively after Smurr nodded or whispered something to him. The next day, Edwin appeared to Mrs. Gregory to be totally confused as to what had happened the day before. No one mentioned anything to Smurr or the court because they wanted to get through the plea and into the sanity trial, as all of the doctors were saying Edwin was insane.

Edwin testified that while he was at Atascadero following his arrest, he understood there was a criminal charge pending against him, and he probably knew it was murder. He also understood there were different possible outcomes of the criminal charge, including not guilty by reason of insanity. Edwin understood that if he were to be found not guilty by reason of insanity, he would be sent to Atascadero and would be given better medical treatment there than at a prison. He also understood that if he were just found guilty of the charge, he would be sent to prison. While he was at Atascadero, Edwin's parents told him that if two doctors were to find him insane at the time of the crime, he would go to Atascadero. They continued to tell him this after he was returned to Tulare County to stand trial.

Edwin returned from Atascadero in fairly good shape, mentally. When he was housed in the infirmary at the jail upon his return, however, he started having ups and downs. He had "tremendous problems" retaining information. When asked if he recalled anyone explaining to him, outside of court before the date of the plea, about the process of him pleading guilty and going on to an insanity trial, Edwin responded, "Well, I remember my parents trying to explain to me something, but what mostly I remember is me not understanding what they were trying to say. Mostly I do remember them saying that I had to get past this next phase as a formality. That's what I understood from my parents. And anything else was not clear to me."

Edwin recalled meeting with Smurr prior to the change of plea proceedings, but was unable to make sense out of what Smurr was telling him,

as it seemed Smurr was not speaking English.[7] Edwin did not ask Smurr for clarification because he believed, from what his parents had told him, that the plea was a formality so he would be found not guilty by reason of insanity. He was concerned that if he told Smurr his difficulty, Smurr would call off the court proceedings. When he entered the courtroom, Edwin still felt confused and did not know what was to happen. As the judge began to explain to him the rights he was giving up by entering a plea, he finally realized that he was to plead guilty to second degree murder. When the judge began asking him questions, Edwin initially was honest and said he did not understand. He stopped asking for clarification, however, because he remembered his parents telling him that he needed to get past this stage as a formality, and he thought he would not be able to do that if he kept telling the judge that he did not understand the questions. Edwin then answered the questions in a manner he thought would be appropriate, even though he did not understand them. Edwin believed he would be found not guilty by reason of insanity if he pled guilty. When the judge informed him of the maximum punishment for second degree murder, it did not sink in. Edwin did not truly understand the punishment he was facing until he was sentenced.

Edwin testified that before he entered his plea, no one told him that there had never been a jury verdict of insanity in Tulare County, or that his chances of being found insane by a jury were slim to none. He had no recollection of Smurr discussing with him any alternative to second degree murder or any basis for manslaughter. Had someone told him how low his chances were of obtaining an insanity verdict at a jury trial, and about the alternative possibility of manslaughter, he would not have pled guilty to second degree murder.

Smurr testified that he began representing Edwin shortly after the homicide. From January 1994 on, Smurr's focus, with the agreement of Edwin and his parents, was on developing an insanity defense. Edwin's parents were concerned that Edwin be hospitalized and not go to prison. Smurr retained Drs. Mills and Terrell to assist him in developing the insanity defense. By the spring of 1994, all of the court-appointed and retained doctors had concluded Edwin was insane at the time of the killing, and Smurr was relatively optimistic about the prospects for a disposition of the case, as the prosecutor had not presented him with any evidence to the contrary.

At the April 29, 1994, pretrial conference, Judge Moran agreed with Smurr's theory that Edwin was not guilty by reason of insanity, but alerted Smurr to the fact that a Tulare County jury had never accepted such psychiatric testimony. Smurr was certain he told Edwin's parents about the purported propensity for Tulare County juries not to return insanity verdicts, and was also sure he told Edwin, although he had no independent recollection of relating to Edwin what occurred in chambers at the pretrial conference. He was not sure Edwin was able to process what the information would mean as far as his fate was concerned. During this period of time, Smurr was concerned Edwin would "overload," and he "was always sort of tiptoeing around because [he] didn't want [Edwin] to decompensate." While Smurr would tell Edwin certain things, he

---

[7] Edwin had had problems understanding what people were saying on some occasions even before the shooting occurred. He believed the terminology was "thought blocking." When he was not well mentally and was unable to understand English, he would often stay quiet so that he would not be seen as stupid. When he was better, as he was at the time of the evidentiary hearing due to his medication, he would ask for clarification if he did not understand something.

never wanted to overwhelm Edwin with too much information because, upon reflection, Edwin did not "process like a normal human being."

Between the pretrial conference and plea, Smurr expressed optimism to the family about the outcome of the sanity trial. After the pretrial conference, Smurr reached an agreement with the prosecutor about Edwin pleading to second degree murder. Smurr was sure he conveyed this information to Edwin's parents. He was also sure he immediately told Edwin, but did not discuss it with him in earnest until the date of the plea.

On the day of the plea, Smurr told Edwin what would occur and addressed the rights that were to be articulated in the courtroom, but, looking back, he was "not satisfied that [Edwin] processed them." Edwin appeared to be medicated. In retrospect, Smurr would have had a psychiatrist with him to assure that Edwin had processed the information and knew he was waiving certain rights. At the time of the plea, however, he did not feel it was necessary. Although, on the day of the plea, Smurr believed it to be in Edwin's best interest to enter a guilty plea to second degree murder, Smurr could not presently assure the trial court that on May 16, 1994, Edwin actually understood his legal options, the "upside and downsides of the different possibilities and [that Edwin] independently concluded that second degree murder plea was the best thing for him to do." Smurr did feel, however, that Edwin "most likely" was competent to stand trial.

Dr. Terrell examined Edwin on several occasions. From his October 9, 1993, examination, Terrell formed the opinion that, at the time of the shooting, Edwin believed Frank Lisney was directed by the devil and meant to commit considerable harm to Edwin and his parents, and that Lisney could channel himself through Jack Burrow. As Edwin was acting in what he sincerely believed, due to his paranoid and psychotic mental disorder, to be self-defense, Terrell opined that Edwin did not fully comprehend the wrongfulness of his action and qualified for a plea of not guilty by reason of insanity.

Terrell interviewed Edwin on May 15, 1994, in preparation for Terrell's sanity trial testimony. He was unaware Edwin was going to plead guilty the next day, and was not there to determine competency to enter a plea. Edwin informed Terrell that he was on a daily regimen of four medications, which Terrell was aware could cause side effects, such as confusion, either alone or in combination with each other. Based on his interview with Edwin (which revealed abnormalities in his thought processes and evidence of remaining mental illness, as well as thought blocking, which is very common in people who are severely mentally ill with psychotic disorders such as schizophrenia), the transcript of the plea proceedings, and his observation of Edwin testifying at the evidentiary hearing, Terrell had serious doubts about whether Edwin understood the consequences of his plea on May 16, 1994, although Terrell did feel Edwin was competent to stand trial. Terrell felt Edwin was at least basically competent to go to trial for something such as whether he was insane, but not to enter into a complex plea bargain that would have required him to have a greater degree of insight and understanding. Given Edwin's mental state on May 15, which in all likelihood would not have substantially improved by May 16, it would have been virtually impossible for Edwin to understand and adequately comprehend the possible sentences attached to first and second degree murder and manslaughter that he faced depending on whether he pled guilty or went to trial and was convicted, or adequately to understand his various options had they been explained to him. Terrell believed the only way to explain Edwin's "serious"

comprehension problems was his mental illness or the medications he was on or a combination of both. It appeared to Terrell from the transcript of the change of plea proceedings that Edwin's mental illness was worse that day than on May 15, and that he was "quite impaired" at that time.

Dr. Mills, who examined Edwin on May 11, 1994, testified that on that date, Edwin appeared "significantly ill." In Mills' opinion, he was toxic on one or a combination of medications, or he was confused because of his psychosis, or both. Mills found Edwin's thought process to be "very remarkable for blocking." If Mills had been asked his opinion on that date of Edwin's competence to stand trial, he would have found him marginally competent because Edwin, being intelligent, knew the various courtroom personnel and the crime with which he was charged, and he seemed willing to cooperate with his attorney. He did not seem to have "much beyond that," however, and frequently seemed fairly confused during the evaluation.

In Mills' opinion, Edwin did not understand the consequences of his plea.[8] Mills felt Edwin may have placed undue emphasis on the information given him by his parents, because people with paranoid schizophrenia tend to trust very few people and, hence, the people they do trust have a disproportionately large effect on their opinions and beliefs. Ideally, Edwin should have been asked on several occasions, including immediately before he was going to change his plea, what his alternatives were, which one he had chosen, and why. This would have tested his ability to reason through to a particular outcome and would have demonstrated whether he actually knew and understood the consequences of entering a no contest plea. Mills believed it was possible that, had Edwin's parents gone over with him, on a daily basis, information about the consequences of his plea, and had they not viewed it as a formality to get to the NGI, Edwin might have learned the necessary information. At the time he changed his plea, however, Edwin's mental state was suspect; he was suffering from thought process disruptions that included memory retention difficulty, thought blocking, and confusion. The questions asked by the court during the change of plea proceedings would have been appropriate for most defendants. For Edwin, however, those questions were inadequate because they allowed him, with apparent prompting from his attorney, to answer yes and no without reflecting his degree of confusion.

The People presented testimony from Dr. Estner, a forensic psychiatrist who had reviewed numerous materials in connection with this case. Estner's reading of Terrell's notes indicated to him that Terrell and Edwin discussed the fact there was going to be a no contest plea, and that the charge would be dropped from first degree murder to second degree murder.[9] The notes also indicated Edwin had said a jury would be picked the day after the interview to decide whether he was insane at the time, suggesting he was aware the outcome on the sanity issue was uncertain. The notes further showed Edwin

[8] Mills, who had graduated from law school but never taken a bar exam, made a distinction between the ability to cooperate with counsel and proceed to trial, and the ability to knowingly and intelligently enter a plea. He believed courts had generally construed competency to stand trial as a fairly minimal standard, whereas one had to substantially appreciate what one was doing in entering a plea. He did not believe Edwin did, although he believed it was possible for someone who was suffering from paranoid schizophrenia to enter a knowing and voluntary plea.

[9] Terrell disputed Estner's interpretation of portions of his notes.

1

2

3

4

was aware that, if found NGI, he would go to a state hospital until he got well, while if found guilty, he would go to prison. In Estner's opinion, this covered the issue of competency to enter a plea. In addition, the transcript of the change of plea proceedings showed that Edwin's answers indicated he understood he was in court, that a judge was asking him questions, and that he could agree or disagree. His asking of questions could be taken as a symptom of confusion or mental illness, but it could also indicate someone who was truly competent to enter the plea, and who asked for clarification if he did not understand.

5

6

7

8

The People also presented testimony from Kenneth Clark, a psychiatric social worker with the Tulare County Health and Human Services Agency who provided mental health services to Edwin at the jail. Clark's notes of his contacts with Edwin, which occurred between January 31, 1994, and May 25, 1994, showed Edwin to have been fairly rational and well-oriented, even during the time in early March when he was having a reaction to his medication.

9

10

11

12

The following portion of the Statement of Facts is taken from the unpublished opinion of the Fifth District Court of Appeal in People v. Gregory, 124 Cal.App.4th 1149 (2005) ("Gregory II") (Case No. F037202). (Lodged Doc. 40.) Since there is significant overlap with the factual summary in Gregory IV, only additional factual statements are included below:

13

14

15

16

17

18

Mrs. Gregory testified that, after the April 29, 1994, pretrial conference, defense counsel Smurr informed the Gregory's that, as part of the plea agreement, Petitioner would have to plead guilty to second degree murder. "When Mrs. Gregory asked why second degree, Smurr told her about a case 'with someone with a hair spray can that was mistaken for a gun or something.'" During the pre-trial conference, the court told the attorneys about an insanity case that was tried in Tulare County. In that case, an employee of a market was showering at his employer's house when he shot and killed the employer's girlfriend, who he thought had a weapon. The item turned out to be a can of hair spray.

19

20

21

22

Dr. Gregory testified that he "continued to tell Edwin that if doctors reported he was insane, he would be found not guilty by reason of insanity. Dr. Gregory recalled Smurr telling him that Edwin would plead to second degree murder, after which they would proceed to the sanity phase. Dr. Gregory conveyed this information to Edwin sometime between April 29 and May 16. Dr. Gregory believed it was in Edwin's best interest to plead guilty to second degree murder."

23

24

25

26

Dr. and Mrs. Gregory, Edwin's brother Eric, and Altounian all felt, based on how Edwin acted in court during the change of plea proceedings, that Edwin did not understand what was occurring. The next day, Edwin appeared to Mrs. Gregory to be totally confused as to what had happened the day before. No one mentioned anything to Smurr or the court because they wanted to get through the plea and into the sanity trial, as all of the doctors were saying Edwin was insane.

27

28

Dr. Gregory was aware at the time of the plea that a jury trial was possible, but he was still under the impression from Smurr that the case would settle before trial because no one had rendered an opposite opinion regarding Edwin's sanity. Smurr never explained to Mrs. Gregory the effect of pleading

guilty to second degree murder, as opposed to first degree murder or manslaughter, or the amount of time Edwin could expect to be kept in a state hospital if he were found not guilty by reason of insanity. He likewise did not discuss with her the maximum terms of imprisonment that could be imposed for first or second degree murder or manslaughter should Edwin be found sane.

[Dr.] Terrell concluded [Edwin believed Frank Lisney was direct by the devil and meant to commit considerable harm to Edwin and his parents, and that Lisney could channel himself through Jack Burrow and] this was likely the motive for the shooting, and, at the time of the crime, Edwin was acting in what he sincerely believed, due to his paranoid and psychotic mental disorder, to be self-defense.

Dr. Mills, who examined Edwin on May 11, 1994, testified consistently with Terrell. In Mills' opinion, Edwin did not understand the consequences of his plea. Smurr never asked Mills to explore imperfect self-defense with Edwin.

## C.    Petitioner's Post-Conviction Filings

As described in detail below, many of Petitioner's claims were addressed in the several rounds of state court review.  This Court shall attempt to summarize the state court decisions, with an emphasis on federal claims that were decided in reasoned state court decisions and proved to be significant to the Court's review of the present petition.

### 1.    Direct Appeal

After Petitioner was found sane and sentenced to eighteen years to life in prison on July 8, 1994, Petitioner filed a direct appeal to the California Court of Appeal, Fifth Appellate District. (See Lodged Docs. 1-3.) In the direct appeal, Petitioner raised six claims of error at trial.  None are relevant to the present petition. The Court of Appeal affirmed the judgment in all respects. (Lodged Doc. 3, "Gregory I".) Petitioner filed for review with the California Supreme Court. It denied the petition without comment on February 4, 1996. (Lodged Docs. 4-5.)

Accordingly, this Court finds Petitioner's direct appeal did not provide reasoned decisions relating to the claims presented in his federal petition.

### 2.    First Round of State Habeas Review

Petitioner filed his first petition for writ of habeas corpus in the Tulare County Superior Court on April 1, 1997. (Lodged Doc. 6.) Petitioner raised ten grounds for relief in the petition: 1) Petitioner was deprived of due process by counsel's refusal to stipulate to a court trial on

insanity; 2) Petitioner was deprived of due process by the use of the prosecution's expert, Dr. Morse, to attempt to discredit defense experts; 3) defense counsel was ineffective in failing to move for a change of venue; 4) the trial court violated Petitioner's constitutional rights by failing to sua sponte order a change of venue; 5) Petitioner was deprived of due process by his absence from the April 29, 1994, pre-trial hearing; 6) Petitioner's guilty plea was involuntary because of the combined effects of his mental disease, the medication he was administered, the promise of an insanity stipulation by the prosecution, and Petitioner's lack of knowledge of the likelihood of a sanity finding following a jury trial; 7) Petitioner was deprived of due process by the prosecution's failure to disclose exculpatory impeachment evidence from the expert's testimony in a prior criminal case; 8) defense counsel was ineffective for failing to provide available exculpatory evidence to the defense experts and jury; 9) defense counsel was ineffective for failing to present evidence to rebut the prosecution expert; and 10) Petitioner was deprived of due process based on the cumulative effect of all of the constitutional violations. (Id.)

On May 2, 1997, the superior court denied these claims with the statement: "The petition for writ of habeas corpus is denied because the allegation of fact, even if true, do not support the legal conclusions advanced by petitioner and do not establish grounds for relief." (Lodged Doc. 7.) Petitioner bypassed the appellate court and filed a petition directly with the California Supreme Court. (Lodged Docs. 8-12.) That petition was denied without comment on December 22, 1998. (Lodged Doc. 12.)

Thus, nearly all of Petitioner's claims were exhausted in his first round of habeas review, creating a reviewable record under 28 U.S.C. § 2254(d).

3.      Federal Habeas Review Initiated

On December 22, 1998, Petitioner filed the present habeas petition with this Court. (Pet., Doc. 1.) Petitioner litigated the federal petition in this Court for nearly one and one half years. Relevant briefs were filed and motions to proceed with discovery were granted in part by the Court.  (Docs. 11-12, 16-17, 21, 27-28, and 33.)  However, on August 17, 2000, the Court ordered the case stayed while Petitioner proceeded with his second round of habeas

1  petitions in state court. (Docs. 41-42.) The matter then remained stayed for nearly nine years

2  while the parties litigated in state court. (Order Lifting Stay, ECF No. 91.)

3                4.    Further State Habeas Petitions

4       It is unclear why Petitioner filed the second round of state court petitions on claims

5  already addressed by his first state court petition. The ability to bring successive habeas

6  petitions based on the same claims and facts has been significantly curtailed  by California

7  statues and judicial opinions.

8       Under California law, a final judgment granting habeas corpus relief is res judicata (In

9  re Fain 139 Cal. App. 3d 295, 301 (1983)), an order denying the writ is not. In re Clark 5 Cal.

10 4th 750, 773 (1993). Even so, the right to bring successive habeas corpus petitions has long

11 been restricted. The California Supreme Court in Clark clarified the rules, making it clear that

12 successive habeas corpus petitions based on claims which could have been adjudicated in

13 previous petitions are not permitted except in rare instances where a fundamental miscarriage

14 of justice has occurred. Such a miscarriage occurs under the following circumstances: a trial

15 was so fundamentally unfair that, absent the error, no reasonable trier of fact would have

16 convicted the defendant; the petitioner is actually innocent of the crime charged; the death

17 penalty was imposed based on a grossly misleading profile of the petitioner; or the conviction

18 was obtained under an invalid statute. Id. at 797-798.  However, in the case of issues raised

19 and determined in prior habeas proceedings, "It is the policy of this [California state] court to

20 deny an application for habeas corpus which is based upon grounds urged in a prior petition

21 which has been denied, where there is shown no change in the facts or the law substantially

22 affecting the rights of the petitioner. " Id. at 769.

23      The California Supreme Court set forth valid reasons for barring such successive

24 petitions. "Willingness by the court to entertain the merits of successive petitions seeking relief

25 on the basis of the same set of facts undermines the finality of the judgment. Moreover, such

26 piecemeal litigation prevents the positive values of deterrence, certainty, and public confidence

27 from attaching to the judgment." Id. at 770.

28      Such is the state of affairs in the present matter. Petitioner filed not only the first one

habeas petition in state court, but **three** additional rounds of habeas proceedings in state court. Each resolves different claims, making  the state court record exceedingly difficult to review.

5.    Second Round of State Habeas Review

Petitioner filed his second petition for writ of habeas corpus in the Tulare County Superior Court on February 1, 2000, and a substantially similar petition on April 12, 2000. (Lodged Docs. 13-14.) The first nine claims raised in the second petition are identical to the claims raised in Petitioner's first petition, namely: 1) Petitioner was deprived of due process by counsel's refusal to stipulate to a court trial on insanity; 2) Petitioner was deprived of due process by the use of the prosecution's expert, Dr. Morse, to attempt to discredit defense experts; 3) defense counsel was ineffective in failing to move for a change of venue; 4) the court violated Petitioner's constitutional rights by failing to sua sponte order a change of venue; 5) Petitioner was deprived of due process by his absence from the April 29, 1994, pre-trial hearing; 6) Petitioner's guilty plea was involuntary because of the combined effects of his mental disease, the medication he was administered, the promise of an insanity stipulation by the prosecution, and Petitioner's lack of knowledge of the likelihood of a sanity finding following a jury trial; 7) Petitioner was deprived of due process by the prosecution's failure to disclose exculpatory impeachment evidence from the expert's testimony in a prior criminal case; 8) defense counsel was ineffective for failing to provide available exculpatory evidence to the defense experts and jury; and 9) defense counsel was ineffective for failing to present evidence to rebut the prosecution expert. (Lodged Doc. 14.) However, the last claim, claim 10, asserts that Petitioner was deprived due process based on a juror's failure to disclose her familial relationship with an arresting officer. (Id.)

In an order to show cause issued on May 19, 2000, the superior court denied claims 1-5, 7, and 9 based on their prior adjudication in the first habeas proceeding. (Lodged Doc. 16.) The court also denied the new claim, claim "10", and ordered further briefing regarding claims 6 and 8; the claims relating to Petitioner's mental state and Petitioner's counsel's ineffective representation based on his failure to rebut the prosecution's expert witness. (Id.)

Then, in a July 18, 2000 order granting an evidentiary hearing on the voluntariness of Petitioner's plea, the court denied Petitioner's eighth claim based on ineffective assistance of counsel, stating that further evidence presented by counsel would have been "merely cumulative," and would not changed the ultimate opinion of any expert witness. (Lodged Doc. 19.)

**At the end of an eight day evidentiary hearing, the court found that Petitioner's plea was not knowing, intelligent, and voluntary** because Petitioner was not advised of other defenses and could not have appreciated the defenses he was waiving when he plead no contest to second degree murder. (Lodged Docs. 20-28, Specifically, Lodged Doc. 26 at 882 regarding the court's decision granting habeas corpus petition.) On December 4, 2000, the court ordered that the writ of habeas corpus be granted, and that the judgment and conviction be vacated. (Lodged Doc. 29.)

Respondent appealed the superior court's grant of the petition for habeas corpus to the Fifth District Court of Appeal on March 21, 2001. (Lodged Doc. 30.) After appropriate briefing, the appellate court reversed the superior court's decision and held that a claim of imperfect self defense based on delusions was not available to Petitioner and therefore Petitioner's lack of advice on such a defense did not render his plea unknowing, unintelligent, and involuntary. (Lodged Doc. 35.)   A petition for rehearing was granted, and the order was vacated on August 2, 2002. (Lodged Doc. 37.) After further briefing, the appellate court again reversed the superior court's decision making only minor modifications to its previous order. (Lodged Doc. 40, "Gregory II")

A petition for review was filed with the California Supreme Court on October 17, 2002, but it ultimately was dismissed without comment on July 27, 2005. (Lodged Docs. 41-47.)

In summary, during the second round of review, the superior court denied most of Petitioner's claims as being already adjudicated in the previous habeas corpus petition, denied Petitioner's claim of ineffective assistance of counsel as cumulative, and granted relief based on the involuntariness of Petitioner's plea based on lack of knowledge of potential defenses. The court of appeal then reversed the grant of habeas relief. However, while the petition for

1   review was pending before the California Supreme Court, Petitioner commenced his third

2   round of habeas review.

3                    6.        Third Round of State Habeas Review

4        Petitioner began a third round of habeas review presenting the remaining issues raised

5   in his previous superior court habeas petition. On March 5, 2005, the superior court held an

6   evidentiary hearing and again granted Petitioner relief. However, on May 11, 2005, the

7   appellate court granted a writ of mandate to set aside the decision on the ground the superior

8   court lacked jurisdiction to hold further proceedings while the matter was being appealed.

9   (Lodged Doc. 48, "Gregory III") Since the decision has been set aside, the parties have not

10  relied on the findings of the superior court with regard to this round of state pleading.

11       After the California Supreme Court reached a decision regarding the second round of

12  habeas review, jurisdiction was restored to the superior court, and it proceeded to act upon

13  the remaining claims. Following further briefing, on May 19, 2006, **the superior court again**

14  **found Petitioner's plea to have been involuntary.**  (Lodged Doc. 53.) The superior court

15  based its decision on Petitioner's mental illness, medication, misadvice, and a finding that

16  Petitioner was unaware of the consequences of his plea. (Id. at 8.) The court also suggests

17  a finding that Petitioner's counsel was ineffective in so far as he had apprised the trial court

18  that he had discussed every element of the plea colloquy with Petitioner and said his client

19  understood he was making a knowing and intelligent waiver of his rights, when in later

20  testimony counsel admitted that Petitioner seemed medicated and may not have understood

21  what he discussed before or during the hearing. (Id. at 9-10.)

22       On appeal, the Fifth District Court of Appeal again reversed the decision of the superior

23  court in a reasoned decision. (Lodged Doc. 59, "Gregory IV")  The California Supreme Court

24  denied review. (Lodged Doc. 61.)

25                   7.        Fourth Round of State Habeas Review

26       On November 13, 2007, Petitioner began his fourth round of habeas review by filing a

27  brief on issues left unadjudicated in the state courts. (Lodged Doc. 62.) Petitioner requested

28  review of the following claims: a) whether the no contest plea was invalid based on the failure

1  to advise Petitioner of an involuntary manslaughter defense; b) whether Petitioner was

2  incompetent at the time he made his no contest plea; and c) whether the conviction of second

3  degree murder was contrary to the interests of justice and should be dismissed under

4  California Penal Code 1385. (Id.) The court only allowed the first issue to go forward, i.e., that

5  of  whether the no contest plea was invalid based on the failure to advise Petitioner of an

6  involuntary manslaughter defense.[10] (Lodged Doc. 65.) After holding an evidentiary hearing,

7  the superior court denied the remaining claim in a reasoned opinion on August 8, 2008.

8  (Lodged Doc. 69.)

9          On September 9, 2008 Petitioner filed a petition for writ of habeas corpus with the

10  California Supreme Court. (Lodged Docs. 72-75.) The petition was denied on March 11, 2009

11  with a citation to In re Miller, 17 Cal.2d 734 (1941), indicating that the petition was successive.

12  On April 26, 2009, Petitioner's second degree murder sentence was reinstated. (Answer at 7.)

13          8.        Petitioner's Federal Habeas Petition Pursued

14          As noted, on December 22, 1998, Petitioner filed a petition for writ of habeas corpus

15  with this Court. (Pet.) On August 17, 2000, the Court ordered the matter to be stayed pending

16  the resolution of the state proceeding. (Order, ECF No. 42, adopting the June 9, 2000 findings

17  and recommendations, Doc. No. 41.)  Over eight years later, on April 3, 2009, the Court lifted

18  the stay, and Petitioner filed an amended petition for writ of habeas corpus on September 8,

19  2009. (Am. Pet., ECF No. 108.)  Petitioner presents eight claims for relief in his amended

20  federal petition:

21          1.) Petitioner's no contest plea was invalid based on Petitioner's absence from a pretrial

22          conference;

23          2.) Petitioner's no contest plea was involuntary due to Petitioner's mental state and

24          other grounds;

25          3.) Petitioner's counsel was ineffective for failing to provide exculpatory evidence to

26  _____

27          [10]After the hearing, on March 11, 2008, Petitioner filed a writ of mandate in the Fifth District Court of
Appeal asking the court to order the Tulare County Superior Court to consider the competency claims raised in
28  the fourth round of habeas review. (Lodged Doc. 70.) The court denied the petition for mandate citing People v.
Zany, 164 Cal. 724 (1913). (Lodged Doc. 71.)

rebut expert witness testimony;

4.) Petitioner's counsel was ineffective for failing to rebut the testimony of Professor Morse;

5.) Petitioner's counsel was ineffective for failing to move for a change of venue;

6.) Petitioner was deprived due process and a fair sanity trial by the court's failure to sua sponte order a change of venue;

7.) Petitioner was deprived due process by the court taking Petitioner's plea and holding a sanity trial while Petitioner was not competent; and

8.) Petitioner was deprived of due process based on the culmination of multiple constitutional violations.

As Respondent correctly notes, every claim but claim seven was raised in Petitioner's originally filed Petition. (Answer at 8.) The effect, if any, of Petitioner's failure to raise claim seven shall be addressed along with the general discussion of the merits of that claim.

All eight claims will be analyzed in succession below.

## II.    JURISDICTION

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  His conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court.   28 U.S.C. § 2254(a); 2241(d).  Accordingly, the Court has jurisdiction over the action.

## III.    LEGAL STANDARD OF REVIEW

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA and is governed by its provisions.

Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n. 7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

**A.     Contrary to or an Unreasonable Application of Federal Law**

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133,  141 (2005) citing Williams, 529 U.S. at 405-06.  "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner" Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003).  A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id. at 75-76, quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the Court further stresses that "an unreasonable application of federal law is different from an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing

1    Williams, 529 U.S. at 410) (emphasis in original).  "A state court's determination that a claim

2    lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

3    correctness of the state court's decision."  Id. at 786 (citing Yarborough v. Alvarado, 541 U.S.

4    653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading

5    outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010).

6    "It is not an unreasonable application of clearly established Federal law for a state court to

7    decline to apply a specific legal rule that has not been squarely established by this Court."

8    Knowles v. Mirzayance, 556 U.S. ___, 129 S. Ct. 1411, 1419 (2009), quoted by Richter, 131

9    S. Ct. at 786.

10                    **B.      Review of State Decisions**

11          "Where there has been one reasoned state judgment rejecting a federal claim, later

12   unexplained orders upholding that judgment or rejecting the claim rest on the same grounds."

13   See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the "look through"

14   presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006).

15   Determining whether a state court's decision resulted from an unreasonable legal or factual

16   conclusion,"does not require that there be an opinion from the state court explaining the state

17   court's reasoning." Richter, 131 S. Ct. at 784-85. "Where a state court's decision is

18   unaccompanied by an explanation, the habeas petitioner's burden still must be met by

19   showing there was no reasonable basis for the state court to deny relief." Id. ("This Court now

20   holds and reconfirms that § 2254(d) does not require a state court to give reasons before its

21   decision can be deemed to have been 'adjudicated on the merits.'").

22          Richter instructs that whether the state court decision is reasoned and explained, or

23   merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is

24   the same: "Under § 2254(d), a habeas court must determine what arguments or theories

25   supported or, as here, could have supported, the state court's decision; then it must ask

26   whether it is possible fairminded jurists could disagree that those arguments or theories are

27   inconsistent with the holding in a prior decision of this Court." Id. at 786. Thus, "even a strong

28   case for relief does not mean the state court's contrary conclusion was unreasonable." Id.

U.S. District Court
E. D. California

-28-

1  (citing <u>Lockyer v. Andrade</u>, 538 U.S. at 75).  AEDPA "preserves authority to issue the writ in

2  cases where there is no possibility fairminded jurists could disagree that the state court's

3  decision conflicts with this Court's precedents."  <u>Id.</u>  To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a
> state prisoner must show that the state court's ruling on the claim being
> presented in federal court was so lacking in justification that there was an error
> well understood and comprehended in existing law beyond any possibility for
> fairminded disagreement.

7  <u>Id.</u> at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts are the

8  principal forum for asserting constitutional challenges to state convictions." <u>Id.</u> at 787.  It

9  follows from this consideration that § 2254(d) "complements the exhaustion requirement and

10  the doctrine of procedural bar to ensure that state proceedings are the central process, not just

11  a preliminary step for later federal habeas proceedings."  <u>Id.</u> (citing <u>Wainwright v. Sykes</u>, 433

12  U.S. 72, 90 (1977).

13  **C.   Prejudicial Impact of Constitutional Error**

14  The prejudicial impact of any constitutional error is assessed by asking whether the

15  error had "a substantial and injurious effect or influence in determining the jury's verdict."

16  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993); <u>see also</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 121-22

17  (2007) (holding that the <u>Brecht</u> standard applies whether or not the state court recognized the

18  error and reviewed it for harmlessness).  Some constitutional errors, however, do not require

19  that the petitioner demonstrate prejudice.  <u>See</u> <u>Arizona v. Fulminante</u>, 499 U.S. 279, 310

20  (1991); <u>United States v. Cronic</u>, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas

21  petition governed by AEDPA alleges ineffective assistance of counsel under <u>Strickland v.</u>

22  <u>Washington</u>, 466 U.S. 668 (1984), the <u>Strickland</u> prejudice standard is applied and courts do

23  not engage in a separate analysis applying the <u>Brecht</u> standard.  <u>Avila v. Galaza</u>, 297 F.3d

24  911, 918, n. 7 (2002).  <u>Musalin v. Lamarque</u>, 555 F.3d at 834.

25  **IV.   REVIEW OF PETITION**

26  **A.   Ground One - Absence From Pretrial Conference**

27  Petitioner's first claim is that he was deprived of his due process rights by his absence

28  from the April 29, 1994, pretrial conference with Judge Moran in which the judge and counsel

1    for both parties discussed trial strategy.

2              1.    Factual Background

3        On April 29, 1994, a pre-trial conference was held before Tulare County Superior Court

4    Judge Moran. (Lodged Doc. H.[11]) The prosecutor, Robert Bartlett, defense counsel, John

5    Smurr, and Petitioner's cousin, attorney Gregory Altounian, attended a conference regarding

6    Petitioner's scheduled May 16, 1994, criminal trial for the murder of Jack Burrow. At Smurr's

7    request, the conference was conducted in chambers. Petitioner was not present at the pretrial

8    conference. The record does not reflect an express waiver of Petitioner's presence.

9        During the conference, the judge discussed potential strategy regarding how to proceed

10   with an insanity defense. The judge described the outcomes of other Tulare County cases

11   involving mental illness and unprovoked murders. The judge expressed his belief that juries

12   given the alternative of finding a defendant guilty of  second degree murder or not guilty by

13   reason of insanity (NGI) were unlikely to return a NGI verdict. The judge felt that juries viewed

14   an NGI verdict as "turning him loose" and "a scam;"  he noted he had never seen a jury in the

15   county find a defendant insane. (Lodged Doc. H at 4, 7.)

16       Petitioner's counsel's statements illustrate that he clearly understood the difficulty he

17   would face in attempting to obtain a NGI verdict in Tulare County:

18           And I understand everything you're saying and I even heard from Mr.
             Cline [the Tulare County District Attorney] that my classmate Richmond tried one
19           down here once with five doctors saying somebody was not guilty by reason of
             insanity and they didn't buy it. Okay. I mean, I've done my homework.
20
21   (Lodged Doc. H at 6.) He further stated,

22           I understand the realities and I appreciate your directness and I spoke
             with [District Attorney] Cline and [Deputy District Attorney] Bartlett and they
             basically have said they can't remember a case where anybody, meaning a jury,
23           has returned such verdicts.

24   (Lodged Doc. H at 7.) Despite the understanding of all the parties present at the conference

25   that obtaining an NGI verdict would be difficult, if not impossible, Petitioner's counsel remained

26   convinced it was the proper way to proceed.

27   _____

28        [11] Lodged Documents listed in sequential order by letter (as opposed to number) refer to documents
     lodged with Petitioner's original pleading with the Court.

The judge suggested that the best way to proceed was to plea guilty to second degree murder and hold a court trial on the NGI issue. However, the district attorney would have to consent to a court trial; he was not willing to do so. (Id. at 7.) The judge concluded that an injustice could occur if the parties did not agree to a court trial on the insanity defense, because Petitioner would be found guilty of second degree murder and sent to prison even though there were serious questions as to his competency. (Id. at 11.) Despite these discussions and the district attorney's refusal to agree to a court trial, Petitioner entered a no contest plea to second degree murder and, after a jury trial on sanity was found sane.

2.      State Review of the Claim

Petitioner presented his claim based on absence from the conference to the Tulare County Superior Court in his first round of habeas review. (Lodged Doc. 6. at 28-30.) The petition was summarily denied by the Tulare County Superior Court and the California Supreme Court. (Lodged Docs. 7, 12.) The claim was again presented to the state courts in Petitioner's second round of habeas review and was denied based on it having already been adjudicated in the first habeas proceeding. (Lodged Dos. 14, 16.)

Under Ninth Circuit precedent, the California Supreme Court's summary denial of the petition for writ of habeas corpus constitutes a decision on the merits of Petitioner's federal claim. See Pinholster v. Ayers, 590 F.3d 651, 663 (9th Cir. 2009) (citing Hunter v. Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1992)); Gaston v. Palmer, 417 F.3d 1030, 1038 (9th Cir. 2005) (recognizing that "[w]e construe 'postcard' denials such as these to be decisions on the merits" (citing Hunter, 982 F.2d at 348)). "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United States Supreme Court]." Richter, 131 S. Ct. at 784-85.

3.      Right To Be Present

Petitioner contends that his constitutional right to be present at his trial was violated because he was not present at a pretrial conference held in chambers with the judge and

1  counsel for the parties. The Supreme Court has recognized that "the right to personal

2  presence at all critical stages of the trial . . . [is a] fundamental right [] of each criminal

3  defendant." Rushen v. Spain, 464 U.S. 114, 117 (1983). This right derives from the

4  Confrontation Clause of the Sixth Amendment and the Due Process Clauses of the Fifth and

5  Fourteenth Amendments. Campbell v. Wood, 18 F.3d 662, 671 (9th Cir. 1994). The

6  Confrontation Clause protects a defendant's right to face his accusers and applies to every

7  stage of a trial. See Illinois v. Allen, 397 U.S. 337, 338 (1970). Due process protects a

8  defendant's right to be present "at any stage of the criminal proceeding that is critical to its

9  outcome if his presence would contribute to the fairness of the procedure." Kentucky v.

10  Stincer, 482 U.S. 730, 745 (1987). A defendant's presence contributes to the fairness of a

11  procedure when, in light of the nature of the situation, defendant's presence would be useful

12  in ensuring a more reliable determination. Id. at 747. In Snyder v. Massachusetts, 291 U.S.

13  97, 105-06 (1934), the Supreme Court articulated the standard as a right to be present and

14  participate if his presence "has a relation, reasonably substantial, to the fullness of his

15  opportunity to defend against the charge." See also id. at 107-08 ("So far as the Fourteenth

16  Amendment is concerned, the presence of a defendant is a condition of due process to the

17  extent that a fair and just hearing would be thwarted by his absence and to that extent only.").

18  Due process does not require a defendant's presence where "presence would be useless, or

19  the benefit but a shadow." Id. at 106-07. (This Court focuses on the due process rather than

20  the Confrontation Clause aspect of the right to be present because no witness was examined

21  at the proceeding from which Petitioner was absent.)

22      The right to be present at all critical stages, like most constitutional rights, is subject to

23  harmless error analysis "'unless the deprivation, by its very nature, cannot be harmless.'"

24  Campbell v. Rice, 408 F.3d 1166, 1172 (9th Cir. 2005) (quoting Rushen v. Spain, 464 U.S. at

25  117 n.2). The vast majority of cases will be subject to a harmless error analysis. See, e.g.,

26  United States v. Gagnon, 470 U.S. 522, 527 (1985) (harmless error where defendant and his

27  counsel not present for in-camera meeting of judge, juror and lawyer for one defendant where

28  juror expressed concern that defendant was sketching portraits of jury); Rushen v. Spain, 464

1   U.S. at 117-18 & n.2 (if constitutional error, then error is harmless as to ex parte

2   communication between juror and judge regarding information forgotten during  voir dire);

3   Turner v. Marshall, 121 F.3d 1248, 1255 (9th Cir. 1997) (defendant's absence from jury room

4   during readback harmless error). To obtain habeas relief, the trial error must have "'had

5   substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v.

6   Abrahamson, 507 U.S. at 637, (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

7                              4.    Analysis of Claim

8        Petitioner asserts that his Fifth and Fourteenth Amendment rights were violated by his

9   not having been present at the April 29, 1994 conference in which Petitioner's counsel[12]

10  discussed insanity defense strategy with the judge and the district attorney. Petitioner asserts

11  that if he had been present and made aware of the difficulty of obtaining an insanity verdict,

12  he would not have plead no contest to second degree murder. (Am. Pet. at 7.)

13       The California court's rejection of this claim was not an unreasonable application of or

14  contrary to clearly established Supreme Court authority. While defendants have a fundamental

15  right to be present at all critical stages of trial, Petitioner provides no authority that such a right

16  extends to pretrial conferences. Rushen, 464 U.S. at 117. Petitioner acknowledges that there

17  is no reasoned decision to support his claim.[13]

18       Petitioner attempts to construe the reasoning of Kentucky v. Stincer, 482 U.S. at 745,

19  in an expansive manner not adopted by any court.  Id. (Defendant has a right to be present

20  "at any stage of the criminal proceeding that is critical to its outcome if his presence would

21  contribute to the fairness of the procedure.") Without any clearly established Supreme Court

22  authority to rely upon, this Court is not inclined to hold that Petitioner has a right to be present

23  at a pretrial hearing.

24

25           [12] Petitioner's cousin, Gregory Altounian, a civil law practitioner acting to assist Petitioner and Petitioner's
26  family understand the proceedings was also present at the hearing.

27           [13]Petitioner states "There is no reasoned state court decision as to this claim." (Am. Pet. at 8.) The Court
    assumes that Petitioner meant to state that there is no reasoned United States Supreme Court decision supporting
28  the proposition, as Petitioner may only seek relief from violations of clearly established Federal law in a Federal
    petition for writ of habeas corpus. See 28 U.S.C. § 2254(d)(1).

1    Petitioner relies upon United States v. Thompson, 827 F.2d 1254 (9th Cir. 1987), to

2    show that convictions may be overturned if a defendant is excluded from a stage of the

3    proceedings. However, the facts of Thompson are quite different. In Thompson, a reversible

4    error occurred when the defendant and defendant's counsel were omitted from an in camera

5    hearing where the prosecution explained that the peremptory challenges were not in violation

6    of  Batson v. Kentucky, 476 U.S. 79 (1986). Unlike the situation in Thompson, Petitioner's

7    counsel was present at the conference. Further, while the parties discussed potential strategy,

8    no evidence was presented, nor were any determinations made by the court. Whereas the

9    proceeding in Thompson occurred during the vior dire phase of trial, the proceeding in the

10   present case was only a status conference months before trial.

11   Petitioner asserts that the "crux" of his argument is that the information regarding trial

12   strategy during the conference was only conveyed to Petitioner's counsel, and that his counsel

13   did not relate the substance of the conversation to Petitioner. (Traverse at 4-6.)  This claim is

14   not relevant to the present inquiry. It goes to whether Petitioner's counsel was effective, not

15   whether he had a right to be present at the hearing.  See Cal. R. Prof. Conduct 3-500 ("A

16   member shall keep a client reasonably informed about significant developments relating to

17   the... representation.").

18   Further, Petitioner places undue significance on the statements made during the

19   hearing. All parties involved were aware of the difficulty of obtaining insanity verdicts. Prior to

20   the hearing, Petitioner's counsel had spoken with the district attorney who advised that he was

21   unaware of any jury in the county returning an insanity verdict. (Lodged Doc. H at 7.) The

22   discussion during the hearing did not convey any new information to Petitioner's counsel

23   regarding the difficulty of obtaining an insanity verdict. Whether Petitioner's counsel properly

24   informed Petitioner of that fact is a different issue, not relevant to whether Petitioner had a

25   right to be present at the pretrial conference. Petitioner's absence from the conference did not

26   violate clearly established federal law, and he is not entitled to habeas relief based on absence

27   at the conference.

28   ///

**B.     Ground Two - Voluntariness of Petitioner's No Contest Plea**

Petitioner asserts that his no contest plea was not knowingly, voluntarily, or intelligently made and was therefore invalid for three reasons: a) Petitioner did not understand the  terms and consequences of the plea due to the combined effects of his mental illness and the psychotropic medications administered in county jail, b) Petitioner was not advised  of available defenses by trial counsel, and c) Petitioner was not advised of the difficulty of prevailing at a sanity trial.[14] Each ground was reviewed separately and addressed in different state decisions during many rounds of state review. The Court shall address each ground separately.

1.     Asserted Invalidity of Petitioner's Plea Based on Petitioner's Lack of Understanding of the Terms and Consequences of the Plea due to the Combined Effects of his Medical Illness and Medications

Petitioner asserts that he was not able to make a knowing, intelligent, and voluntary plea due to the effects of his mental illness and medications.

As described in detail herein, the plea was taken after Petitioner returned from the care of Atascadero State Hospital where he had been sent for treatment after being found incompetent to stand trial. Petitioner was examined by several mental health specialists in the period shortly before and after the plea hearing.  While Petitioner was found minimally

---

[14]In Petitioner's amended petition, Petitioner states in the heading of this cause of action the additional ground that the plea was involuntary based on the promises of an insanity stipulation by the prosecuting attorney. (Am. Pet. at 8.) Petitioner has not addressed nor presented any facts in support of this claim as required by the Rules Governing Section 2254 Cases in the United States District Courts, Rule 2(c)(2). The factual history in Gregory IV explains that Petitioner's parents recall a conversation in which the district attorney made such a promise, but the district attorney denied ever making such a statement. It is clear that while Petitioner's trial counsel was seeking such an arrangement, the district attorney never agreed to it. Petitioner has presented eight claims for relief in his pleadings, and several of the claims, including the instant claim, are based on multiple grounds. Petitioner's counsel on appeal has not been constrained by time (this petition has been pending before this court for over twelve years) nor space (Petitioner's amended petition is over sixty pages long). Furthermore, and of greatest weight, is the fact that Petitioner developed such claims in his original Petition, yet  did not include the allegations in the amended petition. (Pet. at 13.) An amended petition supercedes the original petition, Forsyth v. Humana, Inc., 114 F.3d 1467, 1474 (9th Cir. 1997); King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987), and must be "complete in itself without reference to the prior or superceded pleading." Local Rule 220. "All causes of action alleged in an original complaint which are not alleged in an amended complaint are waived." King, 814 F.2d at 567. As Petitioner has removed the factual allegations supporting this ground for relief from the amended petition (even though failing to amend the heading to reflect such a change), this ground for releif is considered waived and shall not be reviewed.

competent to stand trial, it is uncontroverted that Petitioner was, nevertheless, significantly impaired. Petitioner's functional difficulties notwithstanding, it appears Petitioner's counsel wished to move quickly through the plea hearing believing Petitioner would prevail in his insanity defense.

Petitioner was twice granted habeas relief by the superior court on the ground that his plea was not voluntary.  Both times the grant was reversed by the California Court of Appeal, Fifth Appellate District. Accordingly, the Court shall review the facts surrounding Petitioner's plea and relevant state court decisions to determine if Petitioner is entitled to habeas relief.

a.     Factual Background

The facts surrounding Petitioner's plea hearing were recited in detail by the appellate court in Gregory II and Gregory IV. The pertinent  factual backgrounds from each decision are reproduced above. (See supra Part I.B.) In a proceeding instituted by an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by the state court shall be presumed to be correct. 28 U.S.C. § 2254(e)(1).

(1)     *Summary of Events Leading to No Contest Plea*

Petitioner was confined at Atascadero State Hospital, due to, incompetence to stand trial, from October 25, 1993 until January 24, 1994. During that period, Petitioner related to his mother that, at the time of the shooting, he believed there was a conspiracy between the Russians and the victim to kill him and his family. Petitioner was no longer voicing delusions when he was released from Atascadero. However, during February and March, he suffered a relapse due to changes in his medication and  vacillated between reality and confusion.

On April 29, 1994, defense counsel, the district attorney and the judge met in chambers for the pretrial conference that was the subject of Petitioner's first claim. After the conference defense counsel told Petitioner's parents that the prosecutor was insisting on a jury trial on the sanity issue, but assured them the case would settle. He also told them Petitioner would have to plead guilty to second degree murder.

///

1

(2)     *Petitioner and Petitioner's Family's Observations*

2  Petitioner's mother did not relate these events to Petitioner because she thought the
3  case would settle, and Petitioner was "very fragile" and she did not want to scare him. In May,
4  1994, Mrs. Gregory discussed with Petitioner how he would have to plead guilty to second
5  degree murder as a matter of formality. While on some occasions she thought Petitioner
6  understood, on others he sounded confused, nervous, and scared.

7  On May 16, 1994, prior to entering his plea, Petitioner met with defense counsel and
8  Gregory Altounian. Altounian recalled defense counsel telling Petitioner that he would go to
9  prison instead of a mental hospital if found sane. Altounian did not hear defense counsel
10 advise Petitioner of any defenses; instead, defense counsel simply told Petitioner that he was
11 going to plead guilty to second degree murder. Counsel told Petitioner that the judge was
12 going to take a waiver of his constitutional rights, but did not explain, or ask Petitioner if he
13 understood, what those rights were. Based on his lifelong familiarity with Petitioner and
14 Petitioner's demeanor and lack of response, Altounian did not believe that Petitioner
15 understood what defense counsel had stated. Altounian told defense counsel after the
16 meeting that Petitioner had "no clue" as to what defense counsel was telling him. Defense
17 counsel did not respond.

18 Petitioner's family felt, based on how Petitioner acted in court during the change of plea
19 proceedings, that Petitioner did not understand what was occurring. When the judge asked
20 him questions, Petitioner did not respond promptly, and he frequently asked the judge to clarify
21 or repeat a question. Many times, Petitioner looked to defense counsel, then answered only
22 after defense counsel nodded or whispered something to him.

23 The next day, Petitioner appeared to Mrs. Gregory to be totally confused as to what had
24 happened the day before. Petitioner's family did not mention their concerns to defense counsel
25 as they believed, based on defense counsel's assertions, that getting Petitioner through the
26 plea and into the sanity trial would be the fastest way to find Petitioner insane.

27 Petitioner recalled meeting with defense counsel prior to the change of plea
28 proceedings, but he was unable to make sense out of what he was being told; it seemed

1    defense counsel was not speaking English. Petitioner did not ask for clarification. He relied

2    on representations from his parents that this was the best way to proceed. Petitioner was

3    concerned that if he told defense counsel his difficulty, he would call off the court proceedings.

4    Petitioner was still confused when he entered the courtroom. When the judge began asking

5    him questions, Petitioner initially was honest and said he did not understand. However, based

6    on his understanding that it was best to get through the proceeding, Petitioner then answered

7    the questions in a manner he thought would be appropriate, even though he did not

8    understand them. Petitioner did not truly understand the punishment he was facing until he

9    was sentenced.

10                              (3)    *Defense Counsel's Observations*

11        In retrospect, defense counsel was not satisfied that Petitioner processed the

12   information regarding waiving rights and pleading to second degree murder as discussed in

13   the meeting before the plea hearing. Petitioner appeared to be medicated. Given the benefit

14   of hindsight, defense counsel felt he should have had a psychiatrist with him to assure

15   Petitioner properly processed the information and knew he was waiving certain rights. At the

16   time of the plea, however, he did not feel it was necessary. While defense counsel believed

17   it to be in Petitioner's best interest to enter a guilty plea to second degree murder, he could not

18   assure the trial court that on May 16, 1994, Petitioner actually understood his legal options and

19   the upside and downsides of the different possibilities.

20                              (4)    *Medical Expert's Observations*

21        Dr. Terrell interviewed Petitioner on May 15, 1994, the day before Petitioner plead no

22   contest. He was unaware Petitioner was going to plead the next day, and the interview was

23   not focused on Petitioner's competency to enter a plea. Petitioner informed Dr. Terrell that he

24   was on a daily regimen of four medications, medications which Dr. Terrell felt could cause side

25   effects and confusion. The interview with Petitioner revealed abnormalities in Petitioner's

26   thought processes and evidence of remaining mental illness including thought blocking. Even

27   though he felt  Petitioner was competent to stand trial, Dr. Terrell's  interview of Petitioner, the

28   plea hearing, and other evidence caused him to have serious doubts about whether Petitioner

understood the consequences of his plea on May 16, 1994 . He believed that given Petitioner's mental state on May 15, a status which was not likely to have improved substantially by the next day, it would have been virtually impossible for Petitioner to understand and adequately comprehend the possible sentences attached to the crimes to which he could have been convicted (first and second degree murder or manslaughter) or otherwise adequately understand the various options explained to him. It appeared to Dr. Terrell from the transcript of the change of plea proceedings that Petitioner's mental illness was worse on the day of the plea hearing than on May 15 and that he was "quite impaired" at that time.

Dr. Mills, examined Petitioner on May 11, 1994, five days before the plea hearing. Dr. Mills testified that Petitioner appeared "significantly ill," and that in his opinion, Petitioner was toxic on one or a combination of medications, was confused because of his psychosis, or both. If Dr. Mills had been asked his opinion regarding Petitioner's competence to stand trial, he would have found him marginally competent. However, Dr. Mills notes that Petitioner frequently seemed confused during the evaluation. In Dr. Mills' opinion, Petitioner did not understand the consequences of his plea.  Dr. Mills felt Petitioner may have placed undue emphasis on the information given him by his parents because people with paranoid schizophrenia tend to trust very few people and, hence, the people they do trust have a disproportionately large effect on their opinions and beliefs. Dr. Mills further asserted that at the time he changed his plea Edwin's mental state was suspect and that he was suffering from thought process disruptions that included memory retention difficulty, thought blocking, and confusion. While questions asked by the court during the change of plea proceedings would have been appropriate for most defendants, those questions were inadequate for Petitioner because they allowed him, with apparent prompting from his attorney, to answer yes and no without reflecting his degree of confusion.

Dr. Estner, a forensic psychiatrist, never interviewed Petitioner. He did read Dr. Terrell's notes, and based thereon testified that Petitioner "may" have been aware that the outcome on the sanity issue was uncertain.  He opined that Petitioner was competent to enter a plea. Dr. Estner also felt that while Petitioner's asking of questions could be taken as a symptom of

1    confusion or mental illness, it also could suggest competence to enter the plea insofar as it

2    evidenced a search for clarification of that which Petitioner did not understand.

3                        b.    State Review

4         In three rounds of state habeas proceedings, Petitioner received three separate

5    reasoned decisions denying the grounds presented in his second claim. During the initial

6    habeas round, Petitioner's sixth claim was that his plea was involuntary. (Lodged Doc. 6.) The

7    superior court denied the claim with the statement: "The petition for writ of habeas corpus is

8    denied because the allegation [sic] of fact, even if true, do not support the legal conclusions

9    advanced by petitioner and do not establish grounds for relief." (Lodged Doc. 7.) Petitioner

10   filed a petition with the California Supreme Court that was denied without comment. (Lodged

11   Docs. 8-12.)

12        Petitioner filed a second petition, again including a claim that his plea was involuntary.

13   (Lodged Doc. 13-14.) The superior court granted relief in the form of an evidentiary hearing

14   with regard to Petitioner's claim that the plea was involuntary as "there is a reasonable

15   likelihood that... due to his mental illness and medication and misadvise with respect to

16   proceedings on his plea of insanity, he was not aware of the consequences of his plea."

17   (Lodged Doc. 19.) After the evidentiary hearing, the Court granted relief on the claim, finding

18   that the plea was involuntary because Petitioner was not advised of, and could not appreciate,

19   the possible defense of imperfect self-defense.[15] (Lodged Doc. 26.) The appellate court

20   reversed the superior court order. (Lodged Doc. 40.) The court of appeal found that, under

21   California law, imperfect self-defense cannot be based solely on delusions, and lack of advice

22   to either Petitioner or his parents on imperfect self-defense could not have rendered

23

24

25        [15]While the court did base the decision to grant habeas relief primarily on the fact that Petitioner was not
     advised of potential defenses, the court also noted the following with regard to Petitioner's mental state:

26        "I also find that based on the evidence that I have heard here from the psychiatrists who testified, as well
27   as Ken Clark, the social worker who followed defendant's medication at the jail, that defendant's mental state at
     the time that he was – as the time he entered the plea, at least, makes me doubtful whether, given his mental
28   state, that he could have, in any event, understood the concept of imperfect self-defense at least not without a
     great deal more instruction and advise than he had." (Lodged Doc. 26 at 884.)

1  Petitioner's plea unknowing, unintelligent or involuntary.[16] (Id.) Petitioner's California Supreme

2  Court challenge of the appellate decision was ultimately dismissed. (Lodged Doc. 47.)

3       Petitioner again raised the claim that the plea was involuntary in his third round of

4  habeas review and the superior court again granted relief based on the finding that Petitioner

5  did not understand the consequences of his plea because of mental illness, medication, and

6  misadvice. (Lodged Doc. 53) On appeal, the superior court decision was reversed. (Lodged

7  Doc. 59, Gregory IV.) As described in depth below, the appellate court held that Petitioner's

8  mental state could not be considered when determining if the plea was knowing and voluntary.

9  Petitioner challenged the decision in the California Supreme Court; his challenge was denied

10  without comment. (Lodged Doc. 61.)

11       Petitioner returned to the superior court for his fourth round of habeas review and was

12  granted an evidentiary hearing on the issue of whether the plea was involuntary because

13  defense counsel did not advise Petitioner regarding a possible involuntary manslaughter

14  defense. (Lodged Docs. 65-67.) Following the evidentiary hearing, the superior court rejected

15  Petitioner's claim after finding the evidence did not support a viable involuntary manslaughter

16  claim. (Lodged Doc. 69.) The California Supreme Court denied review. (Lodged Doc. 76.)

17       In summary, Petitioner's claim that the plea was not voluntarily based on the combined

18  effects of his mental illness and medications was last addressed in the appellate court decision

19  in Gregory IV. "In determining whether a state court decision is contrary to federal law, we look

20  to the state's last reasoned decision."  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

21                     c.      Voluntariness of Plea

22  _____"The longstanding test for determining the validity of a guilty plea is 'whether the plea

23  represents a voluntary and intelligent choice among the alternative courses of action open to

24  the defendant.'" Hill v. Lockhart, 474 U.S. 52, 56 (1985) (citing North Carolina v. Alford, 400

25  U.S. 25 (1970)).

26  ///

27

28      [16]This decision shall be discussed in detail below when addressing Petitioner's claims that his plea was
    involuntary based on failure to be advised of defenses.

As stated in <u>Godinez v. Moran</u>:

> The purpose of the "knowing and voluntary" inquiry... is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced. <u>See</u> <u>Faretta v. California</u>, 422 U.S. 806, 835 (1975) (defendant waiving counsel must be "made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open'") (quoting <u>Adams v. United States ex rel. McCann</u>, 317 U.S. 269, 279, 87 L. Ed. 268, 63 S. Ct. 236 (1942)); <u>Boykin v. Alabama</u>, 395 U.S. 238, 244 (1969) (defendant pleading guilty must have "a full understanding of what the plea connotes and of its consequence").

113 S. Ct. at 2687 n.12 (1993).

"What is at stake for an accused facing... imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." <u>Boykin</u>, 395 U.S. at 243-244. "Ignorance, incomprehension, coercion, terror, inducements, subtle or blatant threats might be a perfect cover-up of unconstitutionality." <u>Id.</u> at 242-43.

"A guilty plea... is an event of signal significance in a criminal proceeding. By entering a guilty plea, a defendant waives constitutional rights that inhere in a criminal trial, including the right to trial by jury, the protection against self-incrimination, and the right to confront one's accusers. While a guilty plea may be tactically advantageous for the defendant..., the plea is not simply a strategic choice; it is itself a conviction..., and the high stakes for the defendant require the utmost solicitude... Accordingly, counsel lacks authority to consent to a guilty plea on a client's behalf; moreover, a defendant's tacit acquiescence in the decision to plead is insufficient to render the plea valid..." <u>Florida v. Nixon</u>, 543 U.S. 175, 187-188 (2004) (citations omitted) (citing <u>Boykin</u>, 395 U.S. at 240-243; <u>Brookhart v. Janis</u>, 384 U.S. 1, 6-7,(1966)).[17]

In considering the issue of voluntariness, a reviewing court must examine the totality of circumstances surrounding the plea. <u>Brady v. United States</u>, 397 U.S. 742, 749 (1970) ("The voluntariness of [Petitioner]'s plea can be determined only by considering all of the relevant

---

[17] Rather than pleading guilty, Petitioner entered a plea of nolo contendere. "Under California law, a plea of nolo contendere is 'the same as a plea of guilty and upon a plea of nolo contendere, the court shall find the defendant guilty.'" <u>Jennings v. Mukasey</u>, 511 F.3d 894, 896 (9th Cir. 2007) (citing Cal. Penal Code § 1016.). Petitioner's nolo contendere plea shall be considered for all practical purposes the same as a guilty plea.

1  circumstances surrounding it."); <u>United States v. Anderson</u>, 993 F.2d 1435, 1437 (9th Cir.

2  1993).

3                    d.      Competence to Stand Trial, Plead Guilty, and Represent Oneself

4      While Petitioner is not asserting that he lacked competence to stand trial, the issue of

5  competence is relevant to the present inquiry.

6      The Supreme Court addressed mental competence in <u>Indiana v. Edwards</u>. 554 U.S.

7  164, 169-170 (2008). The Supreme Court summarized its previous holdings and restated the

8  standard for mental competency as follows:

9          The two cases that set forth the Constitution's "mental competence" standard,
           <u>Dusky v. United States</u>, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960) (per
10         curiam), and <u>Drope v. Missouri</u>, 420 U.S. 162, 95 S. Ct. 896, 43 L. Ed. 2d 103
           (1975), specify that the Constitution does not permit trial of an individual who
11         lacks "mental competency." <u>Dusky</u> defines the competency standard as
           including both (1) "whether" the defendant has "a rational as well as factual
12         understanding of the proceedings against him" and (2) whether the defendant
           "has sufficient present ability to consult with his lawyer with a reasonable degree
13         of rational understanding." 362 U.S., at 402, 80 S. Ct. 788, 4 L. Ed. 2d 824
           (emphasis added; internal quotation marks omitted). <u>Drope</u> repeats that
14         standard, stating that it "has long been accepted that a person whose mental
           condition is such that he lacks the capacity to understand the nature and object
15         of the proceedings against him, to consult with counsel, and to assist in
           preparing his defense may not be subjected to a trial." 420 U.S. at 171, 95 S. Ct.
16         896, 43 L. Ed. 2d 103 (emphasis added).

17  <u>Edwards</u>, 554 U.S. at 169-170.

18      Of critical importance here is that competency and Petitioner's ability to provide a

19  knowing and voluntary plea are separate and distinct inquires.  "The focus of a **competency**

20  **inquiry** is the defendant's mental capacity; the question is whether he has the ***ability to***

21  ***understand the proceedings***." <u>See</u> <u>Drope</u>, 420 U.S. at 171 (defendant is incompetent if he

22  "lacks the capacity to understand the nature and object of the proceedings against him")

23  (emphasis added). The purpose of the **"knowing and voluntary" inquiry**, by contrast, is to

24  determine whether the defendant **actually** ***does*** **understand** the significance and

25  consequences of a particular decision and whether the decision is uncoerced. <u>Godinez</u>, 113

26  S. Ct. at 2687 n.12.

27  ///

28  ///

1                          e.      Analysis of Claim

2          In <u>Gregory IV</u>, the appellate court reversed the superior court's grant of the writ and

3   withdrawal of the plea. The appellate court rejected the argument that the plea was

4   "involuntary and due to the mental illness, medication and misadvice."  <u>Gregory IV</u> at *8.

5   Reasoning that Petitioner was competent to stand trial the appellate court held that, "much,

6   if not all, of the evidence offered by [Petitioner] had minimal, if any, relevance to the issue of

7   a knowing and intelligent plea. It did have significant relevance to the issue of competency,

8   which was not in dispute. Given that [Petitioner] was competent to enter a plea, the record

9   does not support the conclusion that the plea was not knowing and intelligent for purposes of

10  understanding or waiver." <u>Id.</u> at *19.

11         Despite acknowledging that the issues of competency and whether a plea is knowing

12  and voluntary require distinct inquiries, the appellate court impermissibly combined the two and

13  in so doing unreasonably applied clearly established federal law as promulgated by the

14  Supreme Court of the United States.

15         The appellate court adequately contrasted the appropriate standards for providing a

16  knowing and voluntary plea and competency. It cited to relevant Supreme Court cases setting

17  forth the standard for providing a knowing and voluntary plea. <u>Gregory IV</u> at *11 (citing <u>Hill v.</u>

18  <u>Lockhart</u> 474 U.S. at 56 and <u>Boykin v. Alabama</u> 395 U.S. at 242-44). It also properly set forth

19  the federal standard for competence based on <u>Godinez v. Moran</u>, 509 U.S. 389, and <u>Drope</u>

20  <u>v. Missouri,</u>  420 U.S. at 172. <u>Gregory IV</u> at *11.

21         After identifying the two different standards, the appellate court noted correctly that the

22  legal inquiries were distinct and that a defendant must both be competent and provide a

23  knowing and voluntary waiver of his rights in order to plea guilty.

24         [A] finding that a defendant is competent to stand trial ... is not all that is
            necessary before he may be permitted to plead guilty.... In addition to
25          determining that a defendant who seeks to plead guilty ... is competent, a trial
            court must satisfy itself that the waiver of his constitutional rights is knowing and
26          voluntary.

27  <u>Gregory IV</u> at *12, citing <u>Godinez</u>, 509 U.S. at 400-01.

28  ///

Further,

> We read <u>Godinez</u>'s two-part inquiry as requiring, first, that in order to be competent, a defendant must be capable of entering a plea that is valid. In other words, he or she cannot merely be oriented to time and place and have some recollection of events, but must have a present ability to consult with his or her attorney with a reasonable degree of rational understanding, and have a rational and factual understanding of the proceedings... Second, the defendant must not only have the capacity or ability to understand, he or she must actually understand what he or she is doing and the significance and consequences of that decision. (citations and footnotes omitted)

<u>Gregory IV</u> at *12.

However, after acknowledging the U.S. Supreme Court's distinction between what is required to show competence to stand trial (i.e., the **ability to understand** the nature and object of the proceedings) and the "heightened" standard necessary for a valid guilty plea (i.e., an **actual understanding** of the significance and consequences of the plea), the appellate court went on to conclude that that distinction did not apply in this case. It held that the finding of competence to stand trial prevented defendant from presenting evidence that his plea was not knowing or voluntary based on his mental condition. "In our view, the consequence of the argument has one of two effects: If Edwin was competent, then necessarily he had the capacity to enter a valid plea and he limits the issues accordingly; if Edwin could not understand what was being said to him or process it, then he was not competent and he likewise places a different perspective on the issues." <u>Gregory IV</u> at *14-*15. "Necessarily then, Edwin's concession that he was competent to enter a plea means there is no basis, on the record before us, upon which to find his plea was not knowing, intelligent, and voluntary if he was indeed competent." <u>Id.</u> "In our view, given the concession of competency, much, if not all, of the evidence offered by Edwin had minimal, if any, relevance to the issue of a knowing and intelligent plea. It did have significant relevance to the issue of competency, which was not in dispute." <u>Id.</u> "Under the evidence presented in this case, capacity to understand and actual understanding, although legally distinct, are factually one and the same." Id. "Thus, once Edwin took the position in the writ proceedings that he was competent, he necessarily rendered insubstantial any evidence that he did not actually understand the nature and consequences of his plea. " Id.

1    This Court struggled mightily to reconcile the state appellate court's oft-repeated

2    enunciation of its position with the Supreme Court's clearly drawn distinction between the two

3    standards. No such reconciliation was achieved.  The appellate court's conclusions are without

4    support in any cited or otherwise relevant authority and, this Court finds, contradict clearly

5    established federal law as stated by the Supreme Court of the United States.

6    The Supreme Court has clearly directed that all relevant factors be considered to

7    determine competence.  Brady, 397 U.S. at 749 ("The voluntariness of [Petitioner]'s plea can

8    be determined only by considering all of the relevant circumstances surrounding it."). While

9    the Supreme Court does not specifically state that Petitioner's mental capacity is a relevant

10   factor, several Courts of Appeals have considered such evidence relevant. The Eleventh

11   Circuit in Fitzpatrick v. Wainright, 800 F.2d 1057, 1065-67 (11th Cir.1986), created an eight

12   factor test to determine if a petitioner made a knowing, voluntary and intelligent waiver. The

13   first factor is  "The defendant's age, education background, and physical and mental health."

14   (Id.) In United States v. Cash, 47 F.3d 1083 (11th Cir. 1995), the court relied on petitioner's

15   mental health to determine that his plea was not knowing, voluntary, and intelligent. Id.

16   ("However, considering the inadequacy of the district court's colloquy with Appellant, we

17   believe that the findings of Appellant's mental problems tip the balance in favor of finding that

18   Appellant's waiver of counsel was not knowing, voluntary and intelligent.  The personality

19   disorder with which Appellant was diagnosed causes him to overestimate and overstate his

20   abilities.") In Cash, the appellant was diagnosed with Narcissistic Personality Disorder, and

21   despite appellant's competency to stand trial, the Eleventh Circuit found that his  personality

22   disorder prevented him from knowingly and intelligently waving counsel. Id.

23   The Court of Appeals for the Eighth Circuit has similarly held that mental condition is

24   relevant to determining if a defendant's plea is knowing, voluntary and intelligent. See Shafer

25   v. Bowersox, 329 F.3d 637, 650 (8th Cir. 2003) ("The record evidence made Shafer's mental

26   condition relevant to determining whether he understood the consequences of his decision.").

27   The Shafer court discussed the importance for the court performing a thorough plea colloquy

28   to ensure the defendant can make knowing, voluntary and intelligent decisions when a

defendant is suffering from severe mental conditions. Id. at 649. ("The importance of the trial court's omissions at the colloquy is magnified in significance when Shafer's mental condition is taken into consideration. There was undisputed state court evidence from a number of experts that Shafer suffered from depression, personality disorders, and other psychological problems that caused impulsive and irrational decision making and frequent mind changes. The state's expert admitted that he had not even attempted to determine whether Shafer could knowingly and intelligently waive his rights and plead guilty. A thorough colloquy was even more important under these circumstances to ensure that Shafer could make knowing, voluntary, and intelligent decisions.") Additionally, in a decision prior to Shafer, the United States District Court for the Western District of Missouri also concluded that a petitioner's mental condition is relevant when determining if a petitioner knowingly and voluntarily waived his rights. Wilkins v. Delo, 886 F. Supp. 1503, 1512-13 (W.D. Mo. 1995) ("Clearly, a defendant's mental condition is relevant to his ability to truly knowingly and voluntarily waive his constitutional rights. This proposition is supported by common sense as well as the extensive psychiatric testimony in this case.")

While focused on competency rather than ability to provide a knowing and voluntary plea, the Ninth Circuit in Bills v. Clark recently distinguished between a defendant's competency to stand trial and competency to act as his own counsel. 628 F.3d 1092, 1099 (9th Cir. 2010) "Courts may 'take realistic account of the particular defendant's mental capacities,' and find some defendants 'competent enough to stand trial under Dusky but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.'" Id. (Citations omitted.) While the Ninth Circuit in Bills discussed competency standards, the case illustrates that Petitioner's mental condition is still a factor in determining if Petitioner can properly conduct himself at trial. Even assuming that Petitioner is competent to stand trial, Petitioner's ability to knowingly and intelligently waive his rights or represent himself are separate inquires for which Petitioner's mental condition is still a relevant consideration. See also Brooks v. McCaughtry, 380 F.3d 1009, 1013 (7th Cir. 2004) ("And even if the standards for competence to stand trial and for competence to waive the right of

1   counsel are the same, the existence of an effective waiver need not be automatically deduced
2   from a finding that the defendant is competent to stand trial... A judge who, having explained
3   the consequences, finds that the defendant doesn't understand them is entitled to conclude
4   that although competent to stand trial, the defendant has not made an effective waiver of his
5   right to counsel and therefore may not represent himself. This result is consistent with
6   Godinez.").

7        While these decisions from other circuits are not binding on this Court, they are
8   persuasive. Based on Supreme Court guidance in Brady, this Court finds that Petitioner's
9   mental condition is relevant to an inquiry as to whether he knowingly and voluntarily waived
10  his rights. See also,  John Parry, Criminal Mental Health and Disability Law, Evidence and
11  Testimony 317 (2009) ("Nevertheless, functional issues regarding mental health disorders
12  normally are relevant considerations. For instance, a person with paranoid schizophrenia or
13  severe depression may be able to satisfactorily complete competency assessment instruments
14  that measure cognitive understanding. Yet, that person's delusional system or the irrational
15  sense of guilt, worthlessness, and hopelessness associated with depression might functionally
16  impair his or her ability to make knowing, voluntary, and intelligent decisions.")

17       Here, the facts are uncontroverted. Petitioner had been diagnosed with paranoid
18  schizophrenia in the fall of 1993 and was found by several experts to be incompetent to stand
19  trial. He was sent to a state hospital to attempt to recover.  He was released from the care of
20  the state hospital in late January, 1994, after medications were prescribed for his condition.
21  Despite improvement which rendered Petitioner sufficiently competent to be released from the
22  state hospital, Dr. John A. Riley warned that Petitioner's mental state could "decompensate"
23  if placed in a stressful environment, such as jail. (Clerk's Transcript on Appeal, p. 105.)
24  Petitioner nevertheless was returned to jail.

25       Despite the opinions of several medical experts that Petitioner was "minimally"
26  competent to stand trial and despite Petitioner's behavior in a meeting before the plea hearing
27  in which Petitioner's uncle and defense counsel both were unsure if Petitioner understood
28  what was to happen at the proceeding, Petitioner's no contest plea was taken. During the plea

proceedings, Petitioner appeared confused and relied heavily on instructions from counsel. At times it appeared that the court was addressing and talking directly with defense counsel, not Petitioner.   This and other evidence presented to the superior court by way of an evidentiary hearing indicates at minimum that Petitioner's mental condition was of great concern at the time of the plea hearing.

Like the state courts, this Court can only speculate as to why Petitioner's defense counsel, and the trial court for that matter, did not challenge or inquire further to ensure that Petitioner was competent to enter a knowing and voluntary plea.[18]   However, Petitioner's competency is not at issue. Petitioner's ability to provide a knowing and voluntary plea is, and significant evidence exists to show that his mental condition affected his ability to provide such a plea.

When the superior court granted habeas relief on this ground, the appellate court reversed.  As stated in <u>Gregory IV,</u> the appellate court held that because Petitioner was found to be legally competent at the time of the plea, the plea was necessarily knowing and intelligent. The Court reasoned that Petitioner's mental condition is only relevant to Petitioner's competency and cannot be basis for Petitioner's plea being knowing and voluntary.[19]

---

[18]State courts reviewing Petitioner's plea colloquy have commented that the written record seems completely ordinary and may suggest that Petitioner was perfectly competent at the time of the hearing. However, the lack of discussion, including the failure to involve expert witnesses as to Petitioner's competency, ask Petitioner specific questions regarding his ability to think clearly, the effects of his medications, and his understanding of the proceedings before him, is troubling when counsel and the courts were well aware that Petitioner was not competent only months before.  The only indication from the record that Petitioner's mental condition was at issue is that the court asked defense counsel if Petitioner had the capacity to intelligently and knowingly waive his rights. (Plea Transcript at 9.)  If the court and counsel had any reservations regarding Petitioner's mental condition,  it would have been prudent to inquire further or even continue the hearing to assure that Petitioner was  capable of proceeding. Instead, this Court finds itself addressing, after nearly fifteen years of continuous appeals, whether Petitioner's  plea was knowing and voluntary.

[19] The court explains its reasoning as follows:

Edwin has repeatedly and expressly refused to place his competence in dispute, both in the trial court and before this court. We may speculate that this concession was made because the psychiatric evidence available is that he was in fact competent, therefore limiting the argument that properly could be made to whether he actually understood. It does appear, on the record before us, that the expert testimony confused the issues of competency to enter a plea and the level of understanding to enter a plea. Nevertheless, Edwin's attempt to parse the standards of competence and the concepts of knowing and intelligent waiver into distinct aspects that utilize the same standards to reach different results cannot be logically reconciled. Edwin was

1    The appellate court blurs the distinction between competence and waiver. The court

2 reasons that the inquiries "utilize the same standards" and that finding Petitioner's plea was

3 not knowing and voluntary "necessarily rests" on finding him incompetent to plea. The court

4 cites no legal authority for such a premise.  In so concluding, the court  denied Petitioner the

5 ability to properly challenge whether his plea was knowing and voluntary.

6    The court's concern with undermining the competency proceeding is misplaced.

7 Through the competency proceeding process, it was determined that Petitioner was 'minimally

8 competent' and, that if subjected to stress, could decompensate.  Given the determinations

9 of the medical experts, Petitioner's competence was a close call and should have heightened

10 trial court and counsel's concern regarding Petitioner's competency. The appellate court's

11 insistence that  mental condition and competence is a clearly defined "yes or no" proposition

12 does not comport with the realities of Petitioner's mental state which likely fluctuated in

13 response to factors known to be present, e.g., stress and changes in medication. See Indiana

14 v. Edwards, 128 S. Ct. 2379, 2386 (2008) ("Mental illness itself is not a unitary concept. It

15 varies in degree. It can vary over time. It interferes with an individual's functioning at different

16 times in different ways."). Thus, a finding that one is, during a period of time, sufficiently

17 mentally competent to understand and participate in trial proceedings is not inconsistent with

18 a finding that the same person is, at a particular point within that period of time, mentally

19 unable to understand the significance and consequences of a plea.  There would be no reason

20 for the Supreme Court's distinction if the two criteria were exactly the same in every case in

21 which the defendant's impaired ability arose from a mental deficiency or aberration.

22 _____

23      either competent or he was not. The effectiveness of his argument necessarily rests upon us
         concluding that while competent at the time he entered his plea, he did not make a knowing and
24      intelligent waiver because he was not competent at the time he entered his plea. Edwin's
         argument does not carve out any legally credible middle ground. To conclude on this evidence
25      that Edwin did not understand or process what was said to him, but was capable of doing
         precisely that, is inherently inconsistent and would be legal sophistry. Edwin's argument would
26      place a trial court in the untenable position of never being able to achieve a level of confidence
         in his understanding, which is the precise purpose of a competency proceeding under section
27      1368.  Gregory IV at *14.

28

1    To the extent that the state court relied on Petitioner's competence and not on the

2  totality of circumstances, including Petitioner's mental condition, to determine if Petitioner's

3  plea was knowing and voluntary, the state court's decision was both contrary to and an

4  unreasonable application of clearly established Federal law. See 28 U.S.C. § 2254(d)(1);

5  Brady, 397 U.S. at 749. The Supreme Court in Brady provided a governing legal principle to

6  the issue before the state court. Lockyer v. Andrade, 538 U.S. at 70-71.  However, in Gregory

7  IV, the appellate court denied Petitioner the opportunity to present evidence of his mental

8  condition even though the Supreme Court has stated that a court must consider all relevant

9  circumstances. A state court decision will involve an "unreasonable application of" federal law

10 only if it is "objectively unreasonable."   Lockyer v. Andrade, 538 U.S. at 75-76. Further, "[a]

11 state court's determination that a claim lacks merit precludes federal habeas relief so long as

12 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington

13 v. Richter, 131 S. Ct. 770, 785 (2011). Here, given the Supreme Court's direction in Brady that

14 all relevant circumstances be considered, no fairminded jurist would agree that it was

15 appropriate to prevent Petitioner from presenting evidence of his mental condition when

16 evaluating whether his plea was knowing and voluntary.

17    Repeatedly, throughout its opinion in Gregory IV, the appellate court states that

18 Petitioner "conceded" that he was competent (the words 'conceded' or 'concession' are used

19 some fourteen times with regard to Petitioner's competency) and therefore held that he could

20 not argue his deficient mental condition rendered his plea not knowing and voluntary. To this

21 Court, that argument is logically flawed. Here, at best, Petitioner was "minimally competent"

22 to proceed. Nevertheless and despite his own reservations about Petitioner's competency,

23 Petitioner's counsel proceeded with the plea hearing. If Petitioner was not competent but his

24 counsel did not challenge the competency finding, the appellate court's line of reasoning would

25 hold an incompetent defendant has 'conceded his competency' and cannot later challenge it

26 or the voluntariness of his plea. In essence, the court held that by conceding competency

27 Petitioner effectively waived his right to argue that his plea was not knowing and voluntary.

28

1  Following such logic, a petitioner would never be able to challenge a plea as being unknowing

2  or involuntary based on mental condition if he was competent to stand trial. The Supreme

3  Court held to the contrary when it stated that competency and a knowing and voluntary plea

4  must meet separate and distinct requirements. In conflating the standards, the appellate court

5  denied Petitioner the right to assert a claim based on clearly established Supreme Court law.

6      Respondent also asserts that this Court should give deference to the findings of the trial

7  court in accepting the plea. See <u>Blackledge v. Allison</u>, 431 U.S. 63, 74 (1977) ("[T]he

8  representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as

9  any findings made by the judge accepting the plea, constitute a formidable barrier in any

10 subsequent collateral proceedings. Solemn declarations in open court carry a strong

11 presumption of verity.") However, "the barrier of the plea or sentencing proceeding record,

12 although imposing, is not invariably insurmountable." (<u>Id.</u>) Such has been the case for

13 Petitioner. Twice state superior courts have granted Petitioner habeas relief and found that his

14 plea was not knowing and voluntary. (<u>See</u> Lodged Docs. 26, 53.) While the appellate court

15 found that nothing in the plea record indicated that Petitioner lacked understanding, the court

16 impermissibly limited its inquiry and refused inquiry to determine if Petitioner's mental condition

17 affected his ability to provide a knowing and voluntary plea. To completely defer to the

18 discretion of the judge accepting the plea would deny Petitioner his right to federal habeas

19 review. <u>Blackledge</u>, 431 U.S. at 75 ("In administering the writ of habeas corpus..., the federal

20 courts cannot fairly adopt a *per se* rule excluding all possibility that a defendant's

21 representations at the time his guilty plea was accepted were so much the product of such

22 factors as misunderstanding ... as to make the guilty plea a constitutionally inadequate basis

23 for imprisonment.").

24      In conclusion, the state court's reliance on Petitioner's competence and not on the

25 totality of circumstances, including Petitioner's mental condition, to determine if Petitioner's

26 plea was knowing and voluntary, made the state court's decision both contrary to and an

27 unreasonable application of clearly established Federal law. <u>See</u> 28 U.S.C. § 2254(d)(1);

28

1  <u>Brady</u>, 397 U.S. at 749. The Court recommends habeas relief be granted on such grounds.

2          2.    <u>Asserted Invalidity of Petitioner's Plea Based on Trial Counsel's Failure
                 to Advise Petitioner of the Lesser Included Offense of Involuntary
3                Manslaughter</u>

4  Petitioner asserts that he would have not plead to second-degree murder if he had

5  been advised of the possibility of arguing that he was only guilty of the lesser included offense

6  of involuntary manslaughter. As described below, uncontroverted evidence shows that

7  Petitioner was not advised of involuntary manslaughter as a defense to second-degree
   murder.

8                     a.    Factual Background

9          Petitioner was charged with first degree murder. However, due to Petitioner's mental

10 condition, trial counsel focused on attempting to have Petitioner found not guilty by way of

11 insanity.

12         The appellate court found Petitioner did not recall trial counsel ever discussing

13 manslaughter or imperfect self-defense with him, although counsel may have done so.

14 (Lodged Doc. 40, <u>Gregory II</u> at at 783.) Had the judge or an attorney told him how unlikely his

15 chances were of obtaining an insanity verdict at a jury trial, and had someone told him about

16 the alternative possibility of manslaughter, he would not have plead guilty to second degree

17 murder. (<u>Id.</u>)  The superior court also found "sufficient evidence to support Petitioner's claim

18 he would not have entered his plea had he been apprised of the possibility of an inability by

19 the People to prove malice for a first degree murder conviction and that a lesser finding by the

20 jury of involuntary manslaughter may have been the ultimate finding by the jury." (Lodged Doc.

21 69, August 8, 2008 Order, p. 2.)

22         Trial counsel did not discuss or pursue defenses that relied on findings of either

23 voluntary or involuntary manslaughter in the matter. Trial counsel's testimony reflects that he

24 neither pursued manslaughter defenses, nor communicated them to Petitioner. At a 2005 state

25 evidentiary hearing, defense counsel testified accordingly:

26            Q: Mr. Smurr, it's your testimony that you did not ask any of the
                psychiatrists to independently assess the viability of either an imperfect self-
27

28

defense, voluntary manslaughter defense, or lack of malice involuntary manslaughter defense?

A: As the question's couched, yes.

Q: And did you consider involuntary manslaughter as a viable defense at that time when you were representing Mr. Gregory?

A: No.

Q:  Do you recall whether you ever discussed the concept of involuntary manslaughter with Mr. Gregory's parents as an option for a plea?

A: If I did, I told them it wouldn't wash.

Q: Why did you believe it wouldn't wash, sir, using your terms?

A: Because of the fact that – I just didn't think it was viable under the factual situation of the homicide.

Q: What part of the factual situation, sir?

A: Well, if my memory serves me correctly, he went into the bathroom and then came out and shot someone, meaning the victim.
So my analysis was that if it was – if there was going to be any reduction of a homicide, there would have had to have been more than I was aware of at the time.

(Lodged Doc. 75 at 680-81.) Such testimony is also corroborated by defense counsel's declaration signed contemporaneously with the above statements. According to defense counsel's declaration:

I did not inform [Petitioner] of a possible involuntary manslaughter defense. As I testified in 2000, I would tell him certain things about the case, but I never wanted to overwhelm him with too much information. I testified in September 2000 that I did not inform him of the voluntary manslaughter/imperfect self defense option because I did not think he would understand the concept. I did not inform him of involuntary manslaughter as an additional lesser included offense to the murder charge for essentially the same reasons. The concepts of expressed and implied malice are difficult to explain to clients with sound mind, and at the time of the plea, Mr. Gregory was struggling  with both a mental illness and the side effects of psychotropic drugs that he was given to combat the illness.

As I testified in September 2000, my focus at this time was on obtaining a Not Guilty By Reason of Insanity verdict, in accordance with the opinions of the several psychiatrists who had examined Edwin Gregory. I did not ask these psychiatrists to independently assess the viability of either an imperfect self defense/voluntary manslaughter defense or a lack of malice/involuntary manslaughter defense.

1   (Smurr Decl., March 9, 2005, Lodged Doc. 75 at 676-77.)[20]

2          While the record clearly indicates that Petitioner was not advised of any defense relying

3   on involuntary manslaughter, it is unclear if the defense was actually viable. In the August 8,

4   2008 opinion, the superior court attempts to address the merits of the defense, and, ultimately

5   concludes that the defense was not viable. The superior court's decision will be discussed in

6   detail below.  However, since the frame of reference was whether Petitioner would have plead

7   no contest to second degree murder had he been properly advised of the defense, no effort

8   was made on the part of counsel or counsel's experts to develop the defense.

9                          b.     State Review

10          The appellate court in Gregory IV briefly discusses how defense counsel's conduct was

11   within the range of competence in taking the plea as it provided a benefit for Petitioner:

12          We cannot say, in light of the subsequent sanity finding by the jury, that
            [Petitioner] received little or no benefit from a plea to second degree murder,
13          resulting in a base sentence of 15 years to life in prison, in light of the very real
            possibility of a first degree murder verdict, which would have resulted in a base
14          sentence of 25 years to life in prison. "Where, as here, a defendant is
            represented by counsel during the plea process and enters his plea upon the
15          advise of counsel, the voluntariness of the plea depends on whether counsel's
            advise 'was within the range of competence demanded by attorneys in criminal
16          cases.' [Citation]" (Hill v. Lockhart, supra, 474 U.S. at p. 56.) Based on the
            information before us, we cannot say [defense counsel]'s advise fell outside the
17          range of competence. ____

18   Gregory IV, at *11, n. 14.

19          Further, the superior court held an evidentiary hearing and issued an opinion finding

20   that an involuntary manslaughter defense was not meritorious and thus found that trial counsel

21   did not fail in advising Petitioner of the defense. (Lodged Doc. 69.) However, the opinion is

22   somewhat unclear and disjointed. In an attempt to summarize the findings, Respondent

23   undertook to reduce the court order to the following fourteen (14) findings:

24          1) There was "sufficient evidence" to support Petitioner's claim he would not have
            entered a plea if he had been apprised of the possibility that the People would be
25

26   _____
            [20]Respondent asserts that the above-referenced testimony and evidence occurred in a hearing which
27   culminated in an opinion that was voided for lack of jurisdiction, and should not be considered. (See Gregory III,
     Lodged Doc. 48.)  While the Court agrees that caution should be taken when considering the voided proceeding,
28   nothing in the record implicates that the evidence and testimony taken during the proceeding is unreliable.
     Furthermore, the superior court, in its August 8, 2008 order, relied on precisely the same information. (See Lodged
     Doc. 69, p. 3.)

unable to prove malice for first degree murder, and that the jury might find a lesser offense of involuntary manslaughter;

2) There is an "extremely strong argument" that defense counsel did not consider involuntary manslaughter as a viable issue prior to Petitioner entering his plea;

3) There is an "extremely strong conviction" in defense counsel's belief that Petitioner was insane at the time of the shooting;

4) There is evidence that defense counsel never consulted with his professionals regarding the possibility of involuntary manslaughter;

5) Information available to defense counsel about Petitioner's delusions should have been conveyed to the defense experts, but it is unknown whether it was transmitted;

6) The involuntary manslaughter instruction must be considered when an accused does not intend to kill and does not act with conscious disregard for human life;

7) There is overwhelming evidence which supports the conclusion that Petitioner intended to kill the victim on September 5, 1993;

8) There is a tremendous amount of evidence which supports an affirmative finding of a conscious disregard for human life;

9) There was "just barely, sufficient evidence" to support the proposition that a jury should be allowed to consider involuntary manslaughter based on the malice and conscious disregard for human life elements;

10) The involuntary manslaughter instruction also requires that the perpetrator commit a crime (misdemeanor, infraction or non-inherently dangerous felony) posing a high risk of death or great bodily injury because of the way in which it was committed, or committed a lawful act, but with criminal negligence, and without due caution and circumspection;

11) There was no evidence to suggest that, on the day of the shooting, Petitioner believed there was a need for self-defense, and this portion of the instruction would not have been given;

12) The only possible felonies committed by Petitioner were assault with a deadly weapon and assault with a firearm, which are inherently dangerous;

13) The evidence did not support a crime of misdemeanor brandishing; and

14) Involuntary manslaughter was not a viable lesser included crime and defense counsel was not deficient in not advising on it, or pursuing it.

_____In summary, the superior court found that trial counsel did not consider a defense of involuntary manslaughter, provide relevant information to and consult with experts regarding the defense, or advise Petitioner regarding it. Further, despite finding it likely that Petitioner suffered from a mental condition and was delusional and "could not come to reason" at the time of the act, Petitioner still acted with malice, based on an intent to kill or conscious

1   disregard for human life and possessed the requisite mental state for murder not
2   manslaughter. Based on finding that manslaughter was not a viable defense, the superior
3   court held that trial counsel's assistance was not ineffective, and Petitioner's claim lacked
4   merit.

5       This Court shall determine if the decision of the superior court was contrary to or a
6   unreasonable application of federal law, or an unreasonable determination of the facts lin light
7   of the evidence. ___

8               c.      Lack of Advice During Plea Proceeding

9   _____The Supreme Court in Hill v. Lockhart set forth the standard for challenges to guilty
10  pleas based on ineffective assistance of counsel. Hill v. Lockhart, 474 U.S. 52, 58-59 (1985).
11  "We hold, therefore, that the two-part Strickland v. Washington test applies to challenges to
12  guilty pleas based on ineffective assistance of counsel. In the context of guilty pleas, the first
13  half of the Strickland v. Washington test is nothing more than a restatement of the standard
14  of attorney competence.... The second, or 'prejudice,' requirement, on the other hand, focuses
15  on whether counsel's constitutionally ineffective performance affected the outcome of the plea
16  process. In other words, in order to satisfy the 'prejudice' requirement, the defendant must
17  show that there is a reasonable probability that, but for counsel's errors, he would not have
18  pleaded guilty and would have insisted on going to trial." (Id.)

19      The Supreme Court recently revisited the issue of ineffective assistance of counsel at
20  the plea bargaining stage in Premo v. Moore, 131 S. Ct. 733 (U.S. 2011). First, the Supreme
21  Court in Premo discusses the standard for review of claims of ineffective assistance of counsel
22  brought in habeas proceedings:

23          To establish ineffective assistance of counsel "a defendant must show
            both deficient performance by counsel and prejudice." Knowles v. Mirzayance,
24          556 U.S. ___, ___ (2009) (slip op., at 10). In addressing this standard and its
            relationship to AEDPA, the Court today in [Harrington v. Richter, 131 S. Ct. 770
25          787-88 (U.S. 2011)], gives the following explanation:

26          'To establish deficient performance, a person challenging a
            conviction must show that 'counsel's representation fell below an
27          objective standard of reasonableness.' [Strickland,] 466 U.S., at
            688. A court considering a claim of ineffective assistance must
28          apply a 'strong presumption' that counsel's representation was
            within the 'wide range' of reasonable professional assistance. Id.,

at 689. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' Id., at 687.

"With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' . . .

"'Surmounting Strickland's high bar is never an easy task.' Padilla v. Kentucky, 559 U.S. ___, ___ (2010) (slip op., at 14). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial [or in pretrial proceedings], and so the Strickland standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. Strickland, 466 U.S., at 689-690. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' Id., at 689; see also Bell v. Cone, 535 U.S. 685, 702 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. Strickland, 466 U.S., at 690.

'Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both 'highly deferential,' id., at 689; Lindh v. Murphy, 521 U.S. 320, 333, n. 7 (1997), and when the two apply in tandem, review is 'doubly' so, Knowles, 556 U.S., at ___ (slip op., at 11). The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ___ (slip op., at 11). Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."

Premo, 131 S. Ct. at 739-740.

Accordingly, as stated by the Supreme Court, there are two layers of review  when viewing an ineffective assistance of counsel claim in a habeas petition. Effectively, a court may only grant relief if there is no reasonable argument that counsel satisfied Strickland's deferential standard. In reviewing clams relating to ineffective assistance of counsel at the plea bargaining stage, even further deference should be provided:

1

2          There are certain differences between inadequate assistance of counsel
   claims in cases where there was a full trial on the merits and those, like this one,
   where a plea was entered even before the prosecution decided upon all of the
3  charges. A trial provides the full written record and factual background that serve
   to limit and clarify some of the choices counsel made. Still, hindsight cannot
   suffice for relief when counsel's choices were reasonable and legitimate based
4  on predictions of how the trial would proceed. See Richter, ante, at 18.

5          Hindsight and second guesses are also inappropriate, and often more so,
   where a plea has been entered without a full trial or, as in this case, even before
6  the prosecution decided on the charges. The added uncertainty that results
   when there is no extended, formal record and no actual history to show how the
7  charges have played out at trial works against the party alleging inadequate
   assistance. Counsel, too, faced that uncertainty. There is a most substantial
8  burden on the claimant to show ineffective assistance. The plea process brings
   to the criminal justice system a stability and a certainty that must not be
9  undermined by the prospect of collateral challenges in cases not only where
   witnesses and evidence have disappeared, but also in cases where witnesses
10 and evidence were not presented in the first place.

11 Premo, 131 S. Ct. at 745-46. Due to the speculative nature of a case at the plea bargaining

12 stage and how it might have progressed if no plea had been entered, it is imperative that the

13 court strictly adhere to the Strickland standard and provide sufficient latitude to the actions of

14 trial counsel:

15          Acknowledging guilt and accepting responsibility by an early plea respond
   to certain basic premises in the law and its function. Those principles are eroded
16 if a guilty plea is too easily set aside based on facts and circumstances not
   apparent to a competent attorney when actions and advice leading to the plea
17 took place. Plea bargains are the result of complex negotiations suffused with
   uncertainty, and defense attorneys must make careful strategic choices in
18 balancing opportunities and risks. The opportunities, of course, include pleading
   to a lesser charge and obtaining a lesser sentence, as compared with what
19 might be the outcome not only at trial but also from a later plea offer if the case
   grows stronger and prosecutors find stiffened resolve. A risk, in addition to the
20 obvious one of losing the chance for a defense verdict, is that an early plea
   bargain might come before the prosecution finds its case is getting weaker, not
21 stronger. The State's case can begin to fall apart as stories change, witnesses
   become unavailable, and new suspects are identified.
22
           These considerations make strict adherence to the Strickland standard
23 all the more essential when reviewing the choices an attorney made at the plea
   bargain stage. Failure to respect the latitude Strickland requires can create at
24 least two problems in the plea context. First, the potential for the distortions and
   imbalance that can inhere in a hindsight perspective may become all too real.
25 The art of negotiation is at least as nuanced as the art of trial advocacy and it
   presents questions farther removed from immediate judicial supervision. There
26 are, moreover, special difficulties in evaluating the basis for counsel's judgment:
   An attorney often has insights borne of past dealings with the same prosecutor
27 or court, and the record at the pretrial stage is never as full as it is after a trial.
   In determining how searching and exacting their review must be, habeas courts
28 must respect their limited role in determining whether there was manifest
   deficiency in light of information then available to counsel. Lockhart v. Fretwell,

506 U.S. 364, 372 (1993). AEDPA compounds the imperative of judicial caution.

Second, ineffective-assistance claims that lack necessary foundation may bring instability to the very process the inquiry seeks to protect. <u>Strickland</u> allows a defendant "to escape rules of waiver and forfeiture," <u>Richter</u>, ante, at 15. Prosecutors must have assurance that a plea will not be undone years later because of infidelity to the requirements of AEDPA and the teachings of <u>Strickland</u>. The prospect that a plea deal will afterwards be unraveled when a court second-guesses counsel's decisions while failing to accord the latitude <u>Strickland</u> mandates or disregarding the structure dictated by AEDPA could lead prosecutors to forgo plea bargains that would benefit defendants, a result favorable to no one.

Whether before, during, or after trial, when the Sixth Amendment applies, the formulation of the standard is the same: reasonable competence in representing the accused. <u>Strickland</u>, 466 U.S., at 688. In applying and defining this standard substantial deference must be accorded to counsel's judgment. <u>Id.</u>, at 689. But at different stages of the case that deference may be measured in different ways.

In the case of an early plea, neither the prosecution nor the defense may know with much certainty what course the case may take. It follows that each side, of necessity, risks consequences that may arise from contingencies or circumstances yet unperceived. The absence of a developed or an extensive record and the circumstance that neither the prosecution nor the defense case has been well defined create a particular risk that an after-the-fact assessment will run counter to the deference that must be accorded counsel's judgment and perspective when the plea was negotiated, offered, and entered.

<u>Premo</u>, 131 S. Ct. at 741-42.

d.     Analysis of Claim

_____In the present case, the superior court denied the petition despite trial counsel's failure to pursue the involuntary manslaughter defense because substantial evidence existed that Petitioner indeed did possess the requisite intent to kill or at least showed such a conscious disregard for human life so as to render the defense weak and not likely to succeed. The superior court found not actionable under <u>Strickland</u> trial counsel's failure to pursue such a weak defense because such a failure was within the range of reasonable professional assistance and did not prejudice Petitioner.  In strict adherence to <u>Strickland</u>, this Court must find that the superior court's determination was reasonable and presented a reasonable argument that trial counsel's actions were adequate.

///

First, the Supreme Court in <u>Premo</u> cautioned it might be difficult to determine the

1   ultimate outcome of the matter had Petitioner not plead to second degree murder. Here, the

2   effect of Petitioner not having been advised of the potential lesser included offense of

3   involuntary manslaughter must be evaluated without the benefit of defense counsel's

4   preparation of that defense, by, among other things, securing expert witness testimony

5   regarding Petitioner's ability to think rationally at the time of the offense.[21] The superior court

6   in reviewing such a claim engaged in significant speculation as to the evidence that would

7   have been presented if Petitioner had gone to trial and how the jury would interpret such

8   evidence. As described above, this Court must give deference to the opinion of the state court,

9   even if other reasonable inferences could be made.

10         Second, this Court acknowledges that insanity defenses are rarely successful and the

11   same may well have held true for an attempt to show Petitioner was guilty of no more than

12   manslaughter given his impaired mental state. However, just because Petitioner's case may

13   be difficult, it does not excuse trial counsel from advocating strongly on his behalf. Respondent

14   notes that legal scholars have found that "The body of literature examining biases toward the

15   insanity defense is robust, demonstrating a largely skeptical and punitive public." (Christian

16   Breheney et al., Gender Matters in the Insanity Defense, 31 Law & Psychol. Rev. 93, 95

17   (2007).) However, despite the difficulties in presenting such a defense, the defense is a

18   perfectly viable legal theory and may have warranted research and reflection. Even if the

19   possibilities of success were slim, the only action that completely precluded success was not

20   to have presented the defense at all.

21         Third, it is difficult for this Court to reconcile defense counsel's belief that this was the

22   strongest insanity case of his career with his conclusion that it did not warrant investigation

23   into whether Petitioner harbored the required mental state for murder. (See Reporters

24

25   _____

26   [21] The superior court notes that expert witnesses would not be able to testify as to Petitioner's ultimate mental state. See Cal. Penal Code §§ 28(a), 29. (Lodged Doc. 69 at 13.) However, expert witnesses would be able offer evidence as to whether Petitioner suffered from a mental disease and how that disease affected Petitioner. From such testimony the jury may infer as to Petitioner's mental state. See People v. Coddington, 23 Cal. 4th 529, 583-84 (2000). The fact that California law creates a prohibition on experts testifying to Petitioner's ultimate mental state does not foreclose the possibility of presenting such a defense.

1   Transcript, April 29, 1994 hearing, pp. 4-5, "I've practiced law for 25 years and... this is the

2   most authentic NGI anyone had ever seen.") Based on his confidence in the strength of the

3   insanity defense, defense counsel proceeded down that avenue despite knowing that a jury

4   had never found anyone insane in Tulare County.  If defense counsel was so convinced that

5   Petitioner was so affected by his mental condition as to be insane, surely that mental condition

6   would have warranted research into other defenses related to Petitioner's mental state.

7       Fourth, this Court is not convinced Petitioner received a benefit in accepting a plea

8   reducing the charges from first degree murder to second degree murder.  There was scant

9   evidence of the premeditated deliberation required for a finding of first degree murder. In the

10  pretrial conference, a superior court judge flatly rejected the possibility of Petitioner being

11  found guilty of first degree murder. (See Reporters Transcript, April 29, 1994 hearing, p. 4, "I

12  just don't see any way you're going to get a first degree murder out of this thing. ...[T]hey will

13  find him guilty of second degree murder.")

14      Regardless, in light of the extreme level of deference that this Court must extend it

15  cannot find this state court's determinations to have been an unreasonable application of

16  federal law in determining that defense counsel's representation was at least minimally

17  effective. See Premo v. Moore, 131 S. Ct. 733. Petitioner was charged with first degree

18  murder. Defense counsel advised Petitioner to plea to second degree murder without advising

19  Petitioner of possible defenses involving involuntary manslaughter. To answer why defense

20  counsel did not feel that such defenses "would wash" would be mere speculation. However,

21  defense counsel's advice did reduce Petitioner's potential criminal liability and further, may

22  have freed resources to allow him to focus on the insanity defense which he felt had a higher

23  chance of success.

24      In summary, this Court must determine if "there is any reasonable argument that

25  counsel satisfied Strickland's deferential standard." Premo, 131 S. Ct. at 740. The state court

26  has presented a reasonable argument as to why the plea was taken. Accordingly, federal

27  habeas relief is not warranted as to this claim.

28          3.      Asserted Invalidity of Petitioner's Plea Based on Trial Counsel's Failure

<u>to Advise Petitioner that an Insanity Defense was not Likely to Succeed</u>

Petitioner asserts that he would have not plead to second-degree murder if he had been advised that he was not likely to succeed with an insanity defense at the guilt phase of trial.

a.     Factual Background

Petitioner asserts that defense counsel did not advise him that it was very unlikely that he would succeed in presenting a not guilty by reason of insanity defense to a jury in Tulare County. Defense counsel knew well the difficulties of presenting such a defense. A pretrial conference was held in which the judge warned the parties that Petitioner would be found sane if the matter was to proceed to a jury trial.

However, it is unclear to what extent defense counsel advised Petitioner of the chances of succeeding on the insanity claim. Respondent asserts that the appellate court, in <u>Gregory IV</u> clearly found that Petitioner was told by counsel how difficult it be to obtain an insanity verdict. Factual findings of the state court are presumed to be correct and such presumption can only be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). However, here the appellate court's alleged findings in <u>Gregory II</u> and <u>Gregory IV</u> do not instill confidence in the finding that Petitioner was provided such information from trial counsel. According to the appellate court:

> At the April 29, 1994, pretrial conference, Judge Moran agreed with [defense counsel]'s theory that [Petitioner] was not guilty by reason of insanity, but alerted [defense counsel] to the fact that a Tulare County jury had never accepted such psychiatric testimony. [Defense counsel] was certain he told [Petitioner]'s parents about the purported propensity for Tulare County juries not to return insanity verdicts, and was also sure he told [Petitioner], although he had no independent recollection of relating to [Petitioner] what occurred in chambers at the pretrial conference. He was not sure [Petitioner] was able to process what the information would mean as far as his fate was concerned. During this period of time, [defense counsel] was concerned [Petitioner] would "overload," and he "was always sort of tiptoeing around because [he] didn't want [Petitioner] to decompensate." While [defense counsel] would tell [Petitioner] certain things, he never wanted to overwhelm [Petitioner] with too much information because, upon reflection, [Petitioner] did not "process like a normal human being."
>
> Between the pretrial conference and plea, [defense counsel] expressed optimism to the family about the outcome of the sanity trial. After the pretrial conference, [defense counsel] reached an agreement with the prosecutor about [Petitioner] pleading to second degree murder. [Defense counsel] was sure he

conveyed this information to [Petitioner]'s parents. He was also sure he immediately told [Petitioner], but did not discuss it with him in earnest until the date of the plea.

(Lodged Doc. 40, <u>Gregory II</u> at 783.)

[Petitioner] testified that before he entered a plea, no one told him that there had never been a jury verdict of insanity in Tulare County, or that his chances of being found insane were slim to none.... Had someone told him how low his chances were of obtaining an insanity verdict at a jury trial, and about the alternative possibility of manslaughter, he would not have plead guilty to second degree murder.

...

[Defense counsel] was certain that he told [Petitioner]'s parents about the purported propensity for Tulare County juries not to return insanity verdicts, and was also sure he told [Petitioner], although he had no independent recollection of relating to [Petitioner] what occurred in chambers at the pretrial conference.

<u>Gregory IV</u> at *5.

Moreover, although [Petitioner] testified he was never told how slim his chances of being found NGI actually were, [defense counsel] believed he informed both the [Petitioner's parents] and [Petitioner] of the propensity of Tulare County juries on the issue.

<u>Id.</u> at *11, n. 14.

Based on the findings of the appellate court, it is not entirely clear if defense counsel actually conveyed information regarding the very low possibility of success of the NGI defense to Petitioner.  Petitioner asserts that defense counsel did not. Every statement of defense counsel's recollections is prefaced with comments suggesting defense counsel "believed" he told Petitioner or that he did tell Petitioner, but did not recall any details. Since this Court cannot be confident that Petitioner was told of his chances of success with an insanity plea, the Court shall assume, for the purpose of this analysis, that he was not.

b.      State Review

It appears that this precise issue was not completely resolved by the state courts in any of the rounds of habeas review. In the second round of review, the superior court granted relief based on the finding Petitioner was not advised of the defense of voluntary manslaughter as imperfect self defense. The appellate court, in <u>Gregory II</u>, discussed only that issue. In the third round of review, the superior court granted the petition based on Petitioner's failure to

provide a knowing and voluntary plea based on several factors, including, his not having been

advised of the strength of the insanity defense. However, the appellate court only reviewed the

issue as to whether Petitioner's plea was voluntary based on whether Petitioner's mental state

allowed him to knowingly and voluntarily accept the plea.  Finally, in the fourth round of review,

the only issue before the court was that of whether Petitioner's plea was voluntary given the

failure to counsel Petitioner regarding an involuntary manslaughter defense.[22]

        Regardless, even if the state did not provide a reasoned decision directly on point, a

federal court must determine if there is a reasonable basis for the state court decision

notwithstanding lack of information as to the state's reasoning.  "When a federal claim has

been presented to a state court and the state court has denied relief, it may be presumed that

the state court adjudicated the claim on the merits in the absence of any indication or state-law

procedural principles to the contrary." Harrington v. Richter, 131 S. Ct. at 784-85. "Where a

state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still

must be met by showing there was no reasonable basis for the state court to deny relief. This

is so whether or not the state court reveals which of the elements in a multipart claim it found

insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been

adjudicated." Id. at 22-23. In such a case, the federal court must contemplate the reasoning

of the state court in denying the petition, and determine if that reasoning is an unreasonable

application of federal law. Id. at 28-29 ("Under § 2254(d), a habeas court must determine what

arguments or theories supported or, as here, could have supported, the state court's decision;

and then it must ask whether it is possible fairminded jurists could disagree that those

arguments or theories are inconsistent with the holding in a prior decision of this Court.")

///

_____

[22] Unfortunately, due to the procedural complexities of this case, routine determinations, such as identifying the last reasoned state opinion become extremely difficult. It could be argued that the superior courts, in granting habeas petitions in the second and third rounds of review, addressed this issue. However, in those decisions the courts combined several factors to determine that Petitioner's plea was not voluntary. They do not include discussion related solely to this issue.  Accordingly, this Court shall not consider such state opinions as providing pertinent rulings on the issue.

c.      Right to Be Advised of the Consequences of a Plea

It is a cardinal rule of attorney-client relations that "a lawyer shall abide by a client's decisions concerning the objectives of representation and . . . shall consult with the client as to the means by which they are to be pursued." Model Rules of Prof'l Conduct R. 1.2(a). In the case of a criminal defendant, "the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify." Id. The scheme of these principles reaches into the Constitutional context. "An attorney undoubtedly has a duty to consult with the client regarding important decisions, including questions of overarching defense strategy. That obligation does not require counsel to obtain the defendant's consent to every tactical decision." Florida v. Nixon, 543 U.S. 175, 187, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004) (internal quotation marks and citation omitted) (interpreting the Sixth Amendment).

However, decisions relating to the ultimate outcome of the case can only be made upon consulting with the client and obtaining his or her consent. "A defendant... has the ultimate authority to determine whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal. Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action. Florida v. Nixon, 543 U.S. at 187 (citations omitted).

Here, even if Petitioner was not properly advised regarding his plea, he must show that such lack of guidance constituted ineffective assistance of counsel. The standard for ineffective assistance of counsel at the plea bargaining stage was described in detail above. See Premo v. Moore, 131 S. Ct. 733.

d.      Analysis of Claim

Several points are relevant to this inquiry. Due to Petitioner's mental condition, his parents and his cousin were present and intimately involved in his defense. Many of the discussions of the facts of the case and trial strategy appeared to have taken place between trial counsel and Petitioner's parents. However, at all times Petitioner remained the client. Communications with Petitioner's family did not absolve defense counsel of his duty to

communicate with his client even if Petitioner's parents discussed the same information with Petitioner. See Model Rules of Prof'l Conduct R. 1.14, comment 4. ("The client may wish to have family members or other persons participate in discussions with the lawyer. When necessary to assist in the representation, the presence of such persons generally does not affect the applicability of the attorney-client evidentiary privilege. Nevertheless, the lawyer must keep the client's interests foremost and, except for protective action authorized under paragraph (b), *must to look to the client, and not family members, to make decisions on the client's behalf.*") (emphasis added.) While decisions relating to strategy may be made by counsel, decisions relating to the ultimate outcome of the case should only be made by an informed client regardless of Petitioner's mental capacity. See Model Rules of Prof'l Conduct R. 1.2(a), 1.14 ("A lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client.").

Second, the fact that counsel felt uncomfortable consulting and informing Petitioner regarding the substance and consequences of his guilty plea, yet proceeded with the plea arraignment, raises grave due process concerns. Of even greater concern, is the fact that defense counsel did not inform the trial court that Petitioner was not properly processing information. Had such information been relayed to the trial court, action could have been taken to determine if Petitioner was actually indeed competent to stand trial and if he was providing a knowing and voluntary plea to the offense. Defense counsel instead asserted during the plea proceeding that he fully discussed all of the information regarding the plea with Petitioner, and the trial court did not inquire further into Petitioner's mental state.

Such information is of significance. As noted, trial counsel advised Petitioner to plea to second degree murder so as to quickly move to the sentencing phase, and present what he thought would be a successful insanity defense. Accordingly, if he had the capacity to understand defense counsel, Petitioner knowingly and voluntarily plead to second degree murder so that he could assert an insanity defense. However, if defense counsel failed to advise Petitioner that the insanity defense was not likely to be successful, it is quite possible Petitioner would not have decided to accept the plea agreement especially since Petitioner

would have been able to present an insanity defense with or without the plea.

Regardless, this Court need not decide if defense counsel was ineffective for failing to inform Petitioner of the likelihood of success in presenting an insanity defense. As noted, the Court shall recommend relief be granted based on finding Petitioner's plea was not knowing, voluntary or intelligent because Petitioner's mental condition at the time of the plea. By finding that Petitioner's plea was not knowing, voluntary and intelligent based on Petitioner's mental condition, it necessarily follows that Petitioner was not able to make such a plea regardless of whether he was properly instructed by counsel or not. Accordingly, the Court shall not determine if defense counsel's failure to inform Petitioner of the his chances of success in presenting an insanity defense is a basis for federal habeas relief.

C.    **Ground Three - Ineffective Assistance of Counsel; Failure to Provide Exculpatory Evidence to Expert Witnesses and Jury**

Petitioner contends that defense counsel was ineffective in failing to provide certain exculpatory evidence to the expert witnesses and the jury to strengthen Petitioner's insanity defense in the sanity trial. In the amended petition, Petitioner asserts that defense counsel was ineffective for failing to present the following evidence or testimony: 1) Petitioner's statements to Gregory Altounian and Petitioner's mother demonstrating paranoid delusions about homicidal threats to him and his family to show he was actively psychotic at the time of the homicide; 2) Petitioner's contemporaneous handwritten notes of the meeting at which the murder occurred to show Petitioner had lost touch with reality during the course of the meeting; 3) Evidence that the decedent bought good news to the business meeting that should not have prompted an angry response; 4) The observations of law enforcement officers, who contacted Petitioner immediately after the shooting to show manifestations of the mental disorder; and 5) Evidence that county jail nurse, Stacy Ybarra, overstated the duration and depth of his communications with Petitioner during the weeks after the shooting. (Am. Pet. at 32-33.)

In addition to the argument that such evidence would bolster Petitioner's case and the testimony of the defense experts, of even more import is Petitioner's claim that the evidence could have changed the opinion of the prosecution expert, Prof. Stephen Morse. Petitioner's

claim is premised on the fact that despite three experts testifying that Petitioner was insane at the time of the offense, not challenging the prosecution's expert left the door open for the jury to rely on the latter expert and find Petitioner sane at the time of the offense.  This is significant because the prosecution expert states on appeal if he had been made aware of the additional evidence he would have testified that there was significant support for the proposition that Petitioner was insane at the time of the offense. In such a case, the jury would have been presented with four experts all of whom would have testified to Petitioner's insanity. Petitioner now asserts that defense counsel's failure to question the prosecution witness and present him with additional evidence constituted ineffective assistance of counsel.

                1.   <u>Factual Background</u>

     Petitioner asserts that defense counsel was ineffective for failing to present five specific categories of evidence at trial. The five categories are discussed below.

                a.     Statements of Delusions Made to Family Members

     Petitioner asserts that defense counsel should have presented evidence to the jury of Gregory Altounian's and Petitioner's mother's observations of Petitioner's delusional conduct. Petitioner also asserts that to the extent such information was not conveyed to the defense experts, it should have been. Defense counsel did present testimony from Petitioner's mother, but it focused on events before the offense and not her communications with Petitioner after he was in custody. Altounian never testified. In 2008, the superior court found that Altounian had reported his knowledge of Petitioner's  delusions to defense counsel, but that it was unknown whether defense counsel conveyed that information to the experts. (Lodged Doc. 69 at 5.) The superior court also found that Petitioner reported delusional ideas to his mother, and that she reported them to defense counsel. (<u>Id.</u> at 4.) The additional evidence would have included Petitioner's statements to his mother that  there was a jail conspiracy, FBI agents were monitoring him, and CIA and Russian agents were out to get his family. Petitioner warned his mother that the family was in danger and that his uncle's business would be bombed by Turkish agents. (Lodged Doc. I.) The superior court found that "[t]his information . . . should have been presented to professionals . . . ." (Lodged Doc. 69 at 5.)

b.      Petitioners Handwritten Notes

During the September 5, 1993, business meeting preceding the shooting, Petitioner took notes. These notes were placed in evidence at the sanity trial through the testimony of Dr. Gregory (Trial RT 121, 236), and defense counsel argued to the jury that they showed Petitioner was not rooted in reality. (Lodged Doc. M.) In the amended petition, Petitioner faults defense counsel for failing to also give the notes to the experts as further evidence of his psychosis. In his declaration, defense counsel states, "If I did not provide a copy of these notes to the defense experts, or confront Professor Morse with the notes, it was inadvertent." (Lodged Doc. M.)

c.      Evidence that the Business Meeting was Positive

Petitioner asserts that defense counsel failed to present evidence of the positive nature of the September 5, 1993, business meeting.  While defense counsel did not focus on such evidence, he did present testimony from Petitioner's father that the meeting went "very well." (Trial Reporter's Transcript ("Trial RT") at 113-114, 118.)

d.      Evidence from Law Enforcement Officers

Petitioner asserts, based on information contained in declarations from three law enforcement officers who witnessed Petitioner at or near the scene, that Petitioner was acting in an abnormal and psychotic state at the time of the offense. Defense counsel did not at trial present any evidence regarding these observations.

During the appeal process, Detective Bouffard completed a declaration stating that Petitioner's behavior "was like that of a mentally ill person I might see on the street in that he made long rambling statements." (Lodged Doc. FF.)  However, at a 2008 evidentiary hearing, Officer Bouffard explained that the "ramblings" made sense, and he attempted to distance himself his declaration.  (Lodged Doc. 68 at 94-95.)

In his 1998 declaration, Officer Lozano said that he was one of the first to respond to the scene and he found Petitioner "mentally off kilter and detached from the reality of what had obviously just occurred." Petitioner had a "blank stare," and looked "disconnected." He was "eerily and inappropriately matter of fact and detached." (Lodged Doc. EE.) Later, Officer

Lozano also attempted to distance himself from the declaration and testified at the 2008 evidentiary hearing that, "The whole time Petitioner seemed normal other than the fact that he wasn't emotionally attached to the incident that had just occurred." (Lodged Doc. 68 at 80.)

In his 1998 declaration, Officer Steven Ward said that he was also one of the first to respond and Petitioner repeatedly said, "I had to do it. I had to do it," and "I had to do it. He was killing us," and "They were killing me and my family." He further stated that Petitioner's demeanor was uncontrollably talkative and repetitive, and he seemed to have a lot of adrenaline. He observed that Petitioner expressed no remorse and "[i]t sounded like he really thought he needed to do what he did to save his family." (Lodged Doc. U.) However, Officer Ward in a note at the end of his declaration stated Petitioner inquired about the type of sentence he would receive and where he would serve his time. Officer Ward opined that Petitioner showed no remorse and was making excuses for the shooting. (Lodged Doc. U.)

According to Prof. Morse, the officers' statements would have caused him to weaken his opinion that Petitioner's behavior was consistent with a lack of psychosis. According to him, the evidence of psychosis was "ambiguous," but the officers' statements would have "substantially reduced the ambiguity . . . ." (Lodged Doc. S.)

    e. Evidence that Jail Nurse Ybarra Overstated His Observations of Petitioner

Petitioner asserts that defense counsel was ineffective in failing to investigate whether the jail nurse, Stacey Ybarra, overstated his contact with Petitioner. (Am. Pet. at 34, 38.) Ybarra testified on behalf of the prosecution that he visited Petitioner during the period of September 7 through September 9, 1993, and found his behavior to be substantially appropriate under the circumstances. (Trial RT 571-578.) Ybarra did not see any indications of paranoid thinking; he recommended that the 15-minute watches be terminated. (Id. at 576-578.) Petitioner asserts that an investigation would have shown that Ybarra's visits were very brief, only a few minutes, and did not allow a reliable assessment to be made.

///

///

///

f.      Evidence Allegedly Not Provided to Professor Morse[23]

Professor Morse testified as an expert for the prosecution to rebut the unanimous testimony of three experts that Petitioner was insane. Professor Morse's testimony differed from that of the other psychological experts in two significant ways. First, Prof. Morse refused to look at all of the evidence provided, and allegedly examined only the evidence that he thought would be relevant. Further, Prof. Morse refused to arrive at an ultimate conclusion regarding Petitioner's sanity. However, his testimony suggests substantial evidence that Petitioner was not insane at the time of the offense.[24]

During Prof. Morse's testimony, the prosecution inquired as to what materials Prof. Morse reviewed in preparing to testify.  Prof. Morse stated as follows:

> I've never seen so much paper in a case. Well, my list includes the police reports, the reports of Dr. Terrell, Velosa, and Davis, the trial testimony of Dr. Terrell, Velosa and Mills. The testimony of Doctor and Mrs. Gregory and [Gregory Altounian], and the confession that the defendant gave after the shooting, the psychiatric records from Fresno Community Hospital and Atascadero State Hospital, Mr. Gregory's employment records and his business correspondence with Brad. Mrs. Gregory's written account, or log you might call it, of Mr. Gregory's behavior at the time of the shooting.  Miss Jeanne Bird's statement and testimony. Miss Jeanne Bird was an employee of Brad. Mr. Gregory, that is Edwin Gregory's letters to his family from jail, and I've also looked at Mr. Gregory's jail records. (Trial RT at 600-01.)

---

[23]Petitioner presents two claims regarding ineffective assistance of counsel and Prof. Morse. The present claim is that defense counsel failed to provide relevant information to Prof. Morse (along with the jury and the defense experts) and that the evidence would have changed Prof. Morse's opinion regarding Petitioner's sanity. Petitioner also presents an ineffective assistance of counsel claim with regard to defense counsel's failure to rebut the testimony of Prof. Morse.  While closely related, Petitioner presents different arguments for each claim.  The failure to present rebuttal testimony is addressed in the discussion of claim four, below.

[24]Prof. Morse, in later filed declarations, objects to state court's determinations that his testimony left little doubt that Petitioner was sane at the time of the offense.  In his March 17, 1997 declaration, Prof. Morse states, "Nonetheless, the Court of Appeals found that, although I refused to give an opinion about legal sanity, there was little doubt that I thought that Mr. Gregory was legally sane[]. With all respect, I disagree with the Court's inference. I testified then only that there was considerable evidence consistent with lack of psychosis on September 5. That is all I said and all I meant." (Am. Pet, Ex. Q, p. 2.) Despite Prof. Morse's protestations, he does admit that his testimony was quite favorable for the defense, despite his decision not to provide an ultimate opinion on sanity. (See March 8, 2009, Decl. of Prof. Morse, pp. 11-12, ECF No. 87-1, "During my direct examination by Mr. Bartlett, [defense counsel] became visibly agitated as I apparently was able to make effective points... [defense counsel] knew, and the jury obviously understood, that I was effectively undermining the defense case during cross-examination.")  While Prof. Morse did not provide an ultimate opinion as to sanity, it is clear that his testimony that Petitioner lacked psychotic symptoms at the time of the offense was powerfully persuasive testimony to rebut the testimony of the defense experts.

1       Additionally, Prof. Morse also described how he believed the most relevant evidence

2   to determine Petitioner's sanity was evidence of Petitioner's mental state very close to the time

3   the offense was committed.

4       Q.  In assessing whether someone is legally insane, say, at a time of a given
    act, in this case a shooting, what do you feel is the best evidence that can be

5   obtained in making that determination?

6   A. [Prof. Morse:] Well, what we're concerned with when you're considering legal
    insanity is what was the defendant's mental state at the time of doing the crime,

7   not much later, not much earlier. The question the jury must address is what was
    his mental state or her mental state at the time of the crime. The very best

8   evidence there is to determine is evidence of the defendant's own conduct,
    whether by his own words, or by observations of him, close to the time of the

9   crime. If you have somebody who observed the crime, better yet.

10      Evidence of the time close to before the crime and close to after the crime
    is going to  be the very best evidence there is. The kind of evidence that's

11  provided by friends, families, neighbors, co-workers, the people who have had
    a chance to observe the person and really see how the person is operating.

12  (Trial RT at 608-09.)

13      Prof. Morse chose not to interview witnesses or Petitioner because of the ample

14  contemporaneous evidence available for review:

15  Q. If you can just say why you didn't examine the defendant?

16  A.  [Prof. Morse:] I didn't because, number one, there was from my point of view
    incredibly good contemporaneous, unusually good contemporaneous

17  evidence. This was a defendant who was living with his family right up until the
    time of the crime; a concerned, loving and caring family. He was living with them

18  right up until the time.

19      In the hours right before the shooting he was in the presence of his
    father, a physician, who has had the experience of seeing, certainly, a fair

20  amount of mental disorder in his practice and can recognize it.

21  ...

22  Q.  If you would continue on. You were talking about contemporaneous
    evidence?

23

24  A.  [Prof. Morse:] Yes. There was evidence of his family, the evidence of his
    father, the physician, there in the meeting leading up to the shooting, witnessing

25  the shooting.  Then there were police officers there almost immediately that saw
    Mr. Gregory.  Then there was the confession within hours.

26      Then there were the jail personnel, jail reports when he was being
    observed on a consistent basis in jail. So in the – then there were also business

27  associates that dealt with him in the months before the shooting.

28      So between the business associates and family in the months before the

shooting, father, police, right at the time of or around the shooing and jail personnel right after the shooting, I thought there was incredibly good contemporaneous evidence. (Trial RT at 612-15.)

Upon cross examination, defense counsel questioned Prof. Morse about his decision not to conduct interviews of witnesses knowledgeable about Petitioner's mental state near the time of the offense.

Q. [Defense counsel:] Now, you've indicated that you had a lot of information, meaning observational information by independent parties, whether the be family, police officers, jail attendants, etcetera, correct?

A. [Prof. Morse:] That's correct.

Q. Did you ever attempt to interview Dr. Jack Gregory?

A. No, I did not.

Q. Did you ever attempt to interview Jasmine Gregory?

A. No, I did not.

Q. Did you ever attempt to interview Eric Gregory, the brother or sibling?

A. No, I did not. I assume you're pointing to Eric.

Q. Correct. I'm sorry.

A. No, I did not.

Q. Did you ever attempt to interview Nannette Gregory, the sister.

A. No, I did not.

Q. Did you ever attempt to interview detective or Officer Bouffard?

A. No, I did not.

Q. Did you ever attempt to interview any of the people in Akron, Ohio?

A. No, I did not.

Q. Did you interview Michael Dominic?

A. I interviewed no one. (Trial RT at 644-45.)

As it stood, Prof. Morse was the only expert for the prosecution regarding Petitioner's sanity. While all three experts for the defense testified that Petitioner was insane at the time of the offense, Prof. Morse testified that there was a substantial lack of evidence that Petitioner was insane at the time of the offense.

Some time later, after Petitioner was found sane, Prof. Morse was approached by Petitioner's legal counsel on appeal and asked to review additional evidence.  Prof. Morse obliged, and after reviewing that evidence, came to the conclusion that, if it would have been available to him at trial, it would have significantly changed his opinion and his testimony. Specifically, he states that if he had been aware of the additional evidence, he would have found significant evidence corroborating the fact that Petitioner was insane at the time of the offense and would have so testified.  (See Am. Pet., Exs. Q and S.)

Specifically, Prof. Morse states:

"After considering the evidence presented at trial and the new evidence I have reviewed for the prior and present declarations, I continue to believe that there is evidence consistent with Edwin Gregory's lack of psychosis on September 5. But I now conclude, based on all of the evidence in my possession, that compared to the evidence I considered before testifying, there is much more credible and substantial material evidence from which the inference could be drawn that Edwin Gregory was psychotic and did not understand the factual context of his actions on September 5.

I still have no opinion about whether Mr. Gregory was legally insane. But, assuming all the new information that I have been provided is credible and that no substantial contrary information appears, I now believe that the defense claim that Edwin Gregory was psychotic on September 5, 1993 is far stronger that it appeared when I reviewed the evidence in this case before testifying. If I had been in possession of this information before testifying, my testimony would have been generally and substantially different. I would not have suggested some critical inferences that might be drawn and would have substantially weakened suggestions of other critical inferences that might be drawn that were consistent with lack of psychosis. I would have acknowledged that the new evidence provided substantial and credible evidence consistent with the inference that Edwin Gregory was psychotic at the time of the homicide."(Am. Pet., Ex. S.)

In his March 17, 1997 declaration, Prof. Morse states that information from declarations prepared by Altounian and Petitioner's mother regarding their communications with Petitioner around the time of the offense evidence that Petitioner was psychotic and would have considerably strengthened Petitioner's claim of insanity. (Am. Pet, Ex. Q.) Further, in a July 15, 1998 declaration, Prof. Morse states that testimony of a jail nurse, Mr. Ybarra, upon which he relied was undermined by Petitioner's statements regarding his interactions with Mr. Ybarra. Prof. Morse also relied on testimony of the three police officers who arrived at the scene of the crime to support his finding that Petitioner was psychotic at the time of the offense. (Am. Pet,

1   Ex. S.)

2           2.      State Review

3           This claim was presented to the Tulare County Superior Court during Petitioner's first

4   round of habeas review.  The court denied the petition on May 2, 1997, stating that "the

5   allegation of fact, even if true, do not support the legal conclusions advanced by petitioner and

6   do not establish grounds for relief." (Lodged Docs. 6-7.) The claim was presented to the

7   California Supreme Court and denied without comment (Lodged Docs. 8, 12.)

8           The claim was renewed in Petitioner's second round of habeas review (Lodged Docs.

9   13-14), and again denied based on the following reasoning:

10                  With respect to the claim that petitioner received ineffective assistance
            of counsel because counsel failed to provide to expert witnesses or the jury
11          evidence of delusions of petitioner following his arrest communicated to
            members of his family, such evidence would have been merely cumulative to
12          much evidence of delusional behavior before and after petitioner's arrest, and
            it would not have changed the ultimate opinion of any expert witness or the jury
13          as to whether or not petitioner was legally sane at the time of the homicide.
            There is no reasonable probability that, but for any deficiency on the part of
14          counsel, the result would have been more favorable to petitioner. People v. Frye
            (1998) 18 Cal.4th 894, 979-980.[25] (Lodged Doc. 19.)
15
            The Tulare County Superior Court denied the claim based on the fact that the evidence
16
    was merely cumulative and would not have changed the ultimate opinion of any expert
17
    witness. It appears from the record that the same or similar declarations by Prof. Morse were
18
    included with the second habeas petition. Those declarations included here equivocally state
19
    that Prof. Morse's testimony would have been substantially different. The state court's
20
    seemingly irreconcilable determination in this regard is discussed in detail below.
21
            Further, as noted, Petitioner described five categories of evidence defense counsel
22
    failed to present to expert witnesses or the jury. The state court only addressed "evidence of
23
    delusions of petitioner following his arrest communicated to members of his family." The court
24

25          [25]The California Supreme Court in Frye relies heavily on the federal standard for ineffective assistance
26   of counsel as promulgated by the Sixth Amendment of the United States Constitution and the seminal case on
     point, Strickland v. Washington, 466 U.S. 668 (1984). While the court also addresses Petitioner's right to effective
27   assistance of counsel under California law, the decision serves as a reasoned state court opinion addressing
     federal law that shall be reviewed by this Court as required under the AEDPA. See Early v. Packer, 537 U.S. 3,
28   8 (2002).

U.S. District Court
E. D. California                                    -76-

failed to address the other four categories and so its decision did not reach the merits of those categories.

Respondent asserts that the court addressed this issue again in 2008 when it evaluated Petitioner's claim that his plea was involuntary because defense counsel failed to advise him regarding a lesser offense of involuntary manslaughter. (Lodged Doc. 69.) The superior court, in concluding states. "[Defense counsel's] evaluation of his case and his resulting advice and professional guidance is in line with the court's finding. There was no failure on his part." (Id. at 17.) However, the court only addressed whether defense counsel's representation was effective in advising Petitioner to accept the plea, not his representation during the guilt phase of trial. Effectiveness of representation at the plea stage is a separate and independent issue from the issue raised in this claim, i.e., whether defense counsel was ineffective for failing to produce additional evidence of Petitioner's insanity at trial. This Court does not consider the 2008 opinion a reasoned state court decision on this latter issue.

Because of the piecemeal litigation of the habeas petition through several rounds of review in the state court, this Court struggles to determine which state court decision to review. The "AEDPA  generally requires federal courts to review one state decision." Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005). While many decisions refer to more than one decision when incorporated into the decision of the last reasoned decision, that is not the case here. Even after dismissing the 2008 decision as not relevant to the present inquiry, the Court must decide whether to review the 1997 or 2000 superior court decisions.  While many courts hold that the federal court shall review the 'last reasoned decision' of the state court, they usually do so in the context of higher courts reviewing a lower court decision.  It is surmised that only in very strange procedural settings, such as in the present case, would there be separate trial court decisions addressing the same issue. The multiple decisions not only undermine finality of the state court's original determination, they create a great deal of confusion on federal review.

As a resolution, the Court here shall review the decision in the second round of habeas review on the contention that defense counsel failed to present to the expert or the jury

evidence of Petitioner's family members observations of delusion. That decision is further developed than the 1997 superior court decision. However, in the second round of habeas petitions, the court addressed only Petitioner's claim regarding delusions communicated to his family members and not the other four categories of evidence. Thus this Court must rely on the holding from the first round of habeas review which addressed and rejected all of Petitioner's claims as to the other categories of evidence.

In summary, this Court shall determine if the state court decisions involved an unreasonable application of clearly established United States Supreme Court precedent, or an unreasonable determination of facts in light of the evidence pursuant to 28 U.S.C. § 2254(d).

### 3.    Ineffective Assistance of Counsel

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998).  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the Court must consider two factors.  Strickland v. Washington, 466 U.S. 668 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at 687.   The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Strickland, 466 U.S. at 687; see also, Harrington, 131 S. Ct. 770 (2011).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different," Strickland, 466

U.S. at 694. Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. Id. at 687.  The Court must evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1348; United States v. Palomba, 31 F.3d 1456, 1461 (9th Cir. 1994).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. at 697.  Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail. However, there are certain instances which are legally presumed to result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of counsel or where the State has interfered with counsel's assistance. Id. at 692; United States v. Cronic, 466 U.S., at 659, and n.25 (1984).

As the Supreme Court reaffirmed recently in Harrington v. Richter, meeting the standard for ineffective assistance of counsel in federal habeas is extremely difficult:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." Williams, supra, at 410, 120 S. Ct. 1495, 146 L. Ed. 2d 389. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. ___, ___, 129 S. Ct. 1411, 1419, 173 L. Ed. 2d 251, 261 (2009) (internal quotation marks omitted).

Harrington v. Richter, 131 S. Ct. at 785-86.

1   "It bears repeating that even a strong case for relief does not mean the state court's

2   contrary conclusion was unreasonable." <u>Id.</u> at 786. "As amended by AEDPA, § 2254(d) stops

3   short of imposing a complete bar on federal court relitigation of claims already rejected in state

4   proceedings." <u>Id.</u>  "As a condition for obtaining habeas corpus from a federal court, a state

5   prisoner must show that the state court's ruling on the claim being presented in federal court

6   was so lacking in justification that there was an error well understood and comprehended in

7   existing law beyond any possibility for fairminded disagreement." <u>Id.</u> at 786-87.

8        Accordingly, even if Petitioner presents a strong case of ineffective assistance of

9   counsel,  this Court may only grant relief if no fairminded jurist could agree on the correctness

10  of the state court decision.

11            4.      <u>Analysis of Claim</u>

12  _____Petitioner asserts that the failure to present various pieces of evidence during trial by

13  defense counsel amounted to ineffective assistance of counsel.  This court shall analyze the

14  failure to introduce each type of evidence in turn below.

15            a.      Statements of Delusions Made to Family Members

16  _____Petitioner asserts that defense counsel should have presented evidence from

17  Petitioner's mother and Gregory Altounian regarding their communications with Petitioner soon

18  after the offense and that such evidence would have further evidenced his mental condition

19  and delusional thoughts. It appears that defense counsel failed to produce much of this

20  evidence at trial. It is possible that the evidence could have played a beneficial role in

21  Petitioner's defense.  However, as noted by Respondent, the defense experts testified that

22  Petitioner presented a strong case of insanity and the addition of such evidence would not

23  have changed those experts' ultimate conclusions. It is also possible that such information

24  could have been influential if presented to the jury as it reflects Petitioner's mental condition

25  at a time shortly after the offense. However, defense counsel did present significant evidence

26  regarding Petitioner's mental condition. While more evidence could have been presented, the

27  defense's case in chief presented a relatively strong argument that Petitioner was insane at

28  the time of the offense.  The additional evidence would not have significantly changed the

1  opinions of Petitioner's experts, and defense counsel's representation did not fall below an

2  objectively reasonable standard in not presenting the evidence to *his own experts*.

3  _____However, Prof. Morse has stated that if further information had been presented to him,

4  he would have had and testified to a very different opinion regarding Petitioner's sanity at the

5  time of the offense. (See Traverse at 26-33.) In that case all of the psychological experts

6  would have agreed that there was strong evidence Petitioner was insane at the time of the

7  offense. If all the experts presented such evidence, the jury's determination could have been

8  significantly different.  It is possible that a jury could have found Petitioner sane, but to do so

9  it would have had to refute all of the expert's conclusions or find that Petitioner was sane

10 despite suffering from  paranoid schizophrenia at the time of the offense.

11      Prof. Morse's decision not to investigate and interview relevant witnesses is also

12 significant given his ultimate trial conclusion that there was a substantial lack of evidence

13 supporting Petitioner's insanity defense. In electing only limited review, Prof. Morse may have

14 overlooked evidence that would have supported the insanity defense.  Much of the evidence

15 Prof. Morse now asserts significantly changes his opinion is either evidence he stated he had

16 reviewed at trial or evidence he chose not to review based on the "strong contemporaneous

17 evidence" allegedly was presented to him.

18      In his declarations attached to the Petition, Prof. Morse describes several pieces of

19 evidence he was not aware of at trial that would have changed his opinion regarding

20 Petitioner's sanity. First, he states that information from Petitioner's mother and Gregory

21 Altounian regarding conversations with Petitioner in September, 1993, would have changed

22 his opinion. Prof. Morse relies on declarations by Petitioner's mother and Altounian prepared

23 during the appeal process. However, during trial he stated that he had reviewed the testimony

24 of both Altounian and Petitioner's mother, including her log of her conversations with

25 Petitioner. This give the impression that Prof. Morse had reviewed such material before

26 testifying.

27      Further, in Prof. Morse's July 15, 1998 declaration, he also asserts that the declarations

28 of Officer Ward, Bouffard, Lozano, Gregory, and Luce regarding Petitioner's behavior at or

near the time of the offense would have changed his opinion. However, Prof. Morse decided not to interview such witnesses, and defense counsel pointed that out at trial.  (Trial RT at 644-45.)

Arguably, defense counsel could have done more to rebut Prof. Morse's testimony or provide further information to try to change Prof. Morse's opinion.  However, it appears that the prosecution hired Prof. Morse at the last minute and did not provide any advance report of his testimony. (Pet., Ex. M., Smurr Decl. ("Morse prepared no report, nor did he convey his opinion to me verbally prior to his testimony.")) Such disadvantages could surely hinder defense counsel in adequately preparing to meet Prof. Morse's testimony.  Regardless, defense counsel never sought additional time to investigate and prepare to meet Prof. Morse's testimony.  Moreover, the trial transcript suggests that defense counsel was not fully prepared for the prosecution expert; some of his questions undermined his attempts to challenge the testimony of Prof. Morse.

Ultimately, defense counsel did question Prof. Morse regarding his failure to interview witnesses knowledgeable about Petitioner's mental state at or near the time he committed the offense. Prof. Morse admitted that he did not conduct any interviews, but defense counsel did not question him regarding his knowledge of evidence that might have shown Petitioner's insanity at the time of the offense. Since Prof. Morse's opined that there was a lack of evidence that Petitioner was insane at the time of the offense, defense counsel could have undermined that opinion by identifying evidence that did exist and noting Prof. Morse's failure to uncover and examine such evidence.

The state court held that the failure of defense counsel to provide evidence of Petitioner's delusional thoughts was merely cumulative and  "would not have changed the ultimate opinion of any expert witness or the jury..." Unfortunately, such a conclusion does not address the argument, presented in the petitions to the superior courts, that the additional evidence changed the opinion and testimony of Prof. Morse.  The superior court fails to address such arguments and the attached declarations of Prof. Morse. Prof. Morse is an attorney and a distinguished professor of law. His signed declarations, presented to the state

1  court, should be considered trustworthy and of evidentiary value. Nonetheless, the state court

2  failed to address such evidence. Furthermore, the superior court denied an evidentiary hearing

3  with regard to this claim while granting a hearing on others, thereby foreclosing Petitioner's

4  opportunity to present further evidence in support of this claim.

5        It appears that the state court relied on the district attorney's pleading  assertion that

6  the evidence was merely cumulative: "And while Dr. Morse does state that the additional

7  evidence would have strengthened the Petitioner's argument, he also states: 'After considering

8  the evidence presented at trial and the new evidence I have reviewed from the prior and

9  present declarations, I continue to believe that there is evidence consistent with Edwin

10  Gregory's lack of psychosis on September 5. Exhibit S.'" (Lodged Doc. 17, p. 19.) That excerpt

11  incorrectly suggests that Prof. Morse's opinion and testimony did not change based on the new

12  evidence.

13        However, the very same declaration cited by the attorney general, follows the above

14  with Prof. Morse's statement that there is much more credible and substantial evidence of

15  Petitioner's psychosis on the date of the offense and that his testimony would have been

16  generally and substantially different.  Prof. Morse  "[w]ould have acknowledged that the new

17  evidence provided substantial and credible evidence  consistent with the inference that Edwin

18  Gregory was psychotic at the time of the homicide." (Pet, Ex. S, pp. 9-10.) The attorney

19  general, in quoting Prof. Morse out of context, created the impression to the state court that

20  the new evidence would not have had any effect on Prof. Morse's testimony. Petitioner's

21  traverse introduction attempts to bring to the superior court's attention the fact that the new

22  evidence was not cumulative and that Prof. Morse stated in signed declarations that he would

23  have significantly altered his testimony, and that he "would have substantially weakened or not

24  suggested at all various inferences from the evidence that were consistent with Mr. Gregory's

25  lack of psychosis on September 5, 1993." (Lodged Doc. 18 at 4.) Petitioner further stated,

26  "Thus, petitioner has made allegations and submitted declarations which have been ignored

27  and thus effectively uncontested by the People, apart from counsel's unsupported

28  characterizations." (Id. at 5.) Unfortunately, the superior court also ignored Petitioner's

1    allegations and declarations in determining that the additional evidence was merely cumulative

2    and would not affect the opinion of any expert witness or the jury.

3          The adjudication of a state court claim resulting in a decision based on an unreasonable

4    determination of the facts in light of the evidence may form the basis for federal habeas relief

5    under 28 U.S.C. § 2254(d)(2). "If a state court makes evidentiary findings without holding a

6    hearing and giving petitioner an opportunity to present evidence, such findings clearly result

7    in an 'unreasonable determination' of the facts." Taylor v. Maddox, 366 F.3d 992, 1001 (9th

8    Cir. 2004) (Citations omitted). "And, as the Supreme Court noted in Miller-El, the state-court

9    fact-finding process is undermined where the state court has before it, yet apparently ignores,

10   evidence that supports petitioner's claim. Id.; Miller-El v. Cockrell, 537 U.S. 322, 346 (2003).

11         Based on the strong deference given to state court decisions, the unreasonable

12   determination of facts is a "daunting standard – one that will be satisfied in relatively few

13   cases." Taylor, 366 F.3d at 1000. However, "[e]ven in the context of federal habeas, deference

14   does not imply abandonment or abdication of judicial review. Deference does not by definition

15   preclude relief. A federal court can disagree with a state court's credibility determination and,

16   when guided by AEDPA, conclude the decision was unreasonable or that the factual premise

17   was incorrect by clear and convincing evidence." Miller-El, 537 U.S. at 340. Indeed, the

18   Supreme Court and circuits courts including the Ninth Circuit have found the standard met.

19   Taylor, 366 F.3d at 1000.

20         "In making findings, a judge must acknowledge significant portions of the record,

21   particularly where they are inconsistent with the judge's findings. The process of explaining

22   and reconciling seemingly inconsistent parts of the record lays bare the judicial thinking

23   process, enabling a reviewing court to judge the rationality of the fact-finder's reasoning. On

24   occasion, an effort to explain what turns out to be un-explainable will cause the finder of fact

25   to change his mind. By contrast, failure to take into account and reconcile key parts of the

26   record casts doubt on the process by which the finding was reached, and hence on the

27   correctness of the finding." Taylor, 366 F.3d at 1007-1008 (citations omitted).

28   ///

1    The Ninth Circuit has "made clear that a state court unreasonably determines the facts

2 when it 'overlook[s] or ignore[s] evidence [that is] highly probative and central to petitioner's

3 claim.' Evidence is sufficiently 'probative' and 'central' if it is 'sufficient to support petitioner's

4 claim when considered in the context of the full record bearing on the issue presented in the

5 habeas petition.'" Detrich v. Ryan, 619 F.3d 1038, 1059 (9th Cir. 2010), citing Taylor, 366 F.3d

6 at 1001.

7    As described, the state court failed to address Petitioner's arguments and evidence

8 presented in the form of Prof. Morse's signed declarations that his testimony would have been

9 substantially different. As the prosecution's only expert witness, it is certainly plausible that

10 such testimony would affect the decision of the jury. Surely, it is rare to be presented with a

11 situation where an expert witness comes forward to state that he does not believe that his

12 testimony at a criminal trial accurately reflected his opinion when all of the evidence was

13 considered. Since this issue was not developed by the state court, it is not possible to

14 determine if, upon review, the claim is meritorious.

15    Furthermore, *only two months before* the superior court decision denying this claim, this

16 Court, before staying the matter, issued an order granting discovery with regard to this and

17 other claims due to the strong evidence presented by Petitioner in his federal Petition, which

18 was substantially similar to the later filed state petition.  Specifically, with respect to the parties'

19 request for discovery on this claim, this Court stated,

20        Both parties seek discovery on petitioner's first assertion -- that trial
       counsel was ineffective for failing to provide the experts with evidence that
21     petitioner was acting delusional right after the shooting.  Respondent seeks to
       depose Defense Attorney John Smurr,  Defense Attorney Gregory Altounian,
22     Jasmine Gregory, Stephen Morse, Police Officer David Bouffard, Police Officer
       Steven Ward, Police Officer Patrick Lazano, and Dr. Stephen Morse.  Of these
23     individuals Jasmine Gregory, Gregory Altounian, Steven Ward, Patrick Lozano,
       and David Bouffard have submitted declarations stating that petitioner was
24     exhibiting strange behavior when petitioner was arrested and in the days and
       weeks following petitioner's arrest. See Petitioner's Exhibits I, J, V, V, EE, & FF.
25     Dr. Morse has submitted declarations stating that these declarations support
       petitioner's position that he was psychotic at the time of the shooting and Dr.
26     Morse has stated that if he had known this information, he would not have said
       an inference could be made from petitioner's lack of psychotic symptoms during
27     this time.  See Petitioner's Exhibits Q, S & 1.  *Because of the strong support
       these declarations give to petitioner's experts opinions that he was insane at the
28     time of the shooting, petitioner has shown significant evidence that trial counsel*

1   *was ineffective for not finding this information and giving it to the experts before*
2   *or during trial.* (ECF No. 33, May 11, 2000 discovery order, at 15.) (Emphasis added.)

3   This court stands by this decade old reasoning. Petitioner provided significant evidence,

4   to support a claim of ineffective assistance of counsel for failure to present material evidence

5   to experts or the jury. He submitted declarations which included statements from Prof. Morse

6   that the additional evidence would have significantly changed his testimony. Such a claim, at

7   minimum, requires further development. The failure to address the arguments and evidence

8   presented before the state court deprived Petitioner of his opportunity to have his claim

9   faithfully adjudicated before the state court. "The 'state court's failure to consider, or even

10  acknowledge' this highly probative evidence therefore 'casts serious doubt on the state-court

11  fact-finding process and compels the conclusion that the state-court decision [] [was] based

12  on an unreasonable determination of the facts.' <u>Detrich</u>, 619 F.3d at 1059, citing <u>Taylor</u>, 366

13  F.3d at 1005.

14  Here, this Court need not come to a determination as to whether the state courts'

15  determination was contrary to or an unreasonable determination of federal law under 28

16  U.S.C. § 2254(d)(1). The Supreme Court has recently restated that a federal court "must

17  determine what arguments or theories supported or... could have supported, the state court's

18  decision; and then it must ask whether it is possible fairminded jurists could disagree that

19  those arguments or theories are inconsistent with the holding in a prior decision of this Court.

20  <u>Harrington v. Richter</u>, 131 S. Ct. at 786. The Supreme Court in <u>Harrington</u> addressed the

21  issues arising from decisions of state courts that failed to provide a statement of reasons for

22  the denial of the federal claim. In the present case, a reasoned decision exists, and the only

23  reasonable interpretation of the decision evidences that the decision was based on an

24  unreasonable determination of the facts in light of the evidence. As the state court in this case

25  has provided a reasoned decision that fails to address material evidence presented by

26  Petitioner, it is not possible to hypothesize as to what arguments could have supported the

27  decision without rewriting the state court decision.

28  ///

1   The state court's failure to address Petitioner's contentions that the prosecution expert's

2   opinion and testimony would have been significantly more favorable to Petitioner was an

3   unreasonable determination of the facts in light of the evidence. This Court hereby

4   recommends that Petitioner be granted relief for this claim under 28 U.S.C. § 2254(d)(2).

5                    b.    Petitioners Handwritten Notes

6   As stated above, during the September 5, 1993, meeting preceding the shooting,

7   Petitioner took notes. Statements made by the psychological experts in declarations or

8   evidentiary hearings occurring after the trial show that the experts found that the notes did

9   provide further evidence of Petitioner's insanity.

10  Based on the above information, Petitioner's handwritten notes were relevant and

11  potentially beneficial to Petitioner's defense. Defense counsel did mention the notes during

12  trial, but did not provide them to the experts or enter them into evidence. Defense counsel did

13  present significant evidence in support of Petitioner's insanity defense. The notes are only one

14  bit of evidence in support of Petitioner's case. The state court found that "the allegation of fact,

15  even if true, do not support the legal conclusions advanced by petitioner and do not establish

16  grounds for relief."

17  Petitioner has not shown that the trial counsel's performance was so lacking that it fell

18  below an objective level of reasonableness. Defense counsel did present significant evidence

19  to the jury regarding Petitioner's psychiatric problems manifesting themselves before the

20  offense. He also prepared and presented three expert witnesses that testified to Petitioner's

21  insanity at the time of the offense. The experts were well qualified, and provided significant

22  testimony upon which the jury could have relied in determining that Petitioner was insane.

23  Under Strickland, the question is whether counsel's representation fell below an

24  objective standard of reasonableness. "The first prong -- constitutional deficiency -- is

25  necessarily linked to the practice and expectations of the legal community: 'The proper

26  measure of attorney performance remains simply reasonableness under prevailing

27  professional norms.' Padilla v. Kentucky, 130 S. Ct. 1473, 1482 (2010). Here, defense counsel

28  presented three experts regarding Petitioner's insanity and also presented testimony of

Petitioner's parents and uncle regarding his mental state. While trial counsel could have done more and could have presented Petitioner's handwritten notes to the defense and prosecution experts and the jury, it is unlikely that his failure to do so would make reasonable jurists believe his representation fell below an objectively reasonable level. Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 687; see also Harrington, 131 S. Ct. 770.

This Court must only determine if the state court's determination was an unreasonable application of clearly established federal Law.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington, 131 S. Ct. at 786. In this case, the state court found that "the allegation of fact, even if true, do not support the legal conclusions advanced by petitioner and do not establish grounds for relief." Even though many fairminded jurists might find that the evidence might have strengthened Petitioner's case, certainly another fairminded jurist might disagree and find such evidence would have been merely cumulative and of little additional assistance to Petitioner's case.  As fairminded jurists could disagree regarding the state court's determination, Petitioner is not entitled to relief as to this claim.

c.     Evidence that the Business Meeting was Positive

In the present case, defense counsel was attempting to illustrate Petitioner's insanity and show that he killed the victim based on his mental condition and delusions, not instigation or act of the victim. While defense counsel did not focus on such evidence, he did present testimony on behalf of Petitioner's father that the meeting went "very well," and the prosecution did not present any contrary evidence. (Trial RT 113-114, 118.) Additional information could have been presented regarding how well the meeting went. But reasonable jurists could differ as to whether such information would have been merely cumulative. Accordingly, this Court does not recommend relief be granted based on the failure to provide additional evidence.

///

///

1          d.      Evidence from Law Enforcement Officers

2          Petitioner asserts that the testimony of law enforcement officers who observed

3   Petitioner at the time of the offense would have strengthened his insanity defense.

4   Declarations from the law enforcement officers did indicate that Petitioner was behaving

5   abnormally. However, these statements were not entirely positive for Petitioner. Some of the

6   officers felt that Petitioner's behavior did not indicate a mental problem.

7          Once again, reasonable jurists could consider this evidence cumulative and/or

8   equivocal.  Much discretion must be given to defense counsel in deciding whether to present

9   such evidence. Defense counsel's conduct did not fall below that of a reasonable attorney.

10  The state court's determination that defense counsel effectively assisted Petitioner on this

11  claim is not an unreasonable application of federal law.  Accordingly, this Court recommends

12  that Petitioner be denied relief on this ground.

13          e.      Evidence that Jail Nurse Ybarra Overstated His Observations of
                    Petitioner

14         Petitioner asserts that defense counsel was ineffective in failing to investigate whether

15  jail nurse, Stacey Ybarra, overstated his contact with Petitioner.  As with the other categories

16  of evidence, it is possible that Petitioner's case would have been strengthened  had defense

17  counsel rebutted the testimony of Ybarra. There is no reason why defense counsel could not

18  have done so.   However, as noted, defense counsel presented significant evidence in

19  Petitioner's defense. Deference must be given to his decision not to make such arguments.

20  The state court's determination that the allegation, does not support the legal conclusions

21  advanced by Petitioner is not an unreasonable application of federal law. Relief should not be

22  granted on this ground.

23  **D.    Ground Four - Ineffective Assistance of Counsel; Failure to Rebut
        Testimony of Professor Morse**

24         Petitioner's fourth claim is that defense counsel proved ineffective insofar as he failed

25  to investigate and rebut the testimony of the prosecution's only expert witness, Prof. Morse.

26          1.      Factual Background

27         In rebuttal to the three defense experts who testified as to Petitioner's insanity, the

28  prosecution presented only one expert, Prof. Morse who argued that there was a lack of

evidence of insanity. Prof. Morse was retained as an expert shortly before trial. Defense counsel may have not properly prepared for his cross-examination. The challenge was greater because Prof. Morse failed to provide any opinion or report to defense counsel prior to trial. (Am. Pet., Ex. M, Smurr Decl. at 3-4.)

Defense counsel cross-examined Prof. Morse and elicited evidence favorable to defendant, specifically, Prof. Morse's refusal to interview material witnesses or review readily available evidence. (Reporter's Transcript 644-45.) On the other hand, some defense inquiries were likely detrimental to Petitioner's case. For instance, defense counsel started his cross examination by asking Prof. Morse if he thought the insanity defense should be eliminated, even though Prof. Morse had written extensively in support of the insanity defense. (Id. at 640-642.) Furthermore, defense counsel declined the offers of Dr. Mills, one of Petitioner's experts, to review Prof. Morse's testimony and prepare responses. (See Am. Pet., Ex. O, Mills Decl.) Dr. Mills asserts that he would have suggested potential rebuttal topics to show Prof. Morse's approach to forensic psychology was unorthodox, that he made unwarranted inferences from the absence of evidence, that he failed to review critical evidence, and that he was primarily a scholar and teacher and lacked clinical experience. (Id.)

Defense counsel claims that his failure to challenge Prof. Morse's testimony was one of strategy. He reasoned that the evidence presented in the defense's case in chief was sufficient to convince a jury that Petitioner was insane at the time of the incident. In his March 17, 1997 declaration, defense counsel states, "After Morse testified, I did not prepare or present any rebuttal testimony, believing it was not necessary in light of the defense psychiatric testimony. I did not confer with Dr. Mills or any of the defense experts after Professor Morse's testimony regarding potential rebuttal evidence. I had been in touch with Dr. Mills by telephone after his testimony." (Am. Pet., Ex. M., Smurr Decl.)

2.   State Review of the Claim

Petitioner presented this claim to the Tulare County Superior Court in his first round of habeas review. (Lodged Doc. 6. at 44-52.) His petition was summarily denied by the Tulare County Superior Court and the California Supreme Court. (Lodged Docs. 7, 12.) The claim

1   was again presented to the state courts in Petitioner's second round of habeas review and

2   was denied because already adjudicated in the first habeas proceeding. (Lodged Docs. 14,

3   16.)

4          Under Ninth Circuit precedent, the California Supreme Court's summary denial of the

5   petition for writ of habeas corpus constitutes a decision on the merits of his federal claim. See

6   Pinholster v. Ayers, 590 F.3d 651, 663 (9th Cir. 2009) (citing Hunter v. Aispuro, 982 F.2d 344,

7   347-48 (9th Cir. 1992)); Gaston v. Palmer, 417 F.3d 1030, 1038 (9th Cir. 2005) (recognizing

8   that "[w]e construe 'postcard' denials such as these to be decisions on the merits" (citing

9   Hunter, 982 F.2d at 348)).

10         In situations where the state court provides no rationale for its decision denying habeas

11  relief on the merits, we "perform an 'independent review of the record' to ascertain whether the

12  state court decision was objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853

13  (9th Cir. 2003) (quoting Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000)); see also Cooper

14  v. Brown, 510 F.3d 870, 921 (9th Cir. 2007); Lewis v. Mayle, 391 F.3d at 996. "Where a state

15  court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must

16  be met by showing there was no reasonable basis for the state court to deny relief."

17  Harrington, 131 S. Ct. at 784. "When a federal claim has been presented to a state court and

18  the state court has denied relief, it may be presumed that the state court adjudicated the claim

19  on the merits in the absence of any indication or state-law procedural principles to the

20  contrary." Id. at 784-85. "Under § 2254(d), a habeas court must determine what arguments

21  or theories... could have supported[] the state court's decision; and then it must ask whether

22  it is possible fairminded jurists could disagree that those arguments or theories are

23  inconsistent with the holding in a prior decision of this Court. Id. at 786.

24                    3.    Ineffective Assistance of Counsel

25         The law governing ineffective assistance of counsel has been recited above. See supra,

26  III(C)(3); Strickland v. Washington, 466 U.S. 668; Harrington, 131 S. Ct. 770.

27  ///

28  ///

4.    Analysis of Claim

We examine Petitioner's claim that defense counsel's failure to investigate and rebut the testimony of Prof. Morse amounted to ineffective assistance of counsel: first, it is noted that defense counsel did cross-examine Prof. Morse. While not all of his questions weakened Prof. Morse's testimony, some were likely effective including his questions regarding Prof. Morse's failure to review available evidence and interview witnesses. Certainly, as in nearly every case, defense counsel could have done more. It is not clear why he did not consult with Dr. Mills on possible rebuttal topics. The need to present the strongest case possible was evident from the reported history of cases in the county where multiple experts had testified that the defendant was insane and yet the jury found otherwise. (Am. Pet., Ex. H at 6.) Moreover, by relying on the insanity defense, defense counsel knew that if it failed, Petitioner would be sentenced to prison. Thus, it is difficult to understand defense counsel's decision not to investigate and present further rebuttal of Prof. Morse's testimony.

Defense counsel did not feel it necessary to prepare rebuttal testimony given the evidence presented by defense experts.  (Am. Pet., Ex. M., Smurr Decl.) " [T]he standard for judging counsel's representation is a most deferential one." Harrington, 131 S. Ct. at 788. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome  the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689  (Citations omitted). Counsel does not fall below an objective standard of reasonableness if he presents a "reasonable trial strategy, albeit one subject to criticism and after-the-fact second-guessing." Davis v. Woodford, 384 F.3d 628, 642 (9th Cir. 2004). This is just such a case. Defense counsel did not throughly investigate or prepare to rebut the testimony of Prof. Morse. Counsel did not accept willing and readily available assistance from a defense expert ready in developing and preparing rebuttal testimony. Further, counsel was well aware that insanity verdicts were difficult, if not impossible, to obtain in Tulare County. Despite such concerns, counsel felt comfortable resting on the testimony of the defense experts. It is difficult to understand why defense counsel did not take a "no stone

left unturned" approach in such a case, and why instead rested the case, on the testimony presented by the defense experts.

In summary, defense counsel did present significant evidence to the jury regarding Petitioner's mental state and possible insanity. He could have done more. One can only speculate as to whether that "more" might have provided a different outcome.

Regardless, the highly deferential standard for evaluating ineffective assistance of counsel claims and the deference to the state court decision, compels the conclusion that defense counsel's performance did not fall below the standard of reasonableness. The state court decision denying this claim was not an unreasonable determination of clearly established federal law. Petitioner's claim must be denied.

**E.    Ground Five - Ineffective Assistance of Counsel In Failing to Move for Change of Venue**

Petitioner's fifth claim is that he was deprived of the effective assistance of counsel because trial counsel failed to move for a change of venue and that it was not possible to obtain a fair jury trial on insanity in Tulare County.

1.    Factual Background

On April 29, 1994, a pre-trial conference was held before the Tulare County Superior Court. (Lodged Doc. H.) During the conference, the judge discussed the difficulty presenting insanity cases to juries, and said he had never seen a jury in Tulare County find a defendant insane. (Id.) The district attorney would not agree to a court trial. Nevertheless, Petitioner entered a no contest plea to second degree murder, submitted to a jury trial on sanity, and was found sane.

At no time did trial counsel seek a change of venue.  In a declaration, he states, "I considered the possibility of moving for a change of venue, but did not believe that there were legal grounds for doing so, and therefore refrained from making a motion." (Am. Pet., Ex. M at 3.)

2.    State Review of the Claim

Petitioner presented this claim to the superior court in his first round of habeas review. (Lodged Doc. 6. at 24-26.) The petition was summarily denied by the superior court and the

1   California Supreme Court. (Lodged Docs. 7, 12.) The claim was  again presented to the state

2   courts in Petitioner's second round of habeas review and was denied as having been

3   adjudicated in the first habeas proceeding. (Lodged Docs. 14, 16.)

4          "Under § 2254(d), a habeas court must determine what arguments or theories... could

5   have supported[] the state court's decision; and then it must ask whether it is possible

6   fairminded jurists could disagree that those arguments or theories are inconsistent with the

7   holding in a prior decision of [the Supreme Court]." Harrington, 131 S. Ct. at 786.

8                    3.      Change of Venue

9          California law requires a change of venue when the defendant demonstrates a

10  reasonable likelihood that a fair trial cannot be held in the county. People v. Prince, 40 Cal.

11  4th 1179, 1213 (2007) (citing Cal. Penal Code § 1033; People v. Vieira, 35 Cal. 4th 264,

12  278–279 (2005)). "The factors to be considered are the nature and gravity of the offense, the

13  nature and extent of the news coverage, the size of the community, the status of the defendant

14  in the community, and the popularity and prominence of the victim." Id. As described by the

15  California Supreme Court, the inquiry focuses on whether the knowledge of the jurors, usually

16  based on publicity, prevents the jury from making an impartial decision. While other factors are

17  relevant, they relate to the potential bias of the public.  See People v. Jennings, 53 Cal. 3d

18  334, 363 (1991) ("The key is whether it can be shown that the population is of such a size that

19  it 'neutralizes or dilutes the impact of adverse publicity.'") In People v. Vieira, the California

20  Supreme Court discussed in detail factors leading to affirmation of judgment in which the lower

21  court denied plaintiff's motion for change of venue.  35 Cal. 4th 264, 282-83 (2005). These

22  factors included the amount of publicity, such as "a flurry of publicity around the time of the

23  murders," and the status of the victim and defendant (the victim was white from a prominent

24  family in the community, and the defendant was African-American and not from the county in

25  which less than one percent of the population was African-American). Id. at 283.

26         The federal standard for an impartial jury under the Sixth Amendment relies on

27  substantially the same factors. See Skilling v. United States, 130 S.Ct. 2896, 2912-2917

28  (2010).

1          4.      Analysis of Claim

2          Here, Petitioner does not claim that trial counsel should have moved to change venue

3    because of negative publicity, but instead because jurors in Tulare County were reportedly

4    adverse to insanity verdicts. This distinction is very important.  Negative publicity creates a

5    bias toward a specific defendant. Here Petitioner is asserting that Tulare  County jurors are

6    biased against a legal theory of defense, not specifically against Petitioner.

7          Petitioner has not identified any legal authority authorizing change of venue in such a

8    case. Moreover his sole basis for alleging bias is the statement from the judge and the fact

9    that apparently neither the judge, defense counsel, or the attorney general was aware of a

10   successful insanity defense in Tulare County. It is possible that Tulare County is more

11   conservative than other counties in California in entertaining such a defense. However, such

12   a characteristic does not make such jurors biased or  prejudiced. Respondent has cited to

13   articles documenting a general bias against insanity defenses and reporting that the defense

14   is rarely used, and even more rarely successful. (Answer at 84-85, n. 50.) Petitioner does not

15   dispute the general antagonism to the insanity defense. Petitioner cites no research studies,

16   polls, or  surveys to show that Tulare County jurors are less likely to find a defendant insane,

17   evidence routinely used when attempting to show juror bias based on negative publicity. See

18   People v. Proctor, 4 Cal.4th 499, 524 (1992). Petitioner has not provided any evidence that

19   the actual members of the jury in his case were biased.

20         Petitioner acknowledges that this claim is not based on the bias of the jury, and

21   distinguishes People v. Howard on such grounds. 1 Cal.4th 1132, 1167 (1992) (Describing

22   how the moderate population size of Tulare County does not substantially weigh in favor of

23   a change of venue based on negative publicity.). Instead, Petitioner asserts that a legal

24   defense, insanity, and the aversion of potential jurors in Tulare County to the defense should

25   entitle Petitioner to a change of venue.

26         If this were a valid basis for changing venue, every defendant could obtain such

27   extraordinary relief in Tulare County by raising an insanity defense, whether viable or not.

28   Moreover, changes of venue are rarely granted, and without extensive briefing and tangible

evidence of a county-wide bias against the insanity defense, it is not likely that Petitioner could succeed with this novel legal theory.

Defense counsel, in his declaration, states that his reason for not moving for a change of venue was that he did not believe that there was a legal basis to do so. (Am. Pet., Ex. M at 3.)  Defense  counsel's assertion is reasonable as there was no clear legal theory on which to base such a motion. Moreover, judicial scrutiny of counsel's performance is highly deferential. Harrington, 131 S. Ct. at 788. Similarly, a Federal court's review of the state court decision is granted deference.  Id. at 785. ("A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.")

As a federal court reviewing this claim under the AEDPA, we must determine if the state court's determination was an unreasonable determination or contrary to federal law. Petitioner's claim is asserted as a claim of ineffective assistance of counsel. The standard for review of ineffective assistance of counsel under Strickland and Harrington therefore applies. 466 U.S. 668; 131 S. Ct. 770. Here, Petitioner has not shown that trial counsel's failure to bring a motion to change venue based on an untried legal theory fell below an objective standard of reasonableness or that there is a reasonable probability that such a motion would have been successful and the result different. While the state court judgment does not provide reasoning for its denial of this claim, this Court must assume its reasoning and determine if the same was an unreasonable determination of Federal law. Harrington, 131 S. Ct. at 786. Here, fairminded jurists would disagree as to the correctness of the state court determination. This Court recommends that Petitioner not be entitled to relief on this claim.

**F.    Ground Six - The Trial Court's Failure to Sua Sponte Order a Change of Venue Violates Due Process**

Petitioner's sixth claim is that he was deprived of due process based on the trial court's failure to sua sponte order a change of venue.

**1.    Factual Background**

As discussed above, the superior court judge discussed the difficulty presenting insanity cases to juries and said he did not believe a Tulare County jury had ever found a defendant

insane. Regardless, Petitioner plead guilty to second degree murder and relied on presenting an insanity defense to a jury. At no time did trial counsel or the superior court discuss changing venue.

During vior dire of the jurors, the court and counsel made it clear that the case did not involve a determination of guilt, but instead involved a determination of Petitioner's sanity. (See Reporter's Transcript, May 23, 1994.) The jurors were asked several questions regarding whether they would be able to make an unbiased decision regarding Petitioner's sanity.  The jurors responded that they could. (Id.)

### 2. State Review of the Claim

Petitioner presented this claim to the superior court in his first round of habeas review. (Lodged Doc. 6. at 26-28.) The petition was summarily denied by the superior court and the California Supreme Court. (Lodged Docs. 7, 12.) The claim was  again presented to the state courts in Petitioner's second round of habeas review and denied based on being already adjudicated in the first habeas proceeding. (Lodged Dos. 14, 16.)

### 3. Petitioner's Claim is Barred Under Teague v. Lane

Pursuant to the AEDPA, federal habeas relief from a state court judgment will be granted when a petitioner demonstrates the state court's adjudication of the claim on its merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). In other words, it mus be shown that the state court applied a legal rule which contradicts a prior United States Supreme Court holding. Ramdass v. Angelone, 530 U.S. 156, 165-66,(2000) (citing Williams, 529 U.S. 362). Relief is also appropriate "if, under clearly established federal law, a state court has been unreasonable in applying the governing legal principle to the facts of the case." Id.

In Williams, the Court announced the "clearly established federal law" standard of § 2254(d)(1) is the equivalent of the "old rule" standard under Teague v. Lane:

> In Teague v. Lane, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989), we held that the petitioner was not entitled to federal habeas relief because he was relying on a rule of federal law that had not been announced

1
2
3
4
5

> until after his state conviction became final. The anti-retroactivity rule recognized in <u>Teague</u>, which prohibits reliance on "new rules," is the functional equivalent of a statutory provision commanding exclusive reliance on "clearly established law." Because there is no reason to believe that Congress intended to require federal courts to ask both whether a rule sought on habeas is "new" under <u>Teague</u> -- which remains the law -- and also whether it is "clearly established" under AEDPA, it seems safe to assume that Congress had congruent concepts in mind. It is perfectly clear that AEDPA codifies <u>Teague</u> to the extent that <u>Teague</u> requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state conviction became final.

6

<u>Williams</u>, 529 U.S. at 379.

7
8
9
10
11
12
13
14
15
16
17
18
19
20

The Supreme Court further observed a rule is "old" or, in other words, a law is clearly established under <u>Teague</u>, if it was "dictated by precedent existing at the time the defendant's conviction became final." <u>Williams</u>, 529 U.S. at 381 (citing <u>Teague</u>, 489 U.S. at 301). In contrast, a rule that "breaks new ground or imposes a new obligation on the States or the Federal Government," is a "new rule," and in this context, would not be a "clearly established" law. <u>Williams</u> confirmed the principle that "apart from the Supreme Court, federal habeas courts ought not act as innovators in the field of criminal procedure, thereby upsetting state convictions because state courts were not prescient and thus failed to comply with federal law that did not exist at the time they ruled." <u>O'Brien v. Dubois</u>, 145 F.3d 16, 23 (1st Cir. 1998) (overruled on other grounds by <u>McCambridge v. Hall</u>, 303 F.3d 24 (1st Cir. 2002). Thus, under section 2254(d)(1), the threshold question for a reviewing court is whether the rule of law a petitioner seeks to apply "was clearly established at the time his state court conviction became final." <u>Williams</u>, 529 U.S. at 390.

21
22
23
24
25
26
27
28

Here, there is no United States Supreme Court precedent requiring states to provide the procedural safeguard advocated by Petitioner, i.e., a sua sponte order changing venue based on bias to the insanity defense. Further, circuit courts that have addressed the issue of a court's duty to sua sponte order a change of venue have held that no such precedent exists. <u>See</u> <u>United States v. Reveron Martinez</u>, 836 F.2d 684, 687 (1st Cir. 1988) ("[Petitioner] offers no authority for the novel proposition that the district court erred by not acting sua sponte and directing the parties to focus on a change of venue. There is no such precedent, we suspect, because there is no such duty."); <u>United States v. Martin</u>, 63 F.3d 1422, 1431 (7th

1   Cir. 1995) ("[W]e find it difficult to envision a scenario under which a district court would

2   commit reversible error in neglecting to change venue on its own initiative.").

3       Petitioner relies on California Penal Code section 1044, which grants the judge general

4   authority to control proceedings, evidence, and arguments. See Cal. Penal Code § 1044 ("It

5   shall be the duty of the judge to control all proceedings during the trial, and to limit the

6   introduction of evidence and the argument of counsel to relevant and material matters, with

7   a view to the expeditious and effective ascertainment of the truth regarding the matters

8   involved.") Petitioner also relies on Hicks v. Oklahoma, 447 U.S. 343 (1980), to assert that a

9   denial of a state-conferred right is a denial of federal due process. However, in Hicks, the

10  Supreme Court found a deprivation of due process when a jury was unable to exercise its

11  discretion in sentencing as required by state law.  Here, Petitioner argues that a much more

12  general state statute granting discretion to properly conduct a trial creates a duty by the judge

13  to sua sponte change venue. This Court does not believe that California Penal Code Section

14  1044 stands for such a proposition, and Petitioner has not shown a clearly established federal

15  law requires the state court to sua sponte order a change of venue.  As Petitioner has not

16  presented the Court with a claim based on a clearly established federal law, any such law

17  would be considered a new rule of law and barred under Teague v. Lane, 489 U.S. 288. Thus,

18  the California Supreme Court's denial of relief on Petitioner's sixth claim was not contrary to,

19  nor an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d). This

20  court recommends that this claim for federal habeas relief be denied.

21   **G.   Ground Seven - Petitioner's Due Process Rights Were Violated By Taking
         Petitioner's Plea and Conducting Trial While Incompetent**

22       Petitioner's seventh claim is that his due process was violated when his plea was taken,

23  and the trial conducted, while Petitioner was incompetent to proceed under Godinez v. Moran,

24  509 U.S. at 396.

25       1.   Factual Background

26       Petitioner's mental state was of concern from the time of the offense through trial.  Prior

27  to his plea, Petitioner was diagnosed with paranoid schizophrenia, found incompetent to stand

trial and sent to Atascadero State Hospital for treatment. Petitioner was released from the care of the state hospital after appropriate medications were prescribed. Upon release, professionals warned that Petitioner's mental state could decompensate if he were placed in a stressful environment such as jail.

Nevertheless, Petitioner was found minimally competent to stand trial. Significant testimony regarding Petitioner's confusion and apparent lack of understanding of the plea proceedings indicates that Petitioner's competency at the time of the plea clearly could be called into question.

<u>2.    State Review of the Claim</u>

Despite presenting several claims to the state courts regarding Petitioner's mental state, (specifically, alleging that Petitioner's plea was not knowing or voluntary), it does not appear he presented claims regarding his competency to the California state courts. Petitioner did not attempt to argue competence until the fourth round of state habeas review.

a.    First Round of State Habeas Review

In his first state court petition, Petitioner alleged ten claims. Petitioner's sixth claim alleged that his guilty plea was involuntary because of the combined effects of his mental disease, the medication he was administered, and his lack of knowledge. (Lodged Doc. 6.) While focused on Petitioner's mental state, the claim did not specifically address Petitioner's competency. In summarizing the claim, Petitioner asserts he "was thus rendered psychiatrically incapable of entering a voluntary plea to second degree murder, and was factually ignorant of critical information which equally vitiated the voluntariness of the plea." (Id.) While only a subtle difference, Petitioner chose to state that he was "incapable" rather than "incompetent" to voluntarily plea.

Petitioner did not include a competency claim in his original federal habeas proceeding filed with this court on December 22, 1998. (Pet.)

b.    Second Round of State Habeas Review

In the second round of state habeas review Petitioner again asserted that the plea was not voluntary and that his medication and mental illness rendered him "incapable" of

1  understanding his attorney's advise and the court's admonitions. (Lodged Doc. 14 at 16.)

2  However, Petitioner's claim relied heavily on the Ninth Circuit decision, Miles v. Stainer,108

3  F.3d 1109 (9th Cir. 1997). In Miles, the Ninth Circuit discussed the standard regarding mental

4  competency to stand trial. Id. The court relied upon relevant Supreme Court authority

5  regarding competence. Id. at 1112 (citing Dusky, 362 U.S. 402; Godinez, 509 U.S. at 396.).

6  The Miles court also discussed and relied on Supreme Court authority in asserting that a

7  petitioner does not waive the right to a competency hearing even if defense counsel opines

8  that the petitioner is competent or counsel fails to raise the issue of competency. Id. at 1113

9  (citing Drope, 420 U.S. at 180;  Pate v. Robinson, 383 U.S. 375, 385 (1966).).

10      While Petitioner relied on Miles v. Stainer in his second state habeas opinion, he never

11  explicitly alleged that he was not competent to stand trial. (Lodged Doc. 14 at 16-22.) The

12  petition does explain that Petitioner "failed to understand the proceedings," that he  was

13  "rendered [...] incapable of understanding his attorney's advice," that "petitioner was so

14  mentally confounded that he could not follow the advice or explanations given to him by

15  defense counsel during a conversation in the court holding cell, and was similarly befuddled

16  when the trial court was examining him in open court." (Id.)

17      In response to Petitioner's second habeas petition, the superior court ordered

18  Respondent to file a return addressing why Petitioner was not entitled to relief as to claim six.

19  (Order, Lodged Doc. 16.) Respondent's return addressed the issue of Petitioner's competence

20  to plead guilty. (Return, Lodged Doc. 17.) Respondent argued that the standard for

21  competence to plead guilty is the same standard as competence to stand trial, and that

22  medical experts, Petitioner's attorney, and the court found Petitioner competent to stand trial

23  at the plea proceeding. (Id. at 6-7.)

24      In his traverse, Petitioner addressed Respondent's contention that he was competent

25  to stand trial and plea guilty as follows:

26          Ignoring the two component[s] (sic) of a valid guilty plea, the People focus
           only on the first issue of capacity and ask rhetorically, "How can the petitioner
27          now claim he was mentally not competent to enter a plea when the legal
           standard necessary to do so is the same standard which is required to be
28          competent to stand trial?" Return, p. 7. The short answer is that irrespective of

1
2
3
4
5
6
7
8

competency, which was erratic and episodic following petitioner's return to Tulare County from Atascadero, a host of factors contributed to petitioner's lack of understanding of the consequences of his plea. First and foremost, he was severely impaired by the continuing ravages of schizophrenia well after his return from Atascadero. Indeed, Dr. Pitts' first effort to examine petitioner pursuant to the Penal Code section 1026 appointment on March 2, 1994 (after petitioner's return from Atascadero) revealed petitioner's complete deterioration into psychosis. Dr. Pitts stated that "Edwin Mark Gregory's mental status of the exam at the present time precludes him from being able to cooperate with the defense in any rational way" and that petitioner "at the present time is not only psychotic, but there is a very likely hood [sic] that he is suffering from toxic side effects of the psychotropic medications that he appears to be receiving at the present time," rendering him "completely incapable of participating in any legal procedure at the present time." exhibit KK, p. 3.

9
10
11

Petitioner cycled in and out of basic competency throughout the duration of the Tulare County proceedings, and through the next few years, depending on his relations to medications, depending on mishaps in the administration of medication by the county jail authorities, and depending on the inherently unpredictable course of the disease of schizophrenia.

12
13
14
15
16

*Thus, the crux of petitioner's claim here is not that he was necessarily incompetent to stand trial and thus incompetent to plead guilty on May 16, 1994, but because of all of the disabling and disorienting factors affecting him at that time, first and foremost his mental disease, he did not actually understand the significance of the proceedings and the consequences of his guilty plea. The crux of petitioner's claim is premised on the second prong of Godinez v. Moran, i.e., whether the plea was actually knowing, intelligent, and voluntary, rather than on the incapacity prong.*" (Traverse, Lodged Doc. 8 at 6-7.) (emphasis added.)

17   Due to Petitioner's framing of the argument, the superior court, in granting a order for

18   evidentiary hearing on July 18, 2000, explained that the hearing would resolve the dispute

19   regarding whether Petitioner's plea was voluntary. The court did not state that it would address

20   the issue of Petitioner's competency at the evidentiary hearing. Specifically, the court

21   reasoned,

22
23
24
25
26

Based on the declarations in support of the petition, particularly the declaration of Dr. Mills and Dr. Terrell, there is a reasonable likelihood that petitioner's plea was not voluntary, that due to his mental illness and medication and misadvise with respect to proceedings on his plea of insanity, he was not aware of the consequences of his plea. There is substantial evidence that petitioner's understanding of the plea proceeding was that he would not be committed to prison, that he would be placed in a mental hospital. (Order, Lodged Doc. 19.)

27   After an eight day evidentiary hearing, the superior court granted the habeas petition

28   and found that Petitioner's plea was not knowing, intelligent, and voluntary as Petitioner was

1  not advised of other defenses, and  could not appreciate the defenses he was waiving when

2  he plead no contest to second degree murder. (Lodged Docs. 20-29, Specifically see Lodged

3  Doc. 26 at 882 regarding the court's decision granting habeas corpus petition.) The appellate

4  court reversed the superior court's decision on September 4, 2002, based on the fact that a

5  claim of imperfect self defense based on delusions was not available to Petitioner, and

6  therefore Petitioner's lack of advice on such a defense did not render his plea unknowing,

7  unintelligent, and involuntary. (Lodged Doc. 40.) The California Supreme Court dismissed the

8  petition for review without comment. (Lodged Docs. 41-47.)

9                    c.      Third Round of State Habeas Review

10      After the round of habeas review described above, jurisdiction was restored to the

11  superior court to review Petitioner's remaining claims.  Once more, Petitioner was asked to

12  frame the issues that remained with regard to this claim.  Petitioner again focused on the

13  voluntariness of the plea when filing for summary judgment on December 13, 2005. "Petitioner

14  is not claiming here that he was incompetent under Penal Code § 1368; both Drs. Mills and

15  Terrell described him as severely impaired but 'marginally competent' at the time of the plea.

16  Rather, petitioner's claim is based on the second requirement for a guilty plea, i.e., that he did

17  not actually understand the significance and consequences of the plea." (Mot. for Summary

18  Judgment, Lodged Doc. No. 50 at 5.) Petitioner argued that the plea was involuntary based

19  on Petitioner's mental condition and the effects of medication, rather than his failure to be

20  advised of potential defenses. (Id. at 7.) Again in his reply, Petitioner stated, "Petitioner's claim

21  has always and continues to rest on the lack of 'actual' understanding of the nature and

22  consequences of the plea." (Reply, Lodged Doc. 52 at 2-3.)

23      On May 19, 2006, at the hearing regarding Petitioner's claim, Petitioner again limited

24  his arguments to the voluntariness of the plea, as opposed to competence. (May 19, 2006

25  Transcript, Lodged Doc. 53 at 4.) ("We are not claiming that he was incompetent to proceed

26  at all, but just that his understanding of what was going on was, basic, minimal, and new

27  information was extremely basic for him to assimilate.") Based on the pleadings and testimony,

28  the superior court found the plea involuntary due to Petitioner's mental state.  (Id. at 8-14.)

1    On appeal, the appellate court again reversed the decision and the California Supreme

2    Court denied the petition for review. (Gregory IV, Lodged Doc. 61.)

3                            d.      Fourth Round of State Habeas Review

4    Finally on November 13, 2007, during Petitioner's fourth round of review, he requested

5    that the court determine whether he was incompetent at the time he made his no contest plea.

6    (Lodged Doc. 62 at 3-4, 7-13.) However, in doing so, Petitioner admitted that his prior

7    arguments had focused on the second prong of Godinez, i.e. whether Petitioner's plea was

8    knowing and voluntary. Petitioner stated:

9            The bottom line here is that counsel for petitioner did not explicitly rely on
         the Godinez lack of capacity ground because it seemed superfluous to the
10        readily available and fully supported lack of actual understanding ground. The
         Court of Appeal has taken a different view, and with a heartfelt mea culpa,
11        counsel for petitioner requests that the Court take additional evidence on the
         specific issue not previously focused on, i.e., whether there is a preponderance
12        of the evidence that petitioner was not competent to participate in the
         proceedings of May 16, 1994, and that his plea was therefore invalid and
13        unconstitutional. That nuance of the issue is well within the scope of the habeas
         corpus pleading and the Order of the Evidentiary Hearing." (Id.   at 12.)
14        (emphasis in original.)

15   The superior court declined to allow Petitioner to present the claim. During a hearing

16   on January 11, 2008, the following discussion regarding the issue of Petitioner's competency

17   occurred:

18        MR. MULTHAUP: And with respect to the issue of incompetency as to the other
         crime [sic] of the Godinez, I am –
19
20        THE COURT: You know, Counsel, I believe that you had the opportunity to
         argue that in previous proceedings. You were given that opportunity additionally
21        to make that argument before the Court of Appeals. I am not inclined to revisit
         that issue. I think it's been determined and I am not going to reopen the issue.
22        (Lodged Doc. 65 at 14.)

23   After the hearing, on March 11, 2008, Petitioner filed a writ of mandate with the

     appellate court asking the court to order the superior court to reconsider the competency
24
     claims raised in the fourth round of habeas review. (Lodged Doc. 70.) The court denied the
25
     petition for mandate citing People v. Zany, 164 Cal. 724 (1913). (Lodged Doc. 71.)  Petitioner
26
     then filed a petition for writ of habeas corpus containing the competency claim with the
27
     California Supreme Court. (Lodged Doc. 72.) The California Supreme Court denied the petition
28

1  with a citation to In re Miller, 17 Cal.2d 734 (1941).

2  　　　　In sum, while Petitioner vaguely stated a claim that his plea was unconstitutional in his

3  second habeas petition, he routinely and systematically focused his arguments on whether the

4  plea was knowing and voluntary.  Only after losing two rounds of appeals in the state courts

5  focused on that argument did Petitioner refocus his argument on incompetency to plea. When

6  Petitioner raised the claim in 2008, after nearly ten years of state habeas litigation, the

7  superior court declined to hear the issue. Despite a writ of mandate with the appellate court

8  and a petition for writ of habeas corpus with the California Supreme Court, the claim was never

9  addressed.

10  　　　　　　　3.　　Judicial Estoppel

11  　　　　Respondent argues that Petitioner's seventh claim is barred by the doctrine of judicial

12  estoppel. Judicial estoppel "generally prevents a party from prevailing in one phase of a case

13  on an argument and then relying on a contradictory argument to prevail in another phase."

14  New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (citing Pegram v. Herdrich, 530 U.S. 211,

15  227, n. 8 (2000)). "Where a party assumes a certain position in a legal proceeding, and

16  succeeds in maintaining that position, he may not thereafter, simply because his interests have

17  changed, assume a contrary position, especially if it be to the prejudice of the party who has

18  acquiesced in the position formerly taken by him." Id. (citing Davis v. Wakelee, 156 U.S. 680,

19  689 (1895)). Several factors typically inform the decision whether to apply the doctrine in a

20  particular case: (1) first, a party's later position must be "clearly inconsistent" with its earlier

21  position; (2) second, courts regularly inquire whether the party has succeeded in persuading

22  a court to accept that party's earlier position, so that judicial acceptance of an inconsistent

23  position in a later proceeding would create the perception that either the first or the second

24  court was misled; and (3) third, whether the party seeking to assert an inconsistent position

25  would derive an unfair advantage or impose an unfair detriment on the opposing party if not

26  estopped. Id. at 750-51.

27  ///

28  ///

U.S. District Court
E. D. California

-105-

a.      Clear Inconsistences in Petitioner's Positions

Respondent asserts that during the protracted litigation, Petitioner repeatedly argued he was competent at the time of the plea, but did not knowingly or voluntarily plea to second degree murder.  In support, Respondent references many statements where Petitioner, in an attempt to focus his argument, states that he is not challenging his competency, but limiting his argument to whether the plea was knowing and intelligent.

It is well established under both Federal and California law that a party may plead alternative arguments. See McCalden v. California Library Ass'n, 955 F.2d 1214, 1219 (9th Cir. 1992) ("Our circuit has held that in light of the liberal pleading policy embodied in Rule 8(e)(2) . . . a pleading should not be construed as an admission against another alternative or inconsistent pleading in the same case."); Adams v. Paul, 11 Cal. 4th 583, 593 (1995) ("[A] party may plead in the alternative and may make inconsistent allegations."). Here, it is not clear that Petitioner waived his claim of incompetency to plea by focusing on whether the plea was knowing and voluntary.  While potentially inconsistent, Petitioner had the right to present alternative claims. Petitioner could assert that he was not competent to plea, and, even if he was found competent, that the plea was not knowing and voluntary. Further, it is understandable, and likely necessary, to properly frame his argument, that Petitioner might identify the argument he is *not* focusing on.  For example, in one of Petitioner's pleadings he states "Petitioner is not claiming here that he was incompetent." The use of the word 'here' creates a strong inference that Petitioner's statements are only with respect to that specific argument. This Court is not willing to construe such statements as a clear waiver on behalf of Petitioner of his claim. Such efforts to focus his claim regarding whether the plea was knowing and voluntary by stating that he was not addressing competency are not clearly inconsistent with a claim of incompetence to plea.

b.      Success in Persuading a Court to Accept the Earlier Position

Judicial estoppel prevents a party who prevailed on one ground in a lawsuit to proceed to argue opposite grounds in a subsequent action.  Here, Respondent does not illustrate how Petitioner "prevailed" in showing that he was competent to plea. Petitioner's appellate counsel

1    continuously described the fragility of Petitioner's mental state, and when discussing

2    Petitioner's competence to plea, explained that Petitioner was found "minimally competent"

3    to provide a plea. Petitioner has not claimed competency, much less succeeded in persuading

4    a court to determine his competency. "The purpose of judicial estoppel is 'to protect the courts

5    from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite

6    theories.'" United States v. Hook, 195 F.3d 299, 306 (7th Cir. 1999) (citing Levinson v. United

7    States, 969 F.2d 260, 264 (7th Cir. 1992)). Such is not the case in the present proceeding.

8    The California courts did not address Petitioner's competency in his habeas proceedings.

9    While the courts may have assumed Petitioner was competent to plea to determine if his plea

10   was knowing and voluntary, an assumption for the sake of an argument is not the same as a

11   successful determination on the merits.

12                          c.      Unfair Advantage

13          Again, Respondent has not asserted any grounds upon which Petitioner would derive

14   an unfair advantage if not estopped. Petitioner had a right to assert alternative grounds in his

15   habeas petition. Petitioner still carries the burden of proving his claims. He has not obtained

16   any unfair advantage on other claims by allegedly asserting that he was competent to plea.

17          Petitioner is not barred from presenting this claim based on judicial estoppel.

18                  4.      State Review of Petitioner's Claim

19          Petitioner did not focus on this claim until his fourth round of federal habeas review in

20   November, 2007. The superior court refused to allow Petitioner to present evidence on the

21   claim based on the belief that the claim had been determined and that Petitioner had had the

22   opportunity to bring the claim in previous proceedings. Petitioner had not previously presented

23   the incompetency claim and proceeded to file a writ of mandate asking the appellate court to

24   order the superior court to consider the competency claims. (Lodged Doc. 70.) In the petition

25   for writ of mandate, Petitioner relies on Rose v. Superior Court 81 Cal.App.4th 564, 566

26   (2000), as authority for a California Appellate Court to grant a writ of mandate to direct the

27   lower court to conduct a hearing on a habeas petition. Rose explains that since California

28   Appellate Courts are not equipped to conduct evidentiary hearings, such petitions are often

1   transferred to the trial court. Id. (citing In re Elias 209 Cal. App. 2d 262, 264 (1962) and In re

2   Hillery 202 Cal. App. 2d 293, 294 (1962).) Such orders to show cause before the superior

3   court  act as more than a transfer of the matter to the trial court, the order "institute[s] a

4   proceeding in which issues of fact are to be framed and decided." Id. (citing In re Hochberg,

5   2 Cal. 3d 870, 875 (1970)). In Rose, the Superior Court, upon receiving the order to show

6   cause, summarily denied the case. The appellate court held that the failure to hold an

7   evidentiary hearing "curtail[ed] defendant's right to an evidentiary hearing and due

8   consideration of his habeas corpus petition." Id. at 575. Accordingly, the appellate court issued

9   a writ of mandate commanding the court to hold an evidentiary hearing. Id. at 576.

10      The California Supreme Court has also adopted the reasoning of Rose and required

11   lower courts to hear habeas petitions. See Chen v. Superior Court, 2005 Cal. LEXIS 13798,

12   *1 (2005). In Chen, the California Supreme Court ordered a petition for writ of mandate refiled

13   as a petition of habeas corpus and ordered the Director of the Department of Corrections to

14   show cause before an appellate court why the petition should not be granted. Id.

15      In this case, the Appellate Court denied the petition for mandate citing People v. Zany,

16   164 Cal. 724 (1913).[26] (Lodged Doc. 71.) While a superior court's order denying habeas

17   corpus relief is not appealable, this Court is not aware that such a denial would impact an

18   appellate court's ability to grant a writ of mandate, or issue an order to show cause before the

19   trial court.  Regardless, the petition for mandate was denied, and no evidentiary hearing or

20   briefing occurred on the claim.

21      Finally, when Petitioner presented the claim to the California Supreme Court, it was

22   denied with a citation to In re Miller, 17 Cal.2d 734 (1941). In re Miller holds that a California

23   court shall not review a claim that has been previously adjudicated. However, this claim had

24   not been previously determined by a state court; it does not appear to have been denied on

25

26      [26] The appellate court's reliance on People v. Zany  in a postcard denial creates confusion.  Zany is a
rarely cited California Supreme Court case from 1913. 164 Cal. 724. It appears that the appellate court cites to

27   Zany for the proposition that Petitioner may not appeal a lower court ruling of a habeas petition (as compared to
filing another habeas petition with the higher court).  However, it is unclear if Zany is applicable to a petition for

28   writ of mandate.

the merits. The state supreme court's postcard denial, clearly indicates that the court did not

reach the merits of the claim. <u>See</u> <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002)

("[W]hen it is clear that a state court has not reached the merits of a properly raised issue, we

must review it de novo."). Accordingly, AEDPA deference does not govern our review.

> 5.    Analysis of Petitioner's Competency Claim

"The two cases that set forth the Constitution's  'mental competence' standard, <u>Dusky</u>

<u>v. United States</u>, 362 U.S. 402 (1960), and <u>Drope v. Missouri</u>, 420 U.S. 162 (1975), specify

that the Constitution does not permit the trial of an individual who lacks 'mental competency.'"

<u>Indiana v. Edwards</u>, 554 U.S. 164, 169-170 (2008). <u>Dusky</u> defines the competency standard

as including both (1) "whether" the defendant has "a rational as well as factual understanding

of the proceedings against him" and (2) whether the defendant "has sufficient present ability

to consult with his lawyer with a reasonable degree of rational understanding." 362 U.S. at

402. <u>Drope</u> repeats that standard, stating that it "has long been accepted that a person whose

mental condition is such that he lacks the capacity to understand the nature and object of the

proceedings against him, to consult with counsel, and to assist in preparing his defense may

not be subjected to a trial." 420 U.S. at 171.

Petitioner relies almost exclusively on a July 16, 2008 declaration of Prof. Morse to

support his claim that Petitioner was not competent to plead no contest to second degree

murder. (Lodged Doc. 75, pp. 726-741, Ex. Q of Petitioner's California Supreme Court

Petition.) Prof. Morse's declaration reiterates the factual context of the plea and describes

the conduct and behavior of Petitioner. Based on Petitioner's mental state and behavior, Prof.

Morse believes "there is overwhelming evidence that Edwin Gregory was not able to

understand the plea proceedings and their import and to assist counsel as <u>Godinez v. Moran</u>

requires." (<u>Id.</u> at 11.)

Prof. Morse's declaration, in addition to the state court records and other evidence

presented to the Court are sufficient evidence that Petitioner has presented a potentially

meritorious claim based on competency. Since Petitioner has presented a colorable claim, and

evidence has not been developed in the state court, the claim may warrant an evidentiary

1   hearing to allow the parties to fully brief the issue. See Rule 8, Rules Governing Section 2254

2   Cases. However, as Petitioner is already entitled to relief on other grounds, there is no need

3   to resolve the merits of this claim at this time. This Court recommends that judgment of this

4   claim be reserved and addressed only if relief based on other grounds does not resolve the

5   petition.

6                  6.      Petitioner's Delay in Bringing Competency Claim

7           Petitioner presented his incompetent to plea claim in a petition to the California

8   Supreme Court on September 9, 2008. (Lodged Doc. 76.) The petition was denied with a

9   citation to In re Miller, 17 Cal.2d 734 (1941). In re Miller stands for the procedural bar against

10  a successive claim being heard by a California Court. Petitioner had not previously presented

11  the claim to the California Supreme Court. While the California Supreme Court did not address

12  Petitioner's competency claim on the merits, neither Respondent nor this Court asserts that

13  he failed to exhaust his state remedies. See Ylst v. Nunnemaker, 501 U.S. at 804 n.3 ("Since

14  a later state decision based upon ineligibility for further state review neither rests upon

15  procedural default nor lifts a pre-existing procedural default, its effect on the availability of

16  federal habeas is nil."); Carpenter v. Ayers, 548 F. Supp. 2d 736, 758 (N.D. Cal. 2008); Ayala

17  v. Ayers, 2009 U.S. Dist. LEXIS 48727, 10-11 (S.D. Cal. 2009).

18          Petitioner's delay in brining the  claim may prevent Petitioner from presenting evidence

19  in federal court. Under the AEDPA, if the factual basis of a claim has not been developed in

20  state court, a federal court shall not hold an evidentiary hearing unless certain exceptions

21  apply. Specifically 28 U.S.C. § 2254(e)(2) states,

22          (2) If the applicant has failed to develop the factual basis of a claim in State
            court proceedings, the court shall not hold an evidentiary hearing on the claim
23          unless the applicant shows that–

24              (A) the claim relies on–

25               (I) a new rule of constitutional law, made retroactive to cases on collateral
            review by the Supreme Court, that was previously unavailable; or
26
                 (ii) a factual predicate that could not have been previously discovered
27          through the exercise of due diligence; and

28              (B) the facts underlying the claim would be sufficient to establish by clear

and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

"Those same restrictions apply a fortiori when a prisoner seeks relief based on new evidence without an evidentiary hearing." Holland v. Jackson, 542 U.S. 649, 652-653 (2004). This statutory limitation on the production of evidence is based on the same principles as exhaustion, which require a petitioner to diligently present his claims before state courts so that the state courts have the first opportunity to address such claims. The reasoning was set forth in Williams, 529 U.S. at 436-437:

> It is consistent with these principles [comity, finality, and federalism] to give effect to Congress' intent to avoid unneeded evidentiary hearings in federal habeas corpus, while recognizing the statute does not equate prisoners who exercise diligence in pursuing their claims with those who do not. Principles of exhaustion are premised upon recognition by Congress and the Court that state judiciaries have the duty and competence to vindicate  rights secured by the Constitution in state criminal proceedings. Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law. "Comity . . . dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief." O'Sullivan v. Boerckel, 526 U.S. 838, 844, 144 L. Ed. 2d 1, 119 S. Ct. 1728 (1999). For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met. Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings. Yet comity is not served by saying a prisoner "has failed to develop the factual basis of a claim" where he was unable to develop his claim in state court despite diligent effort. In that circumstance, an evidentiary hearing is not barred by § 2254(e)(2).

Accordingly, Petitioner's competency claim can only be the subject of an evidentiary hearing if Petitioner was not at fault in failing to develop that evidence in state court, or (if he was at fault) the conditions prescribed by § 2254(e)(2) were met. Holland, 542 U.S. at  652.

Should this claim proceed, it must be determined if Petitioner was diligent in presenting his claim.  As described above, the sixth claim of Petitioner's second state habeas petition was sufficiently vague as to potentially state a claim that Petitioner was not competent at the time he entered a plea. However, Petitioner focused the discussion of the issue on the second prong of Godinez, as to whether his plea was knowing and voluntary. While the second state

1  petition was filed in 2000, Petitioner only decided to focus on the competency argument after

2  performing two complete rounds of state habeas review. Accordingly, Petitioner did not focus

3  on the competency issue until late 2007. Such delay may prevent Petitioner from presenting

4  evidence of this claim in federal court. Again, if this claim proceeds, further briefing on this

5  issue may be warranted.

6        **H.    Ground Eight - Cumulative Prejudice of Multiple Errors**

7        Petitioner's eighth claim is that his due process was violated based on the cumulative

8  effects of the errors recited in the previous claims thereby making his trial unfair and violating

9  his due process rights.

10             1.   State Review of the Claim

11        Petitioner presented a claim of cumulative error in his first petition filed with the superior

12  court, filed on April 16, 1997. (Lodged Doc. 6.) The claim was summarily rejected by the

13  superior court and review to the California Supreme Court was summarily denied on

14  December 22, 1998. (Lodged Docs. 7, 12.) Petitioner's claim is exhausted.

15             2.   Analysis

16        "Cumulative error applies where, although no single trial error examined in isolation is

17  sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors has still

18  prejudiced a defendant." Jackson v. Brown, 513 F.3d 1057, 1085 (9th Cir. 2008) (citing

19  Whelchel v. Washington, 232 F.3d 1197, 1212 (9th Cir. 2000)). The court must determine

20  whether the aggregated errors "so infected the trial with unfairness as to make the resulting

21  conviction a denial of due process." Parle v. Runnels, 387 F.3d 1030, 1045 (9th Cir. 2004)

22  (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).

23        The Court has already determined that Petitioner is entitled to relief as Petitioner's plea

24  was not knowing and voluntary. Accordingly, the trial should not have occurred at that time.

25  However, Petitioner has not shown that the cumulation of errors that occurred during trial

26  require federal habeas relief. While trial counsel's conduct may have been lacking, it did not

27  rise to the level required for a finding of ineffective assistance of counsel. The state court's

28  denial of the claim was neither contrary to, nor an unreasonable application of, clearly

1    established Supreme Court law. Williams, 529 U.S. at 412-13. Petitioner is not entitled to relief

2    as to this claim.

3    **V.    APPROPRIATE RELIEF**

4           Here, the Fifth District Court of Appeal's determination that Petitioner's plea was

5    knowing or voluntary was an unreasonable application of clearly established federal law as set

6    forth by the Supreme Court. The decision of the appellate court reversed the 2006 decision

7    of the superior court which found that the plea was involuntary based on Petitioner's mental

8    illness, medication, and misadvice. (Lodged Doc. 53.) The superior court arrived at that

9    decision after reviewing the extensive testimony and evidence presented at an eight day

10   evidentiary hearing before the superior court in 2000.[27]  In short, the state court has already

11   held evidentiary hearings to adduce evidence relevant to the claim. Determinations of state

12   courts regarding factual issues shall be presumed correct. 28 U.S.C. § 2254(e)(1). But for the

13   appellate court reversal based on an unreasonable determination of federal law, Petitioner

14   would have been granted relief on this claim in the state courts.  This Court sees no reason

15   to repeat the efforts of the superior court which determined that Petitioner's plea was not

16   voluntary under Godinez. Based on the period of time that has passed since the events at

17   issue, this Court would stand at a significant, perhaps disabling, disadvantage if it were to

18   attempt to procure evidence more than seventeen years after Petitioner plead no contest to

19   the offense.[28]   Accordingly, it is recommended that the Court adopt the determination of the

20   superior court that Petitioner's plea was not voluntary and find that Petitioner is in custody in

21   violation of the laws of the United States. 28 U.S.C. § 2254(a).

22   _____

23   [27] The evidentiary hearing was held on September 11-14 and 27-28, 2000, and November 3 and 20, 2000.
     (See Lodged Docs. 20-28.) Significant evidence was presented including the testimony of Petitioner, Petitioner's
24   mother, Petitioner's father, Petitioner's brother, Gregory Altounian, Dr. Howard Terrell, Dr. Mark Mills, Dr. Miles
     Estner, Ken Clark, Dr. James Pitts, John Smurr (defense counsel), and Robert Bartlett. The court reviewed the
25   record created during the evidentiary hearing in 2000 which also focused on issues regarding whether Petitioner's
     plea was voluntary.

26        [28]It appears from the state record that defense counsel, John Smurr, was unable to testify at a 2008
     evidentiary hearing based on a medical condition which may well continue to prevent him from testifying at this
27   time. (Lodged Doc. 67 at 303.)

28

"When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." O'Neal v. McAninch, 513 U.S. 432, 436 (U.S. 1995); Pulido v. Chrones, 629 F.3d 1007, 1012 (9th Cir. 2010). Petitioner's plea was not voluntary. Petitioner may not have agreed to the plea if he possessed the appropriate mental state and relevant information to make a knowing and voluntary plea. The lack of opportunity to make a reasoned decision whether to plea or proceed to trial creates grave doubt as to effect of Petitioner's plea on the outcome of the trial. Such error is not harmless. Brecht v. Abrahamson, 507 U.S. 619, 623 (1993). The result is similar as to when a plea agreement is breached. "Where a plea agreement is breached, the purpose of the remedy is, to the extent possible, to 'repair the harm caused by the breach.'" Buckley v. Terhune, 441 F.3d 688, 699 (9th Cir. 2006). In Santobello v. New York, the Court identified two possible remedies: (1) specific performance of the plea agreement; or (2) recision by permitting Petitioner to withdraw his guilty plea. 404 U.S. 257, 262-263 (1971); see also United States v. Roberts, 5 F.3d 365, 370 (9th Cir. 1993) (recognizing alternative remedies); Buckley, 441 F.3d at 699 (same).

In Santobello, the Supreme Court left it to the state courts to select the appropriate remedy. 404 U.S. at 263. See also Gunn v. Ignacio, 263 F.3d 965, 971 (9th Cir. 2001) (leaving to state court to fashion a remedy after grant of habeas relief on breached plea agreement).

Here, it does not appear possible to impose a specific remedy. Petitioner's plea was not knowing and voluntary, and Petitioner would not necessarily have entered the plea had he understood the terms and ramifications of doing so. As Petitioner may have never entered into the plea agreement, enforcement of the agreement does little to provide Petitioner the opportunity to make an informed decision that should have been made when he entered his plea on May 16, 1994.

The Court is concerned with the extreme amount of time that has passed since Petitioner's plea. Should this Court order Petitioner's plea vacated, the State may be forced to conduct a trial that will no doubt be affected by such delay. Should Petitioner again raise

1  an insanity defense, witnesses would be forced to testify regarding Petitioner's mental state

2  more than seventeen years after they witnessed such events.

3       The Court sees little alternative.  Petitioner's constitutional right to provide a knowing

4  and voluntary plea under <u>Godinez</u> has been violated. Despite any difficulties that Tulare

5  County may face in prosecuting the matter, Petitioner's liberty interest in no longer being

6  confined based on an invalid plea are paramount. Accordingly, the undersigned will

7  recommend that this Court grant relief on Petitioner's second ground of relief by issuing an

8  order directing Petitioner's release unless within thirty days (30) of this Court's judgment the

9  State of California permits Petitioner to withdraw his plea of no contest to second degree

10  murder, vacates his sentence, and proceeds accordingly.  __

11  **VI.**   **CONCLUSION**

12  _____Petitioner has presented eight claims for relief from his sentence of fifteen years to life

13  for his plea to second degree murder in California State court. The undersigned

14  RECOMMENDS that Petitioner's second claim, that his no contest plea was not knowing or

15  voluntary be GRANTED. The undersigned further RECOMMENDS that the Court reserve

16  judgment on whether Petitioner was advised of the consequence of accepting the plea (the

17  third argument of claim two) and whether Petitioner was competent at the time of the plea

18  (Petitioner's seventh claim that was not adjudicated or factually developed by the state courts).

19  Finally, it is RECOMMENDED that the remaining claims of the petition be DENIED with

20  prejudice.

21  **VII.**   **RECOMMENDATION**

22  _____The undersigned hereby RECOMMENDS that the petition be GRANTED with respect

23  to Petitioner's second claim for relief, namely that his no contest plea was invalid as it was not

24  knowingly and voluntarily made. It is further RECOMMENDED that the state court release

25  Petitioner within thirty (30) days unless  the State of California permits Petitioner to withdraw

26  his plea of no contest to second degree murder, vacate his sentence, and proceed

27  accordingly. _____

28       This Findings and Recommendation is submitted to the assigned District Judge,

1   pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty days after being served

2   with the Findings and Recommendation, any party may file written objections with the Court

3   and serve a copy on all parties.   Such a document should be captioned "Objections to

4   Magistrate Judge's Findings and Recommendation."   Any reply to the objections shall be

5   served and filed within ten days after service of the objections.  The parties are advised that

6   failure to file objections within the specified time may waive the right to appeal the District

7   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

8

9

10   IT IS SO ORDERED.

11   Dated:   ___June 7, 2011___                    /s/ *Michael J. Seng*

12                                                         UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

U.S. District Court
E. D. California